# EXHIBIT O

## TNMD DOC 224 — SECOND MOTION TO STAY DISPOSITIVE MOTIONS AND OBTAIN THRESHOLD-FIRST TREATMENT

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **JEFFREY RYAN FENTON,** Plaintiff v. **VIRGINIA LEE STORY ET AL.,** Defendants | **CASE NO. 3:24-cv-01282** |

RECEIVED
MAR 12 2025
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

# SECOND[1] MOTION TO STAY ALL DISPOSITIVE MOTIONS UNTIL SERVICE IS COMPLETED AND THE COURT HAS RULED ON PLAINTIFF'S OUTSTANDING EXPEDITED MOTIONS, WITH CLARIFICATIONS ABOUT HOW TO PROCEED[2]

This testimony and motion is brought pursuant to 28 U.S. Code § 1746; 28 U.S. Code § 455(a), (b)(1); U.S. Const. amend V §§ 1, 5.1, 7.1, 7.9, 9.1, 9.10, 9.4, and amend XIV §§ 1.3, 1.5, 1.6, 1.8.12.3, 1.8.13.1; and F.R.Civ.P. Rule 11(b).

1. This lawsuit exposes *predatory litigation*[3], fraud on the court by officers of the court, real estate deed fraud, and racketeering in Middle Tennessee's courts, along with serious public corruption in the areas of Williamson County, Franklin, Brentwood, and Nashville, Tennessee.

---

[1] A "MOTION TO STAY ALL DISPOSITIVE MOTIONS UNTIL SERVICE IS COMPLETE, A RULING IS MADE ON PLAINTIFF'S "AMENDED MOTION TO REQUIRE ALL FILINGS TO INCLUDE A CERTIFICATION STATING THEIR CONTENTS ARE FACTUALLY TRUE AND COMPLIANT WITH F.R.C.P. RULE 11(B), SWORN TO UNDER THE PENALTY OF PERJURY", AND THIS CASE IS TRANSFERRED TO THE CORRECT VENUE (EXPEDITED CONSIDERATION REQUESTED)" was filed in MIWD on October 21, 2024, in DOC 109, PID 5577-5583. https://rico.jefffenton.com/3-24-cv-01282/doc/109.pdf

[2] This lawsuit was originally filed on October 13, 2023, in the United States District Court for the Western District of Michigan (hereinafter "MIWD") as case no. 1:23-cv-01097. On October 25, 2024, MIWD transferred this lawsuit as ordered in ECF 127 to the United States District Court for the Middle District of Tennessee (hereinafter "TNMD") as case no. 3:24-cv-01282. The language used in the file stamps of each page filed is slightly different between the two courts. MIWD uses the term "ECF No." (which I abbreviate as "ECF"), while in place of that, TNMD uses the term "Document" (which I abbreviate as "DOC"). Both courts use the term "PageID" (which I abbreviate as "PID"). Citations to the court record in this lawsuit will be notated without the case name or number, using the starting DOC/ECF number, followed by both the beginning and ending PID. The Notice of Electronic Filing for this transfer is recorded in TNMD DOC 131, at which point the DOC/ECF number from MIWD was retained and continued, but the PID was reset after DOC 130, PID 5727, to restart at zero.

[3] https://tninjustice.org/predatory-litigation-101/

https://jefffenton.com/predatory-litigation-how-us-courts-were-designed-to-produce-justice-why-they-fail-how-to-restore-justice-again/

2. Prior to moving forward and responding to each individual motion filed by the defendants, I need the court to rule on two of my outstanding motions, to provide me with the accommodations and tools necessary for me to have a fair chance at litigating this matter against the wall of power which I am obviously up against in this lawsuit.

3. This request is not only an attempt to even up the odds a bit technologically, by allowing me ECF filing privileges and remote participation which are essential to me being able to participate with the court in *real time* and respond timely and affordably to any individual pleadings, but it is also critical for the court to clarify their posture toward professional misconduct, dishonesty, and frivolous filings, in hopes of eliminating some of the misconduct which has been prevalent so far between the defendants and their counsel.

4. Good professional and judicial conduct is probably the most critical factor, often even the deciding factor, I believe, between whether the courts produce justice or injustice through their proceedings.

5. It's of critical importance in this matter, at least to my family, that the court doesn't just "go through the motions" common to "legal work" in this case, but that the product produced be real honest justice.

## BACKGROUND

6. On October 21, 2024, I filed a motions in MIWD titled, "MOTION TO STAY ALL DISPOSITIVE MOTIONS UNTIL SERVICE IS COMPLETE, A RULING IS MADE ON PLAINTIFF'S "AMENDED MOTION TO REQUIRE ALL FILINGS TO INCLUDE A CERTIFICATION STATING THEIR CONTENTS ARE FACTUALLY TRUE AND COMPLIANT WITH F.R.C.P. RULE 11(B), SWORN TO UNDER THE PENALTY OF PERJURY", AND THIS CASE IS TRANSFERRED TO THE CORRECT VENUE (EXPEDITED CONSIDERATION REQUESTED)[4]" in DOC 109, PID 5577-5583.

[4] DOC 109, PID 5577-5583 | https://rico.jefffenton.com/3-24-cv-01282/doc/109.pdf

7. Since this time, the case changed venues, being transferred from case # 1:23-cv-01097 in the Western District of Michigan[5] to case # 3:24-cv-01282 in the Middle District of Tennessee[6], after which every federal district and magistrate judge in the Middle District of Tennessee recused themselves[7] from this matter.

8. As of February 10, 2025, a "NOTICE OF JUDGE ASSIGNMENT[8]" was posted in DOC 208, PID 686, stating as follows:

> "All District Judges of the Middle District of Tennessee have recused in this matter. Chief Judge Jeffery S. Sutton of the Sixth Circuit Court of Appeals has designated United States District Judge Patricia A. Gaughan to preside over the case."

9. In the next filing by the court on February 11, 2025, in DOC 209[9], PID 687, the court stated as follows:

> "This matter is hereby forwarded to the pro se staff attorney for initial review.
>
> IT IS SO ORDERED."

10. DOC 209, PID 687 also states in the footnote, "United States District Judge for the Northern District of Ohio, Eastern Division, sitting by designation."

11. I have never heard of a *"pro se staff attorney"*, so I am unclear what this means, or exactly what is expected of me at this juncture.

---

5 DOC 127, PID 5706-5710 | https://rico.jefffenton.com/3-24-cv-01282/doc/127.pdf

6 DOC 131 | https://rico.jefffenton.com/3-24-cv-01282/doc/131.pdf

7 DOC 165, PID 139 | https://rico.jefffenton.com/3-24-cv-01282/doc/165.pdf

8 DOC 208, PID 686 | https://rico.jefffenton.com/3-24-cv-01282/doc/208.pdf

9 DOC 209, PID 687 | https://rico.jefffenton.com/3-24-cv-01282/doc/209.pdf

12. There are two specific motions of mine, which remain outstanding, that I honestly need for the court to hear and rule on, before I will have the tools, orders, and understanding necessary for me to proceed to protect my interests while making the best use of my time and resources along with the court's and the defendant's; so we can quickly dispense with frivolous claims and begin to honestly address the substantial merits of this lawsuit.

13. Those motions are listed below followed by a brief explanation why they are needed in the *interests of justice* before I can proceed. I'm trying to be mindful not to cause unnecessary redundancy in my filings, so for a deeper understanding of the *interests of justice* related to either motion, please reference it directly in the docket.

**MOTIONS NEEDING RULINGS PRIOR TO PROCEEDING**

I. Filed in MIWD on October 10, 2024, "AMENDED MOTION TO REQUIRE ALL FILINGS TO INCLUDE A CERTIFICATION STATING THEIR CONTENTS ARE FACTUALLY TRUE AND COMPLIANT WITH F.R.C.P. RULE 11(B), SWORN TO UNDER THE PENALTY OF PERJURY (EXPEDITED CONSIDERATION REQUESTED)[10]" in DOC 100, 100-1, PID 5343-5374.

a) This motion should weed out the vast majority of frivolous claims and filings presented by the defendants, which is estimated to currently be the majority of the defendant's motions pending before this court.

b) This will significantly reduce the misconduct by the defendants and their counsel, while significantly raising the stakes for that misconduct.

[10] DOC 100, PID 5343-5374 | https://rico.jefffenton.com/evidence/2024-10-08_motion-all-filings-be-under-penalty-of-perjury.pdf

c) This motion compels everyone to tell the **truth** and not play games wasting the court's time with nonsense, which should be important to everyone except bad actors who leverage our courts for purposes **contrary** to the honest interests of justice.

d) This motion should significantly reduce the need to address misconduct in this lawsuit, in order to protect my rights to equal protection and due process.

e) Upon information and belief, without this motion being granted, the defendants and their counsel will likely continue to overwhelm me and my disabilities[11] with frivolous filings[12] requiring I perform substantial **process** within tight deadlines, unjustly exhausting my time, energy, and resources to defend myself and my lawsuit against false, twisted, and fraudulent claims, citing inapplicable case law due to the dishonestly contorted claims and strategic material misrepresentations, which appears to have unfortunately become core to some of the defendant's practices, in stark violation of F.R.Civ.P. Rule 11(b), while simultaneously deprioritizing **merits**, **conduct**, and any real **justice**.

---

[11] DOC 52, PID 4254-4257 | https://rico.jefffenton.com/evidence/tn-ada-disabilities-exploited-for-advantage-ocpd-merck.pdf
DOC 32, PID 3296-3309 | https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-declaration-of-disabilities.pdf
DOC 1-38, PID 2032-2045 | https://rico.jefffenton.com/evidence/2020-07-08_tnsc-coa-ada-request-for-modification.pdf

[12] DOC 101, PID 5375-5390 | https://rico.jefffenton.com/evidence/2024-10-08_counter-affidavit-correcting-storys-false-claims.pdf
DOC 99, PID 5328-5342 | https://rico.jefffenton.com/evidence/2024-10-08_motion-for-sanctions-against-story-for-lying.pdf
DOC 102, PID 5391-5468 | https://rico.jefffenton.com/evidence/2024-10-09_concerns-about-transferring-to-tennessee.pdf
DOC 176, PID 225-233 | https://rico.jefffenton.com/evidence/2024-11-08_fenton-reply-to-storys-opposition-to-sanctions.pdf
https://rico.jefffenton.com/evidence/2025-01-17_email-service-of-elaine-beeler-via-lisa-carson.pdf
DOC 207, PID 583-685 | https://rico.jefffenton.com/evidence/2025-01-20_declaration-explaining-my-pursuit-of-justice.pdf
DOC 211, PID 689-723 | https://rico.jefffenton.com/evidence/2025-02-08_objection-to-dispositive-defendant-motions.pdf
DOC 212, PID 730-907 | https://rico.jefffenton.com/evidence/2025-02-10_tn-motion-to-minimize-or-remove-redactions.pdf
DOC 216, PID 984-1015 | https://rico.jefffenton.com/evidence/2025-02-24_notice-to-all-bar-members.pdf
https://rico.jefffenton.com/evidence/2025-03-03_objection-judicial-misconduct-in-michigan.pdf
DOC 217, 218, 219 | "DECLARATION AND MOTION TO FILE UNDER SEAL REGARDING DEFENDANT WALKER'S CLAIMED PRIVACY CONCERNS RELATED TO HIS HOME ADDRESS"

II. Filed in TNMD on January 21, 2025, "MOTION TO FILE ELECTRONICALLY AND FOR REMOTE PARTICIPATION (EXPEDITED CONSIDERATION REQUESTED)[13]" in DOC 197, 191-1, PID 445-486.

a) Without this I am literally unable to work in *real time* with the court, without receiving some compensation from the defendants—prior to proceeding—for the damages they have continued to cause me[14], because I can't afford the cost of postage while USPS service between Michigan and Tennessee can take up to a week, each way.

b) It costs me roughly $125 - $200 to mail **notice** of each filing to the defendants, while I have zero income, real property, and savings as a direct result[15] of the multiple felony crimes committed against my family by the defendants in this lawsuit.

c) It is substantially more work (sometimes days) and expense for me to print and mail notices to the seventeen different addresses currently necessary for noticing the defendants or their counsel about each and every filing. Further complicated by needing to time, execute, and serve a Certificate of Service for each to both the court and each party.

---

13 https://rico.jefffenton.com/3-24-cv-01282/doc/197.pdf | https://rico.jefffenton.com/3-24-cv-01282/doc/197-1.pdf

14 DOC 99, PID 5328-5342 | https://rico.jefffenton.com/evidence/2024-10-08_motion-for-sanctions-against-story-for-lying.pdf

DOC 217, 218, 219 | "DECLARATION AND MOTION TO FILE UNDER SEAL REGARDING DEFENDANT WALKER'S CLAIMED PRIVACY CONCERNS RELATED TO HIS HOME ADDRESS"

15 DOC 214, PID 911-975 | https://rico.jefffenton.com/evidence/fenton-finances-roles-property-education-support-fraud.pdf

d) Almost all of my documents begin as "true" digitally created full-color PDF documents, with optical character recognition enabled, that could be searched in seconds, many containing electronic bookmarks linked to section headings for fast reference, in addition to embedded electronic indexes. A few of my larger documents, such as my FAC[16], even have a hyperlinked table of contents built-in, making them substantially faster, easier, and more intuitive to navigate, search, and work with in their original digital format.

e) Each filing I must make *without* ECF filing privileges, substantially *reduces* the efficiency and value of each document, while *increasing* the workload for the court clerks along with everyone else who encounters or works with the documents afterwards, as "flat" black and white images without many of the benefits which PDF documents are capable.

f) "The purpose of the Federal Rules of Civil Procedure is "to secure the **just**, **speedy**, and **inexpensive** determination of every action and proceeding[17]"" (emphasis added).

g) Granting this motion would allow me to participate much more fully and timely in this lawsuit (just), significantly increasing the speed of my responses (speedy) and my ability to directly address separate issues (just) without the need to bundle together pleadings to save on postage costs (inexpensive).

---

[16] DOC 66, PID 4870-5007 | https://rico.jefffenton.com/evidence/3-24-cv-01282_fenton-vs-story-first-amended-complaint.pdf

[17] https://www.uscourts.gov/forms-rules/current-rules-practice-procedure/federal-rules-civil-procedure

h) This would also substantially reduce the workload for the court's clerks (speedy & inexpensive) while significantly increasing the **value** of my documents filed (just, speedy, and inexpensive) for both the court and each of the law firms working with those files.

i) The defendants have and continue to literally misappropriate public resources and offices for private and criminal purposes, harming me and my family (along with other members of the public), while protecting the bad actors herein[18].

j) It seems a reasonable request, for the court to allow me the benefit of public resources to improve my *access* to the court and opportunity to *participate* therein, through ECF filing and remote participation. That seems like a very logical, practical, and efficient request, in complete alignment with the Federal Rules of Civil Procedure and truly beneficial to the honest interests of justice.

**REGARDING MY FIRST MOTION TO STAY ALL DISPOSITIVE MOTIONS**

14. Referring back to my first motion to stay all dispositive motions[19], which I filed in MIWD on October 21, 2024, in DOC 109, PID 5578-5579, where I wrote in part:

> "It's almost 3:00 on 10/21/2024, the court closes in an hour and a half, and it is well over a one-hour drive with construction."

[18] DOC 207, PID 583-685 | https://rico.jefffenton.com/evidence/2025-01-20_declaration-explaining-my-pursuit-of-justice.pdf

[19] DOC 109, PID 5577-5583 | https://rico.jefffenton.com/3-24-cv-01282/doc/109.pdf

"I've been awake for so long, that it is not safe for me to drive, but I don't have a choice. Everyone is waiting to dismiss this case for a slew of different reasons, none of which are remotely lawful, equitable, or fair."

"I need time to write a brief to substantiate why I'm asking for this motion to stay all dispositive motions, but I don't have time to write it today" (emphasis added).

"Tomorrow I must print, label, and mail 15 copies of what I'm filing in court today, so I won't have time to drive to the court tomorrow to file my brief, I won't even have time to write it by then."

"I don't have ECF, so I can't file it electronically, while the court doesn't accept faxes, so regardless of justice, I'm out of luck."

"I will do my best to write a brief to support this on Wednesday, and mail it on Thursday, so the court will have more to substantiate my motion with" (emphasis added).

"I physically can't do anymore today, while still having any chance of making it to the court to file this before it closes."

"I'm out of time. The court must protect the honest interests of justice, and whether I like it or not, I have no chance outside the court freely choosing to do so."

**A BRIEF TO SUBSTANTIATE MY MOTION TO STAY ALL DISPOSITIVE MOTIONS**

15. What I need to quickly address is the expectation I set in this October 21 motion, which I was unable to fulfill, at least as specified, due to the overwhelming interference and misconduct I experienced in the days and weeks to follow. (See the two underlined sentences in the above motion for what I am referring to.)

16. I stated in my October 21, 2024, motion to stay all dispositive motions, "I will do my best to write a brief to support this on Wednesday, and mail it on Thursday, so the court will have more to substantiate my motion with."

17. In the days immediately following October 21st, I rushed to file executed summonses with the court, while cooperating with opposing counsel who requested extensions of time to reply to my complaint, as both are evidenced in the docket.

18. Amidst that was when I was approached by the U.S. Attorney's Office in Michigan[20], on October 23, regarding defendant Walker's claimed "privacy and safety concerns", which almost immediately hijacked my focus and work flow, prioritizing itself above every other issue, concern, and commitment I was working on, for the alleged "safety" of a federal judge, which I took seriously while diligently working towards a remedy which would protect defendant Walker's privacy without compromising the public's access to any meaningful matters in my lawsuit.

19. Then on October 25th this lawsuit was transferred[21] from Michigan to Tennessee, after which I was quickly contacted by the U.S. Attorney's Office in Tennessee[22] regarding those same alleged concerns of defendant Walkers, after which I could not "come back up for air" (except for very brief periods) for **months**. I am still trying to rectify the damage I was caused by this misconduct, as explained in other filings[23], on this seventh day of March 2025.

---

[20] DOC 212-1, PID 757-766 | https://rico.jefffenton.com/evidence/2024-10_comms-with-usat-ryan-cobb-about-redactions.pdf

[21] DOC 217, PID 5706-5710 | https://rico.jefffenton.com/3-24-cv-01282/doc/127.pdf

[22] DOC 212-1, PID 767-783 | https://rico.jefffenton.com/evidence/2024-11_comms-with-usat-anica-jones-about-redactions.pdf

[23] DOC 211, PID 689-723 | https://rico.jefffenton.com/evidence/2025-02-08_objection-to-dispositive-defendant-motions.pdf
DOC 212, PID 730-907 | https://rico.jefffenton.com/evidence/2025-02-10_tn-motion-to-minimize-or-remove-redactions.pdf
https://rico.jefffenton.com/evidence/2025-03-03_objection-judicial-misconduct-in-michigan.pdf
https://rico.jefffenton.com/evidence/2025-03-05_second-motion-to-extend-time-for-service.pdf
DOC 217, 218, 219 | "DECLARATION AND MOTION TO FILE UNDER SEAL REGARDING DEFENDANT WALKER'S CLAIMED PRIVACY CONCERNS RELATED TO HIS HOME ADDRESS"

20. I have filed several documents trying to substantiate and explain the predominate reasons for my requested motion to stay, but I overlooked naming them in a way which specifically related to that motion or anticipated "brief". I likewise never made it back to write and file a *brief* specifically in support of that one motion as I originally planned when I set that expectation.

21. That is the reason why I am filing this "SECOND MOTION TO STAY ALL DISPOSITIVE MOTIONS UNTIL SERVICE IS COMPLETED AND THE COURT HAS RULED ON PLAINTIFF'S OUTSTANDING EXPEDITED MOTIONS". To further clarify the basis for that original motion, along with this second motion, emphasizing why the motions to stay are important and necessary to the interests of justice in the matters before the court.

22. As a result of needing to respond to so many motions, many of which present similar claims and arguments, I am struggling to understand **how** best and most efficiently to respond to them. Whether to draft and file papers which address specific **topics** and **claims**, for example "Objection to all Defendant Claims that Service was Untimely", or whether I need to redundantly copy and paste the same responses into separate objections which I must file for each and every defendant making similar claims. I would greatly appreciate some instruction or clarification on this question from the court.

23. Therefore, I have worked hard to file documents which address specific aspects of multiple defendant motions, addressing substantive **issues** and **claims**, while seeking to clarify the truth about what I have experienced along with the constitutional merits and justice interests in this lawsuit; hopefully showing the court that some of the frivolous filings by the defendants and their counsel, are just that.

## MISCONDUCT AND INTERFERENCE

24. Upon information and belief, there was significant judicial bias by the Magistrate Judge[24] in the Western District of Michigan, and significant professional misconduct[25] by the defendants and their counsel, some who continued to dodge service[26], while others continued refusing to sign[27] for service successfully received. One of the defendants even went so far as to mail service back weeks after receiving it[28], claiming not to have been served thereafter[29].

## INTERFERENCE BY THE U.S. ATTORNEY'S OFFICES

25. Upon information and belief, I have also had to contend with roughly two months' worth of **extra** work created for me, by misconduct and interference caused by defendant Walker and the United States Attorney's Offices in both Michigan and Tennessee, costing me literally hundreds of extra hours of work, as addressed in the documents named in the next four paragraphs.

26. "DECLARATION AND MOTION TO FILE UNDER SEAL REGARDING DEFENDANT WALKER'S CLAIMED PRIVACY CONCERNS RELATED TO HIS HOME ADDRESS" filed in DOC 217, 218, and 219.

---

[24] DOC 222, PID 1164-1214 | https://rico.jefffenton.com/evidence/2025-03-03_objection-judicial-misconduct-in-michigan.pdf
DOC 60, PID 4736-4739 | https://rico.jefffenton.com/3-24-cv-01282/doc/60.pdf
DOC 62, PID 4744-4760 | https://rico.jefffenton.com/3-24-cv-01282/doc/62.pdf

[25] DOC 101, PID 5375-5390 | https://rico.jefffenton.com/evidence/2024-10-08_counter-affidavit-correcting-storys-false-claims.pdf

[26] DOC 180, PID 281-296 | https://rico.jefffenton.com/3-24-cv-01282/doc/180.pdf
DOC 192, PID 379-408 | https://rico.jefffenton.com/3-24-cv-01282/doc/192.pdf
DOC 205, PID 562-578 | https://rico.jefffenton.com/3-24-cv-01282/doc/205.pdf

[27] DOC 182, PID 313-326 | https://rico.jefffenton.com/3-24-cv-01282/doc/182.pdf
DOC 204, PID 537-561 | https://rico.jefffenton.com/3-24-cv-01282/doc/204.pdf

[28] DOC 114, PID 5623-5632 | https://rico.jefffenton.com/3-24-cv-01282/doc/114.pdf

[29] DOC 183, PID 331-184 | https://rico.jefffenton.com/3-24-cv-01282/doc/183.pdf
DOC 184, PID 327-330 | https://rico.jefffenton.com/3-24-cv-01282/doc/184.pdf

27. "FIRST OBJECTION TO ALL MOTIONS TO DISMISS, FOR SUMMARY JUDGEMENT, AND MOTIONS/ORDERS TO REDACT AND SEAL DOCUMENTS[30]" filed in DOC 211, PID 689-723.

28. "DECLARATION AND MOTION TO CORRECT AND MINIMIZE OR STRIKE AND REMOVE REDACTIONS, WHILE UNSEALING ALL RECORDS[31]" filed in DOC 212, PID 730-907.

29. "SECOND OBJECTION TO ALL DISPOSITIVE MOTIONS, REDACTED AND SEALED FILINGS, WITH DECLARATION ABOUT JUDICIAL MISCONDUCT IN MICHIGAN CAUSING SUBSTANTIAL DELAYS IN SERVICE[32]" filed in DOC 222, PID 1164-1214.

## NASHVILLE'S CULTURE OF CRONYISM AND COURT CORRUPTION

30. Upon information and belief, a big part of the problem with much of this group is that they refuse to confront, report, discipline, or correct egregious fraudulent attorney and judicial misconduct by some of their friends, peers, subordinates, and colleagues, creating a **culture** in Middle Tennessee where **peer pressure** between legal professionals **compels** them to **keep** each other's **secrets** and **cover** for **each other**, rather than obeying their oaths of office and duty to report, discipline, or correct, substantial attorney and judicial misconduct.

31. Upon information and belief, this has nothing to do with the types of misconduct or the severity, such as limiting "the reporting obligation to those offenses that a self-regulating

[30] DOC 211, PID 689-723 | https://rico.jefffenton.com/evidence/2025-02-08_objection-to-dispositive-defendant-motions.pdf

[31] DOC 212, PID 730-907 | https://rico.jefffenton.com/evidence/2025-02-10_tn-motion-to-minimize-or-remove-redactions.pdf

[32] DOC 222, PID 1164-1214 | https://rico.jefffenton.com/evidence/2025-03-03_objection-judicial-misconduct-in-michigan.pdf

profession must vigorously endeavor to prevent[33]", as encouraged in Tenn. R. Sup. Ct. 8.3 - REPORTING PROFESSIONAL MISCONDUCT - Comment [3]. That's **not** what I'm talking about here. As you will see in the next paragraph, some officers of the Middle Tennessee courts, such as defendant Binkley, openly admit that they have **never** reported **any attorney misconduct**, prior to his boisterous public vendetta against Attorney Whistleblower Brian Manookian.

32. On March 21, 2021, the Knoxville News Sentinel published an article[34] titled, "Appeals court removes Tennessee judge from case with lawyer who revealed his secret arrest", which included a video showing defendant Binkley[35] chastising a "courtroom of attorneys" while he was actively employed as a Williamson County Chancery Court Judge. Between the 1:26 and the 1:43 timestamps of that video[36], defendant Binkley stated, "**I've never turned in a lawyer in my entire career.** But there's one, Brian Manookian, I'm going to turn in. And I've got about *seventy* different examples. And I'm not stopping" (emphasis added).

33. Upon information and belief, that statement above by defendant Binkley was a **confession** that throughout his career he had **violated** the court's **codes of conduct**, which are **not optional**, refusing to report misconduct which he witnessed or knew about, except in the case of Brian Manookian, whom Binkley claimed he was reporting for an alleged *seventy* ethics violations.

---

[33] DOC 41, PID 3606 | Tenn. R. Sup. Ct. 8.3 - REPORTING PROFESSIONAL MISCONDUCT - Comment [3]
DOC 41, PID 3570-3608 | https://rico.jefffenton.com/evidence/tennessee-rules-of-judicial-and-professional-conduct.pdf

[34] https://www.knoxnews.com/story/news/crime/2021/03/22/tennessee-appeals-court-pulls-judge-michael-binkley-casey-moreland-brian-manookian/4450016001/
DOC 52, PID 4174-4179 | https://rico.jefffenton.com/evidence/2021-03-21_knoxnews-coa-removes-judge-binkley-for-bias.pdf

[35] DOC 1-15, PID 614-615 | https://rico.jefffenton.com/evidence/2021-03-21_knox-news-binkley-threatens-prior-restraints.pdf

[36] DOC 54-1, PID 4368 | https://rico.jefffenton.com/evidence/2021-03-21_knox-news-binkley-threatens-prior-restraints.mp4

34. Upon information and belief, for those who don't know Brian Manookian was the attorney whistleblower[37] who first reported corrupt former Nashville judge Casey Moreland for ethics violations before the FBI[38] arrested Moreland and put him in prison on multiple corruption related charges[39]. Brian Manookian was also the attorney whistleblower who former judge Michael W. Binkley suspected leaked his secret[40], that Binkley was **arrested** during a 2010 **prostitution sting** on Dickerson Avenue in Nashville, before he became a judge. After which Binkley hired Moreland's own personal attorney, **Ed Yarbrough**[41], to broker a deal with Moreland by which Binkley's Solicitation of Prostitution, or substantially similar charge, was both dismissed and expunged from the Davidson County Court System in a "highly unusual manner, both in timing and procedure[42]."

35. Upon information and belief, interestingly, there is another Yarbrough who is a defendant in this lawsuit. Attorney **Kathryn Lynn Yarbrough** (BPR# 032789) who worked for defendant Story's law firm in Franklin, Tennessee, and actively participated in the RICO scam with Binkley and Story, used to steal my Brentwood home. Defendant Kathryn Lynn Yarbrough has refused to make an appearance in this matter to date, despite receiving service months ago, on multiple occasions.

---

[37] DOC 43, PID 3694-3695 | https://rico.jefffenton.com/evidence/2017-02-01_scene-ethics-complaint-against-two-judges.pdf
DOC 58-2, PID 4628-4630 | https://rico.jefffenton.com/evidence/2019-07-01_tenn-bpr-targets-whistleblowers-not-corruption.pdf

[38] DOC 43, PID 3698-3701 | https://rico.jefffenton.com/evidence/2017-04-03_nc5-moreland-tried-to-plant-drugs-on-witness.pdf
DOC 54-1, PID 4360 | https://rico.jefffenton.com/evidence/2017-04-03_wtvf-moreland-tried-to-plant-drugs-on-witness.mp4
DOC 54-1, PID 4362 | https://rico.jefffenton.com/evidence/2017-04-03_wtvf-undercover-fbi-video-of-casey-moreland.mp4

[39] DOC 52, PID 4180-4201 | https://rico.jefffenton.com/evidence/2018-02-28_tn-judge-cason-moreland-fbi-criminal-complaint.pdf

[40] DOC 52, PID 4174-4179 | https://rico.jefffenton.com/evidence/2021-03-21_knoxnews-coa-removes-judge-binkley-for-bias.pdf

[41] DOC 42, PID 3677-3679 | https://rico.jefffenton.com/evidence/2014-10-23_tenn-moreland-reprimanded-by-state-board.pdf
DOC 54-1, PID 4358 | https://rico.jefffenton.com/evidence/2017-02-01_wsmv-binkley-arrest-expunged-by-moreland.mp4
DOC 43, PID 3696-3697 | https://rico.jefffenton.com/evidence/2017-02-01_wsmv-binkley-arrest-expunged-by-moreland.pdf

[42] DOC 43, PID 3697 | https://rico.jefffenton.com/evidence/2017-02-01_wsmv-binkley-arrest-expunged-by-moreland.pdf

36. Upon information and belief, after which the Board of Professional Responsibility of the Supreme Court of Tennessee retaliated against Brian Manookian and **suspended** him from the practice of law (apparently subsequent to defendant Binkley's complaint alleging *seventy* ethics violations), which ultimately ended with attorney whistleblower Brian Manookian being **disbarred** from the practice of law in Tennessee (though they claim for other reasons).

37. Tennessee Supreme Court Justice Sharon G. Lee wrote in her dissenting opinion about Brian Manookian being disbarred[43], "For the first time, this Court has increased an attorney's discipline through the exercise of the Court's inherent jurisdiction **outside of the process** outlined in Rule 9 by disbarring Brian Philip Manookian **without giving fair notice** of its intent" (emphasis added). Further stating toward the end, "In sum, no matter how offensive the Court deems Mr. Manookian's conduct, the Court **in its haste to disbar Mr. Manookian** should rule in a respectful, **unbiased**, and **even-handed manner** and **not dispense with notice** and **an opportunity to be heard**" (emphasis added).

38. Upon information and belief, when the Tennessee Supreme Court **suspended** attorney whistleblower Connie Reguli[44] and then **disbarred** attorney whistleblower Brian Manookian, they sent a clear message throughout the legal profession in Tennessee, that if you **confront** or **report judicial misconduct** and **court corruption** in Tennessee, you will be **retaliated** against by the Board of Professional Responsibility of the Supreme Court of Tennessee,

---

[43] DOC 58-4, PID 4712-4716 | https://rico.jefffenton.com/evidence/2024-02-16_tnsc-manookian-disbarment-opinion-justice-lee.pdf

[44] Reguli v. Woodruff et al (3:2024-cv-00694) | https://dockets.justia.com/docket/tennessee/tnmdce/3:2024cv00694/99766
Reguli et al v. Hetzel et al (3:2024-cv-00541) | https://dockets.justia.com/docket/tennessee/tnmdce/3:2024cv00541/99331
DOC 54-1, PID 4355 | https://rico.jefffenton.com/evidence/2010-10-05_reguli-tn-senate-judiciary-comm-retaliation-pt-1.mp4
DOC 54-1, PID 4356 |https://rico.jefffenton.com/evidence/2010-10-05_reguli-tn-senate-judiciary-comm-retaliation-pt-2.mp4
DOC 54-1, PID 4364 | https://rico.jefffenton.com/evidence/2010-10-05_savoie-tn-senate-judiciary-comm-jud-misconduct.mp4
DOC 54-1, PID 4376 | https://rico.jefffenton.com/evidence/2016-08-11_reguli-tn-indigent-task-force-poverty-fam-dep-ct.mp4
DOC 54-1, PID 4377 | https://rico.jefffenton.com/evidence/2019-02-26_reguli-tn-gen-assy-conflict-in-child-welfare-sys.mp4
DOC 58-5, PID 4718-4722 | https://rico.jefffenton.com/evidence/2024-05-02_reguli-lawsuit-against-wilco-tn-gov-corruption.pdf

you will have your business **attacked**, be wrongly **sanctioned**, **suspended**, and **disbarred**. You will have your reputation attacked, be professionally smeared, get fined, lose your business, lose your law license, and unless you have another means of supporting yourself and your family, lose your livelihood.

39. I forgot to mention, upon information and belief, Binkley also hit Manookian with *seven hundred thousand dollars* in sanctions[45], which later the Tennessee Court of Appeals overturned due to Binkley's publicly demonstrative *bias* (vendetta). Attorney Whistleblower Connie Reguli was also wrongfully sanctioned, in addition to being arrested and charged with a fake felony[46], to prohibit her from participating as a judicial candidate in Williamson County.

40. Upon information and belief, this is the court culture in Middle Tennessee currently, where the peer pressure amongst legal professionals often works contrary to the honest interests of justice, while compelling attorneys **not** to report professional and *especially* judicial misconduct.

## F.R.CIV.P. RULE 11(B)

41. One of the biggest problems with litigating for a remedy against this group of actors, is that many of them are dishonest and have learned to weaponize the "practice of law" in unethical and illegal ways, contrary to the interests of justice[47], their oaths of office, and the trust they have been afforded as "officers of the court[48]".

42. On top of that, some of the defendants in this case are literally entrusted with the oversight of the "practice of law" throughout the entire State of Tennessee, while protecting

---

45 DOC 52, PID 4174-4179 | https://rico.jefffenton.com/evidence/2021-03-21_knoxnews-coa-removes-judge-binkley-for-bias.pdf

46 https://tennesseeconservativenews.com/fake-felony-charge-used-to-disqualify-conservative-judge-candidate-overturned-for-client/
https://tntribune.com/dcs-and-a-fearless-attorney/
https://www.youtube.com/watch?v=-rC6CjUATTk

47 DOC 207, PID 583-685 | https://rico.jefffenton.com/evidence/2025-01-20_declaration-explaining-my-pursuit-of-justice.pdf

48 DOC 216, PID 984-1015 | https://rico.jefffenton.com/evidence/2025-02-24_notice-to-all-bar-members.pdf

others in this group from being disciplined (sanctioned, suspended, and disbarred) for substantial professional and judicial misconduct, even after they have been reported to the Tennessee Supreme Court, the Tennessee Court of Appeals, the Tennessee Administrative Offices of the Courts, and even the Board of Professional Responsibility of the Supreme Court of Tennessee. Which is precisely why those entities and some of their leaders have been named as defendants in this lawsuit, because they have repeatedly refused to obey their oaths of office, along with the court's codes of judicial and professional conduct, while acting honestly in good faith, to uphold the law and to require their friends, peers, colleagues, and subordinates to do the same.

43. This is not a new phenomenon[49], though it rarely makes the evening news, because there is substantial social, political, professional, and financial pressure not to challenge or expose such illicit groups of lawless centralized power in certain regions throughout the country.

44. The courts have also made a habit of disavowing the legitimacy of such actions, likely in an effort to protect their own or to downplay the prevalence of impropriety and municipal corruption within the courts, as well as in all branches and tiers of state and federal government.

45. There also seems to be a greater appetite within the court system to stifle the **appearance** of impropriety[50], rather than discouraging, addressing, reporting, disciplining, and removing the actual **impropriety** itself. I'm not sure if that is because judges view impropriety by their peers and colleagues as "inevitable", therefore they believe that silencing it is the most

---

[49] Operation Greylord | https://www.fbi.gov/history/famous-cases/operation-greylord
Kids for Cash | https://www.npr.org/2022/08/18/1118108084/michael-conahan-mark-ciavarella-kids-for-cash
Thomas Girardi | See attached "Exhibit A" and "Exhibit B".
Girardi attached "Exhibit A" | https://rico.jefffenton.com/evidence/girardi-investigation-for-the-state-bar-of-california.pdf
Girardi attached "Exhibit B" | https://rico.jefffenton.com/evidence/girardi-lion-air-flight-610-crash-memorandum-order.pdf
https://podcasts.apple.com/us/podcast/edelson-v-girardi-collapse-of-a-titan/id1654960102?i=1000602422362
https://davisvanguard.org/2023/06/petition-for-antitrust-complaint-against-state-bar-and-chairman-filed-and-decided-without-complainants-knowledge/

[50] DOC 58-2, PID 4628-4630 | https://rico.jefffenton.com/evidence/2019-07-01_tenn-bpr-targets-whistleblowers-not-corruption.pdf

effective way to maintain "public confidence in the judiciary", but if so that is a counterproductive belief, out of alignment with literature published by the Department of Justice, in stark contrast with both the ethical canons and the federal rules.

46. Ultimately efforts to silence or hide attorney and judicial misconduct, without discipline and correction, sow dishonesty and fraud into an institution claiming to be based upon truth and law, undermining the ethical credibility of the courts, as well as their realistic ability to produce honest and impartial justice, while substantially eroding the public's confidence in our courts also.

47. As addressed by the U.S. Courts online[51], "How should the judiciary promote public trust and confidence in the federal courts in a manner consistent with its role within the federal government?"

> "The ability of courts to fulfill their mission and perform their functions is based on the public's trust and confidence in the judiciary. In large part, the judiciary earns that trust and confidence **by faithfully performing its duties; adhering to ethical standards; and effectively carrying out internal oversight, review, and governance responsibilities.** These responsibilities include accountability for a failure to observe scrupulous adherence to ethical standards. <u>The surest way to lose trust and confidence is failure to live up to established ethical standards and failure to hold judges and judiciary personnel accountable for misconduct</u>. Transparency in efforts to ensure accountability for misconduct, where possible and appropriate, helps foster public trust and confidence" (emphasis added).

[51] https://www.uscourts.gov/data-news/reports/strategic-planning/strategic-plan-federal-judiciary/issue-2-preserving-public-trust-confidence-and-understanding

48. Upon information and belief, so far in this lawsuit, I've had to confront lies told by defendant Story in her affidavit[52].

49. Upon information and belief, I've had to deal with significant misconduct and interference caused by defendant Walker[53] and both Assistant United States Attorneys[54], costing me hundreds of hours of unnecessary work[55].

50. Upon information and belief, defendant Beeler still claims that she has never been served[56], since she decided to reject service **nineteen days after accepting it**, returning it to the Post Office as "refused"[57], thinking that would usurp the court's jurisdiction over her.

51. Upon information and belief, defendants Garrett and Coke have both refused to sign for service, abandoning packages at the Post Office for weeks and months in an attempt to evade accountability and stymie justice, despite both being employed by supervisory divisions of the Tennessee Supreme Court.

52. Upon information and belief, every individual BAR defendant in this lawsuit exerted some effort (or some effort was exerted on their behalf) to dodge service and/or to obfuscate, defeat, deprive, deny the successful *confirmation of service* as required by the court's rules. (See "Exhibit-A" filed on 10/04/2024, in DOC 96-1, PID 5265-5285.) Every last one!

---

52 DOC 76-1, PID 5076-5079 | https://rico.jefffenton.com/evidence/2024-09-16_affidavit-of-virginia-lee-story.pdf
DOC 101, PID 5375-5390 | https://rico.jefffenton.com/evidence/2024-10-08_counter-affidavit-correcting-storys-false-claims.pdf
DOC 99, PID 5328-5342 | https://rico.jefffenton.com/evidence/2024-10-08_motion-for-sanctions-against-story-for-lying.pdf

53 DOC 217, 218, 219 | "DECLARATION AND MOTION TO FILE UNDER SEAL REGARDING DEFENDANT WALKER'S CLAIMED PRIVACY CONCERNS RELATED TO HIS HOME ADDRESS"

54 DOC 212-1, PID 757-766 | https://rico.jefffenton.com/evidence/2024-10_comms-with-usat-ryan-cobb-about-redactions.pdf
DOC 212-1, PID 767-783 | https://rico.jefffenton.com/evidence/2024-11_comms-with-usat-anica-jones-about-redactions.pdf

55 DOC 211, PID 689-723 | https://rico.jefffenton.com/evidence/2025-02-08_objection-to-dispositive-defendant-motions.pdf
DOC 212, PID 730-907 | https://rico.jefffenton.com/evidence/2025-02-10_tn-motion-to-minimize-or-remove-redactions.pdf

56 https://rico.jefffenton.com/evidence/2025-01-17_email-service-of-elaine-beeler-via-lisa-carson.pdf
DOC 183, PID 327-330 | https://rico.jefffenton.com/3-24-cv-01282/doc/183.pdf

57 DOC 114, PID 5623-5632 | https://rico.jefffenton.com/3-24-cv-01282/doc/114.pdf

53. In DOC 78, PID 5082, paragraph 4, counsel for "The Tennessee Defendants" claimed[58], "Plaintiff wildly, and without merit, accuses all of the Defendants of numerous counts of fraud, coercion, vulnerable adult abuse, IIED, NIED, abuse of process, conspiracy, RICO, and violations of the U.S. Constitution as well as numerous statutes, the bankruptcy act and the ADA."

54. My response to "The Tennessee Defendants" stated in part[59], "This is a verified complaint, substantiated by roughly 5,000 pages of sworn testimony and evidence, including court transcripts which prove beyond any shadow of a doubt that obscene and horrific misconduct took place, including many (if not all of those) "wild" claims which counsel fraudulently claims are "without merit". This is gas lighting; it is improper to respond to a verified complaint without specificity. If it is not worth counsel's time to write exactly what they claim is "without merit" and have an affidavit sworn to under the penalty of perjury by the defendant to substantiate their claim, then it's not worth my time to respond or the court's time to read it. They have no right to claim anything is without merit, without specificity and sworn testimony. That is plain abusive harassment. Which is no more an appropriate lawful response or substitute for a "responsive pleading" than standing in the doorway flexing your muscles, while chanting that the deep pockets of the state stand behind them."

55. Afterwards, did "The Tennessee Defendants" follow-up with specificity and sworn testimony to challenge and try to disprove my "wild" claims? No, they never brought it up again.

58 DOC 78, PID 5081-5084 | https://rico.jefffenton.com/3-24-cv-01282/doc/78.pdf

59 DOC 110, PID 5584-5593 | https://rico.jefffenton.com/3-24-cv-01282/doc/110.pdf

56. After the Tennessee Attorney General and Reporter obtained custody of this case, first their office filed a motion for an extension of time[60], stating in part, "Undersigned counsel requires time to thoroughly review the Amended Complaint and the extensive number of exhibits attached to it. This request is not made to prolong justice or impede the swift resolution of these matters. For these reasons, Defendants request that the Court grant this motion to respond to the Amended Complaint by December 20, 2024."

57. It actually looked like they were taking the case seriously and planning to respond to the complaint based on the substantial merits in the case, which I was glad to grant them extra time for.

58. Unfortunately, on December 20, 2024, the Attorney General's Office filed a **two-paragraph** motion to dismiss, stating instead, "Eleventh Amendment immunity bars suits against the State, state agencies, and state officials in their official capacity. Absolute judicial immunity shields Chancellor Binkley from suit in his individual capacity. And the claims against Mr. Hivner, Mr. Coke, and Ms. Garrett in their individual capacities should be dismissed because a criminal statute does not create a private right of action and the statute of limitations bars the remaining civil claims. For these reasons, the State Defendants request that the Court grant their motion to dismiss."

59. Somehow, they overlooked the **first ten amendments** to the United States Constitution, known as the "**Bill of Rights**", and jumped directly to the eleventh, to materially misrepresent some of the core values, underlying themes, and primary purposes of that document, through a practice known as "proof-texting", to twist the language out of context to do their bidding.

[60] DOC 166, PID 140-142 | https://rico.jefffenton.com/3-24-cv-01282/doc/166.pdf

60. Gone were the lies about my "wild" claims "without merit" made by their prior counsel in Michigan, and instead the Tennessee Attorney General's Office gave this court and my complaint the proverbial middle finger, without choosing to answer or defend a single action or inaction by the state defendants.

61. What do you want to bet that this "one finger salute" filed by the Tennessee Attorney General's Office in those two brief paragraphs fails to provide the court with an honest, ethical, lawful response to my complaint? One which reasonably complies with the requirement in F.R.Civ.P. 11(B), that the Attorney General's Office "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[61]" that **two paragraph** pleading is actually **appropriate** and **true**?

62. **I'll bet my life that it is not,** <u>while that is the precise problem I'm experiencing with most of the defendants and pleadings filed in this matter</u>.

> "Eleventh Amendment does not protect state officials from claims for prospective relief when it is alleged that state officials acted in violation of federal law." *Warnock v. Pecos County, Texas.*, 88 F3d 341 (5th Cir. 1996)
>
> "When a judge acts intentionally and knowingly to deprive a person of his constitutional rights he exercises no discretion or individual judgment; he acts no longer as a judge but as a "minister" of his own prejudices." 386 U.S. 547, 568
>
> "A judge is liable for injury caused by a ministerial act; to have immunity the judge must be performing a judicial function." *See, e.g., Ex parte Virginia,* 100 U.S. 339; 2 Harper & James, The Law of Torts 1642-1643 (1956).

[61] https://www.law.cornell.edu/rules/frcp/rule_11

> The presence of malice and the intention to deprive a person of his civil rights is wholly incompatible with the judicial function.

63. Yet if the court takes them at face value, while I've had nowhere near enough time to respond to all of their misconduct, trusting them to have done the proper due diligence in this matter, then nearly half the defendants in this case could walk without answering for a single action or inaction which was previously portrayed by their counsel as being *so outrageous* that it couldn't possibly be true. But it is **true** and I reasonably believe that the Tennessee Attorney General's Office knows it.

64. Upon information and belief, many of these defendants are not honest people[62]. Many have violated their oaths of office repeatedly, which the courts have said in the past equates to being "engaged in acts of treason". They are not going to act honestly, honorably or show good professional conduct unless this court **forces them to**.

> Note: Any judge who does not comply with his oath to the Constitution of the United States wars against that Constitution and engages in acts in violation of the supreme law of the land. The judge is engaged in acts of treason. The U.S. Supreme Court has stated that "no state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it". Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401 (1958); See also In Re Sawyer, 124 U.S. 200 (188); U.S. v. Will, 449 U.S. 200, 216, 101 S. Ct. 471, 66 L. Ed. 2d 392, 406 (1980); Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 404, 5 L. Ed 257 (1821).

[62] DOC 19, PID 2617-2716 | https://rico.jefffenton.com/evidence/2019_tn-court-motions-in-chronological-order.pdf

65. Upon information and belief, this court has a responsibility to **require** and when necessary to **compel** the defendants and their counsel to **tell the truth** and operate honestly, ethically, and honorably in court filings, regardless of whether the defendants *want to* or not.

66. Upon information and belief, any motion pending before this court, which has the potential of being the deciding argument for having *any* of the defendants permanently released from this lawsuit, without providing my family any remedy for the harm caused, must have *every* reasonable assurance **it has been filed honestly**, in good faith, **in full compliance** with F.R.Civ.P. Rule 11(b).

67. Upon information and belief, I've already **proven**[63] to this court that the oath of office taken by BAR members, and their responsibilities thereunder are **insufficient** to compel some of the defendants and their counsel to operate honestly and ethically in their pleadings filed in this lawsuit.

68. **I have lost** my home, my life savings, my retirement, my stream of income, my freedom, my pursuit of happiness, my hobbies, my constitutional rights, my physical, financial, and legal independence, the community I lived peacefully in and loved for 25 years, along with health care providers, support systems, and friends I had known and worked with for decades, all because of lies and unethical pleadings, not so different than those which I have already exposed the defendants and their counsel filing in this case.

---

[63] DOC 101, PID 5375-5390 | https://rico.jefffenton.com/evidence/2024-10-08_counter-affidavit-correcting-storys-false-claims.pdf
DOC 100, PID 5343-5374 | https://rico.jefffenton.com/evidence/2024-10-08_motion-all-filings-be-under-penalty-of-perjury.pdf
DOC 99, PID 5328-5342 | https://rico.jefffenton.com/evidence/2024-10-08_motion-for-sanctions-against-story-for-lying.pdf
DOC 212-1, PID 757-766 | https://rico.jefffenton.com/evidence/2024-10_comms-with-usat-ryan-cobb-about-redactions.pdf
DOC 212-1, PID 767-783 | https://rico.jefffenton.com/evidence/2024-11_comms-with-usat-anica-jones-about-redactions.pdf
DOC 211, PID 689-723 | https://rico.jefffenton.com/evidence/2025-02-08_objection-to-dispositive-defendant-motions.pdf
DOC 207, PID 583-685 | https://rico.jefffenton.com/evidence/2025-01-20_declaration-explaining-my-pursuit-of-justice.pdf

69. Upon information and belief, this court needs to significantly raise the bar for all pleadings, to begin **forcing** the defendants and their counsel to **operate honestly** in compliance with the court's codes of conduct, without giving them more opportunities to **hurt me** with lies and perverted pleadings.

70. That is the **exact** purpose of my "AMENDED MOTION TO REQUIRE ALL FILINGS TO INCLUDE A CERTIFICATION STATING THEIR CONTENTS ARE FACTUALLY TRUE AND COMPLIANT WITH F.R.C.P. RULE 11(B), SWORN TO UNDER THE PENALTY OF PERJURY (EXPEDITED CONSIDERATION REQUESTED)[64]" in DOC 100, 100-1, PID 5343-5374.

71. Upon information and belief, if the court is unable to certify that the defendants and their counsel are telling the **truth** in their pleadings, under the penalty of perjury, it is obscene to consider the court releasing **any** of the defendants from liability which I have clearly suffered, after certifying, swearing, and even evidencing on the record that the defendants have caused me, while swearing that to be the **truth** under the pains and penalty of perjury. Obviously, I have gone to more trouble and invested far more work than most middle-class litigants ever can or will to have this matter fairly and honestly adjudicated by the court.

72. Upon information and belief, requiring all pleadings to be honest and ethical is "ground zero" in this lawsuit, to fairly and honestly adjudicate anything, and we still aren't even there yet.

73. Upon information and belief, if anyone argues that the above motion is not needed, then we need to start holding "emergency hearings" for **sanctions** immediately (instead of to release defendants as improperly claimed), to compensate me for the real damages I have suffered, exposed, and proven was caused by the defendant's counsel, through lies and misconduct.

[64] DOC 100, PID 5343-5374 | https://rico.jefffenton.com/evidence/2024-10-08_motion-all-filings-be-under-penalty-of-perjury.pdf

74. Upon information and belief, either I need the defendants to be compelled to tell the **truth** and operate **ethically**, or I need to be quickly **compensated**, with additional **time** (toward pending matters) and **money**, once I prove they have violated the court's trust **again**, so that I can afford to hire counsel to help me articulate and survive their misconduct. One or the other.

75. Upon information and belief, to me that seems like the lowest bar of what is "reasonable" under the circumstances.

76. Upon information and belief, I've yet to see any of the defendants answer my complaint based upon the merits or deny the claims therein in any significant capacity while swearing to be telling the truth under the penalty of perjury, as my complaint is sworn and certified accurate and true. I have furthermore yet to see a single responsive pleading filed by any of the defendants or their counsel, which I honestly believe complies with F.R.Civ.P. Rule 11(B), "formed [by defendant's counsel] after an inquiry reasonable under the circumstances[65]".

77. In truth, I haven't had **time** yet to **read** every word filed in this matter by the defendant's counsel, but of the many motions which I have read, the facts have been perverted with material misrepresentations while not appearing to acknowledge the substantial constitutional merits or most significant justice interests woven throughout this lawsuit.

78. Upon information and belief, many of the papers filed to date by the defendant's counsel, have been filed for improper purposes, to tax me with extra work (process), while grasping at seemingly any frivolous argument by which to seek release or dismissal from this lawsuit, without showing any interests or responsibility for the unconscionable misconduct clearly evidenced in the record of this lawsuit, or the merits for which this case has been filed.

[65] F.R.Civ.P. Rule 11(B) "…an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances…" | https://www.law.cornell.edu/rules/frcp/rule_11

## SUPPORTING DOCUMENTS FOR THE MOTION TO STAY ALL DISPOSITIVE MOTIONS

79. "DECLARATION REGARDING FINANCES, MARITAL ROLES, PROPERTY, EDUCATION, EARNING CAPACITY, SPOUSAL SUPPORT, AND FRAUD (AMENDED)[66]", filed in DOC 214, PID 911-975.

80. The document above describes how the defendants egregiously and unconscionably violated my *constitutional* rights along with my most basic *natural* human rights in the preceding matters in Tennessee's state and federal courts. Detailing how they illegally deprived me of my Brentwood marital residence, the sum total of my life's savings and even my premarital retirement investments, worth over *nine hundred thousand dollars* today combined, without one dollar to my benefit, by a court without lawful jurisdiction, to hear and dispose of the matters before it, by undisclosed close family friends and partying/vacationing[67] buddies. This also clarifies the crimes committed by the bankruptcy court and counsel, which Bankruptcy Judge Charles M. Walker "reasonably should [have] know[n][68]" were being executed improperly by both courts, while he signed off on it without bringing any of the concerns to light, failing or refusing to provide me and my two lawful tenants/roommates[69] with "adequate protection" throughout my ex-wife's secret bankruptcy, in strict violation of the federal rules of bankruptcy procedure and federal law[70].

---

[66] DOC 214, PID 911-975 | https://rico.jefffenton.com/evidence/fenton-finances-roles-property-education-support-fraud.pdf

[67] DOC 43, PID 3726-3729 | https://rico.jefffenton.com/evidence/2018-08-30_tennessean-story-hosts-vacations-with-judges.pdf
DOC 44, PID 3740-3741 | https://rico.jefffenton.com/evidence/2018-09-24_tenn-binkley-defends-partying-with-lawyers.pdf
DOC 54-1, PID 4368 | https://rico.jefffenton.com/evidence/2021-03-21_knox-news-binkley-threatens-prior-restraints.mp4
DOC 1-14, PID 597-640 | https://rico.jefffenton.com/evidence/2021-03-21_knox-news-binkley-threatens-prior-restraints.pdf

[68] Tenn. R. Sup. Ct. 1.0 TERMINOLOGY: "(j) "Reasonably should know," when used in reference to a lawyer, denotes that a lawyer of reasonable prudence and competence would ascertain the matter in question." (https://www.tncourts.gov/rules/supreme-court/8)

[69] DOC 45, PID 3800-3807 | https://rico.jefffenton.com/evidence/2019-03-26_fenton-sunnyside-roommate-lease-merriman.pdf
DOC 45, PID 3808-3813 | https://rico.jefffenton.com/evidence/2019-04-09_fenton-sunnyside-roommate-lease-garcia.pdf

[70] DOC 38, PID 3445-3496 | https://rico.jefffenton.com/evidence/2019-04-26_bankruptcy-crimes-rules-and-laws-violated.pdf

81. "NOTICE TO ALL BAR MEMBERS[71]" filed in DOC 216, PID 984-1015.

82. This document explains and demonstrates that bad actors have captured the Board of Professional Responsibility of the Supreme Court of Tennessee, while leveraging it to protect some of the absolute worst actors involved in the "practice of law" throughout the State of Tennessee, including some of the defendants in this matter. This document further shows how those bad actors are leveraging that same board to *retaliate* against and *remove* some of the absolute best in class attorneys, from the "practice of law" in Tennessee, who have proven themselves to be fearless whistleblowers, devoted to defending the rights of the people against powerful local court corruption. These courageous and wrongfully persecuted whistleblowers have shown that they are willing to stand up against, report, and challenge *judicial misconduct* (as every BAR member is *required* to report, but few ever do), as well as other forms of *court corruption* in Williamson County Tennessee, despite the unconscionably harsh retaliation they have and continue to experience from the state as a result.

83. This document explains the ethical and legal responsibilities and potential fiscal liability of every BAR Member involved in this lawsuit. From licensed federal court employees to the defendants, to their counsel in this lawsuit, and the law firms defending each, including even the owners of each of those law firms.

84. Upon information and belief, every BAR member has a duty to report *attorney* and *judicial misconduct* rising to the level clearly proven repeatedly throughout this lawsuit, as well as *felony* crimes committed which they become aware of.

85. Upon information and belief, this document confronts the fact that it would be fundamentally unfair if not irresponsible for this court to *trust* the defendants and their counsel to *comply* with their oaths of office, to testify *honestly*, and for their pleadings to *comply* with F.R.Civ.P.

---

71 DOC 216, PID 984-1015 | https://rico.jefffenton.com/evidence/2025-02-24_notice-to-all-bar-members.pdf

Rule 11(b), without some other *mechanism*[72] to compel or ensure that they do so. While providing evidence proving multiple violations have already taken place in this case.

86. "DECLARATION EXPLAINING MY PURSUIT OF JUSTICE[73]" filed in DOC 207, PID 583-685.

87. This document explains many of my efforts to seek justice, some of the obstacles I have encountered and misconduct I have experienced caused by the defendants, while clarifying that the primary objective of this lawsuit is expressly devoted toward pursuing the critical justice interests in this lawsuit, which are both constitutionally guaranteed and reasonably necessary for *anyone* to be secure in their rights, in absolute alignment with the purpose of our federal courts.

> "District courts conduct trials and hearings, resolving disputes by determining the facts and applying the law to those facts.[74]"

88. Upon information and belief, therefore entertaining any dispositive motion at this point would be extremely **premature**, because the court hasn't "conduct[ed any] trials [or] hearings" yet, nor have they begun to "determin[e] the facts", or to "apply[] the law to those facts".

89. Upon information and belief, I have invested well over *six thousand* hours of work into this lawsuit to date, working at least *ten hours* per day, and at least *six days* per week (often seven), for the past *two years,* nonstop. I believe that I deserve more than *two paragraphs* in return, accompanied by a *one finger salute*!

90. The lawless and unethical actions by the defendants has rendered my life *financially unsustainable*, while no remedy of *any* sort has yet been available to remedy that.

---

72 DOC 100, PID 5343-5374 | https://rico.jefffenton.com/evidence/2024-10-08_motion-all-filings-be-under-penalty-of-perjury.pdf

73 DOC 207, PID 583-685 | https://rico.jefffenton.com/evidence/2025-01-20_declaration-explaining-my-pursuit-of-justice.pdf

74 https://www.uscourts.gov/about-federal-courts/court-role-and-structure/about-us-district-courts

## THE EVIDENCE IS ON THE RECORD

91. Upon information and belief, as absurd as the odds are against me in this lawsuit, that is not due to the facts or the evidence, but rather how difficult it is to obtain a *just* remedy, especially against such an enormous wall of power, as I am up against; even when the plaintiff has a massive amount of clear and convincing facts and evidence, while some are even literally **irrefutable**. The conditions which caused this catastrophe of conscience throughout Middle Tennessee's court culture were a result of the state's negligence and failure, year after year, to properly discipline attorney and judicial misconduct as **required**.

92. Upon information and belief, this is a case where the power of the players has been more significant *so far* than the **law** and possibly even the court's ability to enforce it. There is no question whether the defendants substantially did as I have claimed, regardless of how "unbelievable", egregious, and repugnant of the law their actions actually were. **The evidence is on record, it's not even worth them contesting the facts, and so they have not.**

93. Why isn't Tennessee fervently acting to *discipline* the bad actors while *protecting* the public from this happening again? Upon information and belief, apparently because nobody so far will **force** them to. This is **not** an isolated case[75]! Both the court and every defendant in this matter can clearly see the **truth** of what has transpired. While having both ethical and lawful responsibilities[76] to report, confront, stop, correct, discipline *attorney* and *judicial misconduct* as well as *felony crimes*.

[75] DOC 102, PID 5391-5468 | https://rico.jefffenton.com/evidence/2024-10-09_concerns-about-transferring-to-tennessee.pdf
DOC 215, PID 976-983 | https://rico.jefffenton.com/evidence/2025-01-24_i-protest-with-donald-jeffries-podcast.mp4

[76] DOC 216, PID 984-1015 | https://rico.jefffenton.com/evidence/2025-02-24_notice-to-all-bar-members.pdf

94. Upon information and belief, if this case was backed by a strong national law firm, such as the **Institute for Justice**, I'm willing to bet the defendants would have already pooled resources and tried to settle this matter as quickly and quietly as they could. **Because on the merits and the evidence, the defendants don't have a chance!** While the best chances they can attempt to explore and argue, will still be repugnant of the public's trust, having to do with how long it has taken me, as an indigent, disabled, *pro se* litigant, to finally get them all in front of a court, while they continue to play games dodging service, refusing to make an appearance, and claiming government immunity, for *felony crimes* clearly committed with *malicious* intent.

95. Upon information and belief, if this case was being passionately represented by a legal powerhouse such as Robert Barnes, it would probably be for *ten* to a *hundred times* the amount of money as my lawsuit is presently for, and rightfully so, because there clearly is insufficient disincentive to compel states to *do the right thing* and protect the rights and property of people living within their boundaries, instead of the local bullies who prey upon the public for illicit private gain.

96. What should the **compounding factor** be when a member of the public is savagely betrayed and preyed upon by powerful public and private bad actors working together in concert, while committing felony crimes against the vulnerable, who then is repeatedly denied help, for several years, by roughly a dozen people holding elevated offices of public trust?

97. How should that **compounding factor** affect the statute of limitations for the crimes they collectively committed against him?

98. *Should* the court *order* bad actors to *pay for counsel* to help the plaintiff and victim reach a reasonable remedy for the crimes they committed against him? Upon information and belief, the court **could** pursuant to **sanctions** under F.R.Civ.P. Rule 11(b).

99. Upon information and belief, I think the court should. Bad actors shouldn't be able to collectively cause people damages which literally exceed their ability to reach a remedy, *at no fault of their own*.

100. Upon information and belief, meanwhile no attorneys will take this case because of how the Tennessee Supreme Court has harshly retaliated against and penalized whistleblowers who have stood up to *judicial misconduct* and *court corruption* in Tennessee during recent years[77].

101. Upon information and belief, there are a lot of similarities between how the Board of Professional Responsibility of the Supreme Court of Tennessee[78] has and continues to protect some of the defendants in this lawsuit, such as defendants Binkley and Story, while ignoring repeated complaints about their misconduct, and how the State Bar of California[79] protected Thomas Girardi[80] and the Girardi Keese law firm *for years* while ignoring and refusing to discipline him for one of the most prolific and heinous cases of *attorney misconduct* recorded in our nation.

102. **That's not acceptable.** This is being done at the substantial detriment of public health and safety, for private criminal interests, through misappropriation of public resources!

103. At the end of the day, no matter what anyone claims, the sale of my home was illegally executed using "fraud on the court by officers of the court" (which has no statute of limitations). Executed using a racketeering conspiracy[81] between law firms and government bad

[77] DOC 58-5, PID 4718-4722 | https://rico.jefffenton.com/evidence/2024-05-02_reguli-lawsuit-against-wilco-tn-gov-corruption.pdf
DOC 58-3, PIC.4632-4710 | https://rico.jefffenton.com/evidence/2024-02-16_tnsc-disbarred-whistleblower-brian-manookian.pdf
DOC 58-4, PID 4712-4716 | https://rico.jefffenton.com/evidence/2024-02-16_tnsc-manookian-disbarment-opinion-justice-lee.pdf

[78] DOC 207-1, PID 620-639 | https://rico.jefffenton.com/evidence/tnsc-board-of-professional-responsibility-weaponization.pdf

[79] Girardi attached "Exhibit A" | https://rico.jefffenton.com/evidence/girardi-investigation-for-the-state-bar-of-california.pdf

[80] Thomas Girardi | See attached "Exhibit A" and "Exbibit B".
Girardi attached "Exhibit B" | https://rico.jefffenton.com/evidence/girardi-lion-air-flight-610-crash-memorandum-order.pdf
https://podcasts.apple.com/us/podcast/edelson-v-girardi-collapse-of-a-titan/id1654960102?i=1000602422362
https://davisvanguard.org/2023/06/petition-for-antitrust-complaint-against-state-bar-and-chairman-filed-and-decided-without-complainants-knowledge/

[81] DOC 53, PID 4258-4349 | https://rico.jefffenton.com/evidence/2024-03-13_irrefutable-proof-of-criminal-conspiracy.pdf

actors, in both state[82] and federal[83] courts concurrently, by a *biased* judge[84] with a reputation for boisterous misconduct[85], without the lawful jurisdiction[86] to hear or dispose of my home. By two undisclosed close family friends of ill repute[87], who did so without due process[88], an impartial tribunal, or equal protection under the law.

No matter what **anyone** claims, the related Chancery Court orders to sell my home[89] are, always have been, and as a matter of law can never be anything other than **VOID**[90]. Bias, fraud on the court, obstruction of justice, unconscionable attorney and judicial misconduct, take your pick… there is no statue of limitations for vacating a void judgment or seeking a remedy, while a void judgment can never be repaired or made valid. Similarly, courts have a responsibility to vacate void judgments, and to award damages wherever a rule for damages applies.

## JUDICIAL BIAS, FRAUD ON THE COURT, AND VOID JUDGMENTS

> "An unconstitutional act is not law; it confers no rights; it imposes no duties; affords no protection; it creates no office; it is in legal contemplation, **as inoperative as though it had never been passed."** *Norton v. Shelby County*, 118 U.S. 425 p. 442 (emphasis added).

[82] DOC 19, PID 2617-2716 | https://rico.jefffenton.com/evidence/2019_tn-court-motions-in-chronological-order.pdf

[83] DOC 38, PID 3445-3496 | https://rico.jefffenton.com/evidence/2019-04-26_bankruptcy-crimes-rules-and-laws-violated.pdf

[84] DOC 68, PID 5009-5029 | https://rico.jefffenton.com/evidence/2024-08-22_memorandum-of-law-about-void-tn-court-orders.pdf

[85] DOC 54-1, PID 4368 | https://rico.jefffenton.com/evidence/2021-03-21_knox-news-binkley-threatens-prior-restraints.mp4
DOC 1-14, PID 597-640 | https://rico.jefffenton.com/evidence/2021-03-21_knox-news-binkley-threatens-prior-restraints.pdf
DOC 43, PID 3696-3697 | https://rico.jefffenton.com/evidence/2017-02-01_wsmv-binkley-arrest-expunged-by-moreland.pdf

[86] DOC 54-1, PID 4367 | https://rico.jefffenton.com/evidence/2020-07-02_bk-trustee-john-mclemore-recorded-call.mp3
DOC 28, PID 3276-3288 | https://rico.jefffenton.com/evidence/2020-07-02_bk-trustee-john-mclemore-call-declaration.pdf

[87] DOC 43, PID 3726-3729 | https://rico.jefffenton.com/evidence/2018-08-30_tennessean-story-hosts-vacations-with-judges.pdf
DOC 44, PID 3740-3741 | https://rico.jefffenton.com/evidence/2018-09-24_tenn-binkley-defends-partying-with-lawyers.pdf

[88] DOC 33, PID 3310-3391 | https://rico.jefffenton.com/evidence/2019-08-01_hearing-professional-and-judicial-misconduct.pdf

[89] DOC 19, PID 2617-2716 | https://rico.jefffenton.com/evidence/2019_tn-court-motions-in-chronological-order.pdf

[90] DOC 48, PID 4019-4029 | https://rico.jefffenton.com/evidence/2019-10-29_1986-sunnyside-real-estate-deed-fraud.pdf

**"Fraud upon the court"** has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a **fraud perpetrated by** <u>**officers of the court**</u> **so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases** that are presented for adjudication." *Kenner v. C.I.R.*, 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23. The 7th Circuit further stated "a decision produced by fraud upon the court **is not in essence a decision at all, and never becomes final"** (emphasis added).

"Courts are constituted by authority and they cannot go beyond that power delegated to them. **If they act beyond that authority, and certainly in contravention of it, their judgements and orders are regarded as nullities; they are not voidable,** <u>**but simply void**</u>**, and this even prior to reversal."** *WILLIAMSON v. BERRY*, 8 HOW. 945, 540 12 L. Ed. 1170, 1189 (1850) (emphasis added).

"Where rights secured by the Constitution are involved, **there can be no 'rule making' or legislation which would abrogate them."** *Miranda v. Arizona*, 384 U.S. 426, 491; 86 S. Ct. 1603 (emphasis added).

In 1994, the U.S. Supreme Court held that "**Disqualification is required** if an objective observer would entertain ***reasonable*** questions about the judge's impartiality. If a judge's **attitude** or **state of mind** leads a detached observer to conclude <u>that a fair and impartial hearing is unlikely</u>, **the judge must be disqualified."** *Liteky v. U.S.*, 114 S.Ct. 1147, 1162 (1994) (emphasis added).

Courts have repeatedly held that positive proof of the partiality of a judge is not a requirement, **only the appearance of partiality.** *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194 (1988) (emphasis added).

That Court also stated that Section 455(a) "**requires a judge to recuse himself** in any proceeding in which her impartiality might **reasonably** be questioned." *Taylor v. O'Grady*, 888 F.2d 1189 (7th Cir. 1989) (emphasis added).

The Supreme Court has ruled and has reaffirmed the principle that "**justice must satisfy the appearance of justice**", *Levine v. United States*, 362 U.S. 610, 80 S.Ct. 1038 (1960), citing *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13 (1954) (emphasis added).

"Recusal under Section 455 is self-executing; a party need not file affidavits in support of recusal and **the judge is obligated to recuse herself sua sponte** under the stated circumstances." *Taylor v. O'Grady*, 888 F.2d 1189 (7th Cir. 1989) (emphasis added).

Should a judge not disqualify himself, **then the judge is violation of the Due Process Clause of the U.S. Constitution.** *United States v. Sciuto*, 521 F.2d 842, 845 (7th Cir. 1996) ("The right to a tribunal free from bias or prejudice is based, not on section 144, but on the Due Process Clause.") (emphasis added).

This cannot be ignored its fact recorded! Judgment is a void judgment if court that rendered judgment lacked jurisdiction of the subject matter, or of the parties, **or acted in a manner inconsistent with due process**, Fed. Rules Civ. Proc., Rule 60(b)(4), 28 U.S.C.A., U.S.C.A. *Const. Amend. 5 -Klugh v. U.S.*, 620 F.Supp. 892 (D.S.C. 1985) (emphasis added).

**When appeal is taken from a void judgment, the appellate court must declare the judgment void**, because the appellate court **may not address the merits**, *it must set aside the trial court's judgment and dismiss the appeal.* A void judgment may be attacked at any time by a person whose rights are affected. See *El-Kareh v. Texas Alcoholic Beverage Comm'n*, 874 S.W.2d 192, 194 (Tex. App.-Houston [14th Dist.] 1994, no writ); see also *Evans v. C. Woods, Inc.*, No. 12-99-00153-CV, 1999 WL 787399, at *1 (Tex. App.-Tyler Aug. 30, 1999, no pet. h.) (emphasis added).

**The Court Has a Responsibility to Correct a Void Judgment:** The statute of limitations **does not apply** to a suit in equity to vacate a void judgment. (*Cadenasso v. Bank of Italy*, p. 569; Estate of Pusey, 180 Cal. 368,374 [181 P. 648].) This rule holds as to all void judgments. In the other two cases cited, *People v. Massengale* and *In re Sandel*, the courts confirmed the judicial power and responsibility to correct void judgments (emphasis added).

**A court cannot confer jurisdiction where none existed and cannot make a void proceeding valid.** A void judgment which includes judgment entered by a court which lacks jurisdiction over the parties or the subject matter, or lacks inherent power to enter the particular judgment, **or an order procured by fraud**, can be attacked at any time, in any court, either directly or collaterally, provided that the party is properly before the court. See *Long v. Shorebank Development Corp.*, 182 F.3d 548 (C.A. 7 Ill. 1999) (emphasis added).

> When rule providing for relief from void judgments is applicable, **relief is not discretionary matter, but is mandatory.** *Omer. V. Shalala*, 30 F.3d 1307 (Colo. 1994) (emphasis added).
>
> "The innocent individual who is harmed by an abuse of governmental authority **is assured that he will be compensated for his injury."** *Owen v. City of Independence* (emphasis added).
>
> Society's commitment to institutional justice **requires that judges be solicitous of the rights of persons** who come before the court. *Geiler v. Commission on Judicial Qualifications*, (1973) 10 Cal.3d 270, 286 (emphasis added).

## ALL RIGHTS RESERVED TO ADD, AMEND, AND FURTHER SUBSTANTIATE

104. Due to the large number of defendants in this matter and outstanding motions which I need to both file and respond to in order to protect my rights, I have worked hard to file documents on the record recently which testify to and prove the **truth** to counter false claims made by multiple defendants in their motions. This way I can focus more resources on trying to clearly articulate the truth, rather than swatting down lies, in a more robust, comprehensive, and hopefully understandable fashion.

105. Due to the depth and breadth of this lawsuit, and the high number of powerful bad actors involved, most of whom have repeatedly violated the court's codes of conduct and acted in ways contrary to law and unbecoming of officers of the court, in many matters it is extremely difficult to quickly and concisely state the **truth**, while presenting it in a manner which makes sense and is believable on the face. That is not my fault. That is one of the strategic elements of *predatory litigation*[91] which makes it difficult to catch, articulate, and communicate to others, to reach help.

[91] https://jefffenton.com/predatory-litigation-how-us-courts-were-designed-to-produce-justice-why-they-fail-how-to-restore-justice-again/ https://tninjustice.org/predatory-litigation-101/

106. Therefore I have worked hard to articulate, explain, and evidence many complex matters on the record in declarations focused on communicating specific aspects, such as my "DECLARATION EXPLAINING MY PURSUIT OF JUSTICE[92]", my "NOTICE TO ALL BAR MEMBERS[93]", and my "DECLARATION REGARDING FINANCES, MARITAL ROLES, PROPERTY, EDUCATION, EARNING CAPACITY, SPOUSAL SUPPORT, AND FRAUD[94]."

107. My hope is that the court and/or the defendants will consider the facts, truth, and evidence in those documents, while applying those pleadings as objections and replies to any motions by the defendants or portions thereof claiming otherwise, to substantially reduce the scope of pleadings which I must individually address to prevent another miscarriage of justice. Without requiring me to redundantly copy and paste substantial chunks of facts and pleadings into multiple objections to motions filed by the defendants, alleging similar claims. (I honestly don't know *how* to communicate the *truth* about many of these matters in a more concise fashion than I already have.)

108. This would make far more efficient use of the court's time and everyone else's in this matter, to help quickly dispense with frivolous claims without exhausting more of my critically limited time and resources, defending myself against and responding to motions, or portions therein, which probably *never* should have been filed by opposing counsel in the first place. Considering the **truth** exposed and evidenced in the record by my filings, combined with the requirements in F.R.Civ.P. Rule 11(b)[95], not to file documents "for any improper purpose[96]", and "[b]y presenting to the court a pleading, written motion, or other paper[97]" that the defendant's counsel "certifies that to the best of the person's knowledge, information, and belief, formed after

[92] DOC 207, PID 583-685 | https://rico.jefffenton.com/evidence/2025-01-20_declaration-explaining-my-pursuit-of-justice.pdf

[93] DOC 216, PID 984-1015 | https://rico.jefffenton.com/evidence/2025-02-24_notice-to-all-bar-members.pdf

[94] DOC 214, PID 911-975 | https://rico.jefffenton.com/evidence/fenton-finances-roles-property-education-support-fraud.pdf

[95] https://www.law.cornell.edu/rules/frcp/rule_11

[96] F.R.Civ.P. Rule 11(b)(1)

[97] F.R.Civ.P. Rule 11(b)

an inquiry reasonable under the circumstances[98]" that the claims therein "are warranted by existing law or by a nonfrivolous argument[99]", with meaningful "evidentiary support[100]", with only those denials which are "warranted on the evidence[101]".

109. That does **<u>not</u>** mean that I am *forfeiting* my right or opportunity to provide the court with a direct, robust, well researched rebuttal to each and every claim made by every defendant, should the court require me to in order to apply the *truth* in my *pleadings* for my benefit to any matters being considered by the court. That will certainly take me a lot more time, while I believe that the interests of justice in the matters before this court require the court to provide me extensions of time as are reasonably needed, to protect my constitutional rights to due process and equal protection under the law, while obviously needing to make some accommodations to compensate for the almost impossible odds of having thirty-four well-funded professionals, plus almost as many attorneys representing them, against *one* indigent *pro se* litigant with significant communication *disabilities*[102] and only a high school *education.* The goal is a **substantially just** result, all the same.

> "Following the simple guide of rule 8(e) that all pleadings shall be so construed as to do substantial justice"…"The federal rules reject the approach that pleading is a game of skill **in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits**" (emphasis added). *Conley v. Gibson*, 355 U.S. 41 at 48 (1957)

---

[98] F.R.Civ.P. Rule 11(b)

[99] F.R.Civ.P. Rule 11(b)(2)

[100] F.R.Civ.P. Rule 11(b)(3)

[101] F.R.Civ.P. Rule 11(b)(4)

[102] DOC 52, PID 4254-4257 | https://rico.jefffenton.com/evidence/tn-ada-disabilities-exploited-for-advantage-ocpd-merck.pdf
DOC 32, PID 3296-3309 | https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-declaration-of-disabilities.pdf
DOC 1-38, PID 2032-2045 | https://rico.jefffenton.com/evidence/2020-07-08_tnsc-coa-ada-request-for-modification.pdf

110. I have tried to address many of the false claims repeated by multiple defendants, in the best way I know how to communicate them. If I need to later go back and provide direct pleadings to each and every claim in every motion, I can and will do so, while specifically reserving my right herein, provided the court will allow me extensions of time as are necessary for that to be realistically possible for me.

111. I am doing this in good faith to provide both the court and the defendants with a high-profile view of my posture in this lawsuit. Hopefully, the court and the defendants can work to consolidate and/or strike the defendants' most frivolous motions, or portions therein, pending before this court, so I can focus on addressing those which the defendants and/or the court believe have honest, reasonable, merit considering the scope of this lawsuit, rather than being overtaxed with more attorney misconduct further delaying and deferring justice in these critical time sensitive matters.

## CASE MANAGEMENT AND SCHEDULING ORDER

112. I am overwhelmed with a need to respond to a multitude of filings currently, several of which are frivolous, not knowing how I should prioritize them, which the court is most likely to entertain, or honestly how I should proceed from this point.

113. I don't understand the role of a *pro se staff attorney*, or the scope/purpose of their involvement in this case, or the "initial review[103]" they are apparently preparing. Similarly, I do not understand if or how this impacts what I should be focused on currently. I move the court to provide me with some guidance, information, or notice regarding these questions.

114. I move the court to begin case management and to apply my pleadings and objections already on record to the defendants' dispositive motions.

---

[103] DOC 209, PID 687 | https://rico.jefffenton.com/3-24-cv-01282/doc/209.pdf

115. I move the court to strike any motions filed by the defendant's counsel, which fail to clearly comply with F.R.Civ.P. 11(b), in light of my pleadings already filed on record in this case.

116. I move the court to narrow the matters needing a response by me, and to provide me with a scheduling order so that I will understand how I need to prioritize responding to them, and to what depth, while allowing me ample time to address **one motion at a time**, because of the real limitations caused by my disabilities[104].

117. In any instance where the court would otherwise rule contrary to my interests, I move the court to provide me with a clearly defined period of time to respond to each motion, on a point-by-point basis, factoring in a week for mailing time from Michigan to Tennessee, until or unless the court grants me ECF filing privileges.

118. That is the only way I know whereby this court can rule fairly based upon the **merits** of the matters herein, instead of me simply being *overwhelmed, outperformed,* and *procedurally* defeated because I am a disadvantaged *pro se* litigant who *must* defend myself against *five* judges, *ten* attorneys, *five* law firms, *two* real estate firms, *two* auctioneers, *two* banks, *one* county, and *three* courts, with a total of *five* divisions of state government in Tennessee, plus over a *dozen* law firms representing the defendants, with *two* attorneys from each in most cases, while leveraging public federal, state, and county resources against me and the critical interests of justice in this case.

[104] DOC 52, PID 4254-4257 | https://rico.jefffenton.com/evidence/tn-ada-disabilities-exploited-for-advantage-ocpd-merck.pdf
DOC 32, PID 3296-3309 | https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-declaration-of-disabilities.pdf
DOC 1-38, PID 2032-2045 | https://rico.jefffenton.com/evidence/2020-07-08_tnsc-coa-ada-request-for-modification.pdf

## CONCLUSION

## STAY PHASE-1, RULING ON CRITICAL MOTIONS

119. I move the court to **stay** all dispositive motions until the following tasks or events are completed, and I have **afterwards** had a fair opportunity to respond to each individual dispositive motion remaining, filed by the defendants and/or their counsel:

120. Until after the court rules on my "AMENDED MOTION TO REQUIRE ALL FILINGS TO INCLUDE A CERTIFICATION STATING THEIR CONTENTS ARE FACTUALLY TRUE AND COMPLIANT WITH F.R.C.P. RULE 11(B), SWORN TO UNDER THE PENALTY OF PERJURY (EXPEDITED CONSIDERATION REQUESTED)[105]" filed on October 10, 2024, in DOC 100, 100-1, PID 5343-5374.

121. Until after the court rules on my "MOTION TO FILE ELECTRONICALLY AND FOR REMOTE PARTICIPATION (EXPEDITED CONSIDERATION REQUESTED)[106]" filed on January 21, 2025, in DOC 197, 191-1, PID 445-486.

122. If the court denies *either* of the two motions above, *then* I move the court to escalate my motion for **sanctions**[107] against defendant Story and/or her counsel, and to extend this stay until after the court rules on that motion, or in the alternate the court *sua sponte* orders sanctions against defendant Walker[108] and/or the U.S. Attorney's Offices[109] for their deception and misconduct, resulting in the loss of literally hundreds of hours of my time and work, due to

---

105 DOC 100, PID 5343-5374 | https://rico.jefffenton.com/evidence/2024-10-08_motion-all-filings-be-under-penalty-of-perjury.pdf

106 https://rico.jefffenton.com/3-24-cv-01282/doc/197.pdf | https://rico.jefffenton.com/3-24-cv-01282/doc/197-1.pdf

107 DOC 99, PID 5328-5342 | https://rico.jefffenton.com/evidence/2024-10-08_motion-for-sanctions-against-story-for-lying.pdf

108 DOC 217, 218, 219 | "DECLARATION AND MOTION TO FILE UNDER SEAL REGARDING DEFENDANT WALKER'S CLAIMED PRIVACY CONCERNS RELATED TO HIS HOME ADDRESS"

109 DOC 211, PID 689-723 | https://rico.jefffenton.com/evidence/2025-02-08_objection-to-dispositive-defendant-motions.pdf
DOC 212, PID 730-907 | https://rico.jefffenton.com/evidence/2025-02-10_tn-motion-to-minimize-or-remove-redactions.pdf
DOC 222, PID 1164-1214 | https://rico.jefffenton.com/evidence/2025-03-03_objection-judicial-misconduct-in-michigan.pdf

dishonest and deceptive claims, which are unreasonable in light of the "DECLARATION AND MOTION TO FILE UNDER SEAL REGARDING DEFENDANT WALKER'S CLAIMED PRIVACY CONCERNS RELATED TO HIS HOME ADDRESS", filed in DOC 217, 218, and 219.

123. This is the only way I know of, without the top two motions, where I will have access to the resources necessary to litigate this lawsuit for a remedy, unless the court orders some of the defendants to provide me with counsel due to their substantial egregious attorney and judicial misconduct[110] both in this matter as well as in the precipitating Tennessee actions.

**STAY PHASE-2, COMPLETING SERVICE & COMPELLING APPEARANCES**

124. I move the court to extend this stay of all dispositive motions, until I am able to complete the initial service of this lawsuit and the four outstanding defendants (to follow) have been compelled by the court to make an appearance in this matter, as explained in my "SECOND MOTION TO EXTEND TIME AND ASSIST WITH PERFECTING SERVICE[111]", filed with the court this past week.

---

[110] DOC 22, PID 2818-2862 | https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
DOC 33, PID 3310-3391 | https://rico.jefffenton.com/evidence/2019-08-01_hearing-professional-and-judicial-misconduct.pdf
DOC 24, PID 2921-2947 | https://rico.jefffenton.com/evidence/2019-08-29_authentic-chancery-transcript-and-audio.pdf
DOC 23-4, PID 2920 | https://rico.jefffenton.com/evidence/2019-08-29_chancery-hearing-audio-recording.mp3
DOC 23, PID 2863-2920 | https://rico.jefffenton.com/evidence/2019-08-29_chancery-hearing-transcript-audio-markers.pdf
DOC 68, PID 5009-5029 | https://rico.jefffenton.com/evidence/2024-08-22_memorandum-of-law-about-void-tn-court-orders.pdf

[111] https://rico.jefffenton.com/evidence/2025-03-05_second-motion-to-extend-time-for-service.pdf

125. Below are the four outstanding defendants who have been served, yet have failed or refused to make an appearance in this matter to date (contact information for each is included in this motion[112]):

(1) Attorney Kathryn Lynn Yarbrough[113] (BPR# 032789)
Proofs of Service: DOC 95, PID 5213-5234; DOC 180, PID 281-296

(2) Bankers Title & Escrow Corporation[114] (TN SOS Control #000259388)
Proof of Service: DOC 201, PID 493-509

(3) Attorney Alexander Sergey Koval[115] (BPR# 029541)
Proof of Service: DOC 192, PID 379-408

(4) Spragins, Barnett & Cobb, PLC[116] (TN SOS Control #000334328)
Proof of Service: DOC 221, PID 1129-1163

## STAY PHASE-3, CASE MANAGEMENT, STRIKING FRIVELOUS DEFENDANT MOTIONS, AND CREATING A SCHEDULING ORDER

126. I move the court to strike any motions filed by the defendant's counsel, which fail to clearly comply with F.R.Civ.P. 11(b), in light of my pleadings already filed on record in this case.

127. I move the court to strike frivolous motions, or parts thereof, filed by the defendants or their counsel, either based on the merits of my objections and recent filings, per this motion as outlined herein, or *sua sponte* in the interests of justice. To substantially reduce the workload for me in filing individual objections, or in the alternative to *notify* me that the court will *not* do so, thereby narrowing and/or clarifying the scope of work before me.

---

[112] https://rico.jefffenton.com/evidence/2025-03-05_second-motion-to-extend-time-for-service.pdf

[113] DOC 95, PID 5213-5234 | https://rico.jefffenton.com/3-24-cv-01282/doc/95.pdf
DOC 180, PID 281-296 | https://rico.jefffenton.com/3-24-cv-01282/doc/180.pdf

[114] DOC 201, PID 493-509 | https://rico.jefffenton.com/3-24-cv-01282/doc/201.pdf

[115] DOC 192, PID 379-408 | https://rico.jefffenton.com/3-24-cv-01282/doc/192.pdf

[116] DOC 221, PID 1129-1147 | https://rico.jefffenton.com/3-24-cv-01282/doc/221.pdf
DOC 221-1, PID 1148-1163 | https://rico.jefffenton.com/3-24-cv-01282/doc/221-1.pdf

## STAY PHASE-4, REQUIRING ALL DEFENDANTS TO ANSWER MY COMPLAINT BASED ON THE MERITS, CERTIFIED TRUE UNDER THE PENALTY OF PERJURY

128. I move the court to enter an order requiring every defendant in this lawsuit to file an answer based upon the **merits** of my complaint, while including specificity about any claims they seek to dispute or disavow, while including a declaration or affidavit with language specifically certifying that their claims, testimony, and contentions are in fact **correct** and **true**, sworn to under the penalty of perjury.

129. I move the court to ensure that those orders are executed in a manner which ensures that any defendant found and proven later to have lied or provided material misrepresentations in their answer will be guilty of committing perjury.

130. If for any reason this court denies this request, I move the court to provide me with an explanation or justification for this decision.

## STAY PHASE-5, SET EXPECTATIONS REGARDING THE ROLE OF THE PRO SE STAFF ATTORNEY, NOTICE IF I SHOULD WAIT FOR THEIR INITIAL REVIEW

131. I move the court to notify me what the role is of the *pro se* staff attorney[117], clarifying what my expectations should be, and whether or not I should *wait* upon the completion of their *initial review* prior to proceeding with filing more objections to the defendant's outstanding motions.

[117] DOC 209, PID 687 | https://rico.jefffenton.com/3-24-cv-01282/doc/209.pdf

## STAY PHASE-6, ANSWERING QUESTIONS AND PROVIDING CLARIFICATIONS

132. To quickly recap a concern: I am struggling to understand **how** best and most efficiently to respond to the defendants motions to dismiss. Whether to draft and file papers which address specific **topics** and **claims**, for example "Objection to all Defendant Claims that Service was Untimely", or whether I need to redundantly copy and paste the same responses into separate objections which I must file for each and every defendant making similar claims. Similarly, the interests of justice as related to each objection could be many pages long (possibly ten or twenty pages) and likely won't change much between objections, so do I need to redundantly repeat (copy and paste) that content into each and every individual objection?

133. I move the court to answer those questions while noticing me about the most practical and efficient means for me to object to the defendant's remaining motions, so that we can quickly move past these matters to timely address the substantial merits of this lawsuit.

## STAY PHASE-7, ALLOW ME TIME TO RESPOND TO ALL REMAINING DISPOSITIVE MOTIONS AFTER THE COURT HAS RULED ON THE ABOVE

134. In the event that any part of this motion to stay is denied, I move the court to provide me an extension of time in all matters until the court has ruled on this motion and provided me notice of the order, and I have **afterwards** had a fair opportunity to respond to each individual dispositive motion remaining by the defendants and/or their counsel.

135. I emphatically object to any party being released from this lawsuit and to this lawsuit to be dismissed, for any reason prior to this court addressing my papers and pleadings regarding attorney and judicial misconduct by the defendants and their counsel—along with that performed by the previous district court in Michigan—while allowing me an opportunity to fairly respond

after the court has ruled on those matters, to protect my interests in any and all matters before this court, prior to any dispositive rulings.

> The plaintiff's civil rights pleading was 150 pages and described by a federal judge as "inept". Nevertheless, it was held "Where a plaintiff pleads pro se in a suit for protection of civil rights, the Court should endeavor to construe Plaintiff's Pleadings without regard to technicalities." *Picking v. Pennsylvania Railway*, 151 F.2d. 240, Third Circuit Court of Appeals

**CERTIFICATION AND DECLARATION**

By signing below, I, Jeffrey Ryan Fenton, certify that this document has been executed in good faith, in the honest pursuit of justice, and in strict compliance with F.R.Civ.P. 11(b).

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct, except as to matters herein stated to be on information and belief, and as to such matters, I certify as aforesaid that I verily believe the same to be true.

All rights reserved.

Executed on March 9, 2025.

JEFFREY RYAN FENTON, PRO SE
17195 SILVER PARKWAY, #150
FENTON, MI, 48430-3426
CONTACT@JEFFFENTON.COM
(P) 615.837.1300
#TNinjustice
#iAMhuman

**DOCUMENTS REGARDING (CASE: 3:24-CV-01282):**

1. SECOND MOTION TO STAY ALL DISPOSITIVE MOTIONS UNTIL SERVICE IS COMPLETED AND THE COURT HAS RULED ON PLAINTIFF'S OUTSTANDING EXPEDITED MOTIONS, WITH CLARIFICATIONS ABOUT HOW TO PROCEED

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2025, I mailed the foregoing or above-named papers to the United States District Court for the Middle District of Tennessee, at their address below, for filing in case number 3:24-cv-01282.

I further certify that on or before March 10, 2025, I am serving these same documents to the defendants or their counsel by first class or priority mail with postage prepaid at the addresses listed below. If for any reason beyond my control, I am unable to complete either on the date specified, I will do so on the very next business day.

UNITED STATES DISTRICT COURT (TNMD)
719 CHURCH ST
NASHVILLE, TN 37203-6940

MEGAN CALME & SARAH MATHEWS
WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
3102 WEST END AVE STE 400
NASHVILLE, TN 37203-1623

PEAKO ANDREA JENKINS
TENNESSEE ATTORNEY GENERAL'S OFFICE
PO BOX 20207
NASHVILLE, TN 37202-4015

KATHRYN LYNN YARBROUGH
223 TOWN CENTER PKWY UNIT 1897
SPRING HILL, TN 37174-3040

LISA M. CARSON
BUERGER, MOSELEY & CARSON, PLC
4068 RURAL PLAINS CIR STE 100
FRANKLIN, TN 37064-8039

CAROLINA MARTIN & COURTNEY WILLIAMS
GORDON & REES SCULLY MANSUKHANI, LLP
4031 ASPEN GROVE DR STE 290
FRANKLIN, TN 37067-2951

ALEXANDER SERGEY KOVAL
CLARK & WASHINGTON, P.C.
1321 MURFREESBORO PIKE STE 320
NASHVILLE, TN 37217-2858

ANTHONY NOEL & LARUA BASSETT
LEITNER, WILLIAMS, DOOLEY, AND NAPOLITAN, PLLC
750 OLD HICKORY BLVD STE 200
BRENTWOOD TN 37027-4567

ANICA CLARISSA JONES
U.S. ATTORNEY'S OFFICE
719 CHURCH ST STE 3300
NASHVILLE, TN 37203-7155

SANDRA J. DENSHAM
PLUNKETT COONEY
333 BRIDGE ST NW STE 530
GRAND RAPIDS, MI 49504-5365

THOMAS E. ANDERSON
1187 OLD HICKORY BLVD STE 125
BRENTWOOD, TN 37027-4248

GREGORY BROWN & WILLIAM HICKERSON
LOWE YEAGER & BROWN, PLLC
920 VOLUNTEER LANDING LN STE 200
KNOXVILLE, TN 37915-2584

ALAN RHENEY
SPRAGINS, BARNETT & COBB, PLC
312 E LAFAYETTE ST
JACKSON, TN 38301-6220

BRET CHANESS
RUBIN LUBLIN, LLC
3145 AVALON RIDGE PL STE 100
PEACHTREE CORNERS, GA 30071-1570

R L MOORE
BANKERS TITLE & ESCROW CORPORATION
3310 WEST END AVE STE 540
NASHVILLE, TN 37203-6802

B. GOLDAMMER & D. SUEDEKUM
KAY GRIFFIN, PLLC
222 2ND AVE N STE 340M
NASHVILLE, TN 37201-1649

G. CATE & K. INGRAM-HOGAN
BRADLEY ARANT BOULT CUMMINGS, LLP
1221 BROADWAY STE 2400
NASHVILLE, TN 37203-7238

ERIK HALVORSON
BRADLEY ARANT BOULT CUMMINGS
1221 BROADWAY STE 2400
NASHVILLE, TN 37203-7238

## ELECTRONIC SERVICE OPTIONS

Many of my filings in this lawsuit are also made publicly available on the Internet, through my list[1] of documents filed by myself in this lawsuit, since the release of my lawsuit service package[2]. I typically try to do this as quickly as I can after filing them in court, depending upon my workload. Not every filing warrants being electronically published in this manner, while my time is extremely limited, therefore I cannot provide any guarantees about which documents will or will not be made available online, or exactly when.

For those interested, these files are usually "true" digitally created PDF files, in full color, often with optical character recognition enabled, sometimes with electronic bookmarks, and occasionally with a built-in table of contents which is hyperlinked for easy and efficient referencing, in my largest and most significant documents, such as my amended complaint[3].

## CERTIFICATION AND DECLARATION

By signing below, I, Jeffrey Ryan Fenton, certify that this document has been executed in good faith, in the honest pursuit of justice, and in strict compliance with F.R.Civ.P. 11(b).

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

All rights reserved.

Executed on March 10, 2025.

**Jeffrey Ryan Fenton, pro se**
17195 Silver Parkway, #150
Fenton, MI, 48430-3426
contact@jefffenton.com
https://JeffFenton.com
(P) 615.837.1300
#TNinjustice
#iAMhuman

1 https://jefffenton.com/digital-service-package-for-lawsuit/fenton-filings-since-service/

2 https://jefffenton.com/digital-service-package-for-lawsuit/
ECF 69, PID.5030-5042 | https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-lawsuit-service-pack-details.pdf

3 DOC 66, PID 4870-5007 | https://rico.jefffenton.com/evidence/3-24-cv-01282_fenton-vs-story-first-amended-complaint.pdf

CERTIFIED MAIL

7020 3160 0002 3001 3981

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

Retail

U.S. POSTAGE PAID
PM
LINDEN, MI 48451
MAR 10, 2025

RECEIVED $17.57

RDC 03

MAR 12 2025 S2324P501528-06

UNITED STATES POSTAL SERVICE® | PRIORITY® MAIL

FROM: 17195 SILVER PKWY
PMB #150
FENTON, MI 48430-3426

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at *http://pe.usps.com*.
** See International Mail Manual at *http://pe.usps.com* for availability and limitations of coverage.

TO:

UNITED STATES DISTRICT COURT
ATTN: CLERK OF THE COURT
719 CHURCH ST
NASHVILLE, TN 37203-6940

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

TRACKED ■ INSURED

PS00001000014

EP14F July 2022
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

This package is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; July 2022; All rights reserved.


UNITED STATES POSTAL SERVICE ®
PRIORITY ® MAIL
FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT
To schedule free Package Pickup, scan the QR code.
USPS.COM/PICKUP
TRACKED ■ INSURED
PS00001000014
EP14F July 2022
OD: 12 1/2 x 9 1/2
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE
For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.

PLAINTIFF'S
EXHIBIT
A

EXHIBIT
1

PLAINTIFF'S EXHIBIT A-1

MUNGER TOLLES & OLSON LLP

PRIVILEGED AND CONFIDENTIAL

# Independent Investigation for the State Bar of California: Summary of Findings and Recommendations

32

Mark B. Helm
Bart H. Williams
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100

PLAINTIFF'S EXHIBIT A-2



This report summarizes the major findings and recommendations of an independent investigation that Munger, Tolles & Olson LLP conducted as outside counsel for the State Bar of California ("State Bar" or "Bar"). We will provide a fuller recitation of the results of the investigation to the Board of Trustees ("Board") at a closed session meeting scheduled for October 17, 2014.

## I. BACKGROUND AND SCOPE OF INVESTIGATION

The investigation began on August 26, 2014, in response to a July 31, 2014 Report of Improper Activity from the Bar's Chief Trial Counsel, Jayne Kim. Attachment 1. Among other things, Kim reports "concerns related to certain actions by Executive Director Joseph Dunn (ED), Chief Financial Officer Peggy Van Horn (CFO) and General Counsel Thomas Miller (GC) that demonstrate a disturbing [] lack of transparency at the highest levels within the organization." She claims that "State Bar leadership is failing to adhere to basic principles of governance" and that a "'five layer chess game' with key stakeholders and other executives" has "systematically fostered a culture of intimidation and isolation within the organization and resulted in dishonest communications to the Board of Trustees." In the investigation's early stages, we also received a memorandum from Deputy Executive Director Robert Hawley raising some issues relating to Van Horn's handling of various finance matters, including her handling of certain expense reports for Dunn's travel. Attachment 2.

We conducted an initial investigation consisting of interviews of five designated witnesses and a preliminary review of documents. This culminated in an interim report to the Board at a closed session meeting held September 14, 2014. The Bar then engaged us to undertake a second phase of the investigation that has involved, among other things, interviews of nineteen additional witnesses, collection and review of additional documents, and further legal analysis.

Our investigation probed the issues raised in Kim and Hawley's memoranda with particular focus on the following issues:

PLAINTIFF'S EXHIBIT A-3



- Whether Joseph Dunn misled the Board or allowed the public to be misled about the use of Bar funds in connection with travel to Mongolia;
- Whether Dunn and Thomas Miller failed adequately to inform the Board about the California Supreme Court's reservations about pending legislation (A.B. 852) when the Board was voting to sponsor that bill;
- Whether Van Horn mishandled expense reports relating to Dunn's travel, and whether she knowingly concealed those reports from the Bar's auditors;
- Whether Dunn engaged in cronyism or violated Bar procedures in his hiring of certain Bar employees (including General Counsel Thomas Miller), his handling of certain contracts for the provision of services, and/or offers of assistance to Board members or others.

The third phase of the investigation involved the preparation of this report. We reach the following major conclusions and recommendations:

- Dunn failed on several occasions to satisfy his contractual and fiduciary duties to provide complete and accurate disclosures to the Board. In particular, he misled the Board or allowed the public to be misled about the use of Bar funds in connection with travel to Mongolia; failed to inform the Board of the Supreme Court's concerns regarding A.B. 852; and made misstatements to a Board committee regarding the Supreme Court's views on the Bar's possible move to Sacramento. These concerns are aggravated by Dunn's lack of candor on several issues during the investigation. This misconduct justifies termination of Dunn's at will employment, although the Board should consider various factors discussed below in deciding whether to take that action.
- The quality and effectiveness of Van Horn's work as the Bar's chief financial officer are subject to serious question. In particular, Van Horn failed to correct improper accounting for the Mongolia travel and did not properly handle expense

PLAINTIFF'S EXHIBIT A-4



reports relating to Dunn's travel. For these reasons, we recommend that Van Horn be reprimanded and that the Board take appropriate steps to bring about that result.

- If it decides not to terminate Dunn, the Board should consider taking steps to strengthen the General Counsel position as a possible independent check on the Executive Director. First, it may want to consider replacing Miller, whose ability to serve as an independent counterweight is questionable in light of his performance at the Board meetings on A.B. 852. Second, whoever continues in that role, the Board should reinvigorate the policy that the General Counsel reports directly to both the Board and the Executive Director.

## II. MAJOR FINDINGS

### A. Mongolia Travel

In January 2014, Dunn, Bar employee Thomas Layton, and former State Bar President Howard Miller of the Girardi Keese law firm traveled to Mongolia in response to a request from the Mongolian government for help in implementing a new regulatory system for lawyers. In April 2014, Layton and Miller traveled to Mongolia a second time. Our investigation has focused on whether false statements were made about the use of Bar funds for the trip and how the Bar accounted for expenses related to the trip.

#### 1. Statements concerning the use of Bar funds for travel to Mongolia

There is substantial evidence that Dunn (i) misinformed the Board that Bar funds would not be used for the Mongolia trip, and (ii) failed to correct Howard Miller's public statement that Bar funds had not been used—or at least failed to bring the issue to the Board's attention for its consideration.

The evidence strongly suggests that Dunn told the Board no Bar funds would be used for travel to Mongolia. Three trustees recall that, at a meeting in November 2013, Dunn told the Board that no Bar funds would be used because Mongolia would cover the expenses. Another

PLAINTIFF'S EXHIBIT A-5



trustee could not recall whether Dunn affirmatively denied whether Board funds would be used for that purpose. No interviewees recalled Dunn ever telling the Board that Bar funds would be spent on trips to Mongolia, either in November or later. And several persons interviewed believed that, if Dunn *had* disclosed that information, it would have prompted Board discussion.

Dunn's representation that no Bar funds would be used proved to be untrue. In connection with the January trip, the Bar paid $6,041.72 in mandatory Bar dues for Dunn and Layton's airfare and cell phone roaming charges.[1] In connection with the April trip, the Bar paid $1,046.72 in expenses from the Administration of Justice Fund to cover Layton's hotel, meals and taxis. *Id*. Indeed, Dunn and Past President Luis Rodriguez acknowledge that they decided from the outset to use Bar funds for at least some of the costs of the January trip to Mongolia.

The extent to which Bar funds were used for the trip is complicated somewhat by the deposit into a State Bar fund on April 3, 2014 of a $5,000 check from the Girardi Keese firm dated March 20, 2014. Howard Miller said that the check was intended to cover past and future expenses related to Mongolia, and Van Horn has said she plans at some point to account for that deposit as a credit against Mongolia expenses. For several reasons, however, this check does not significantly mitigate the inaccuracy of Dunn's statement to the Board.

First, as of the start of this investigation on August 27, 2014, more than seven months after the first trip to Mongolia, and nearly five months after the check was received by the Bar, no accounting entry has been made to credit the donation against the expenses.

Second, the intent of the donation remains ambiguous, which may account for the delay in accounting treatment. Although Miller told us that the check dated March 20 was meant to reimburse the Bar for both past and future expenses, his contemporaneous email to Dunn indicated that the check was timed to enable booking the future *April* trip to Mongolia. That the

[1] This figure does not include $107.60 in expenses relating to meals and travel to and from the airport that Dunn submitted for reimbursement but that have not been processed.

PLAINTIFF'S EXHIBIT A-6



check was intended to cover only future expenses is also consistent with Dunn and Rodriguez's stated understanding, noted above, that Bar funds *would* be used for the first trip.

Third, even if accounted for to cover past expenses, the $5,000 check is insufficient to cover the full $7,088.44 in expenses incurred by the Bar.

The inaccurate information that Bar funds had not been used for the Mongolia trip later appeared in an article written by Howard Miller, published in the *Daily Journal* on April 23, 2014. Miller wrote:

> *Under the direction of State Bar President Luis Rodriguez, and discussions with CEO/Executive Director Joseph Dunn, it was decided* since a sovereign state had asked for help in the administration of justice in a unique area of its expertise, the State Bar would designate representatives to visit and work with Mongolia, *so long as no bar funds were used*, and the State Bar would simply be acting as a facilitator and advisor.
>
> *With that understanding, three of us, including Dunn and Thomas Layton . . . .went to Ulaan Bataar, Mongolia* in January.

Miller, *The Mongolian Connection*, DAILY JOURNAL, Apr. 23, 2014 at 5 (emphasis added). Dunn admitted that he saw the article at the time and noticed the statement. Several trustees and State Bar staff reported that they read the article at the time it was published and noted the statement that no Bar funds would be used. But Dunn took no steps to correct the statement, either by requesting Miller to do so or by issuing his own correction. The two explanations Dunn offered for his failure to correct the statement were troubling and, in our view, were inadequate to explain the failure to take any corrective action.

First, he claimed that the article is ambiguous and can be read to say only that no Bar funds would be used for *future* trips (an interpretation Rodriguez echoed). But this is an untenable interpretation of the article's plain meaning.

Second, Dunn said that he felt no obligation to correct the inaccurate statement because he did not write it. But Miller was (or at least appeared to outsiders to be) acting as an agent of the Bar in connection with the trip to Mongolia: he participated in the official trips; he was the Bar's representative at a ceremony in Mongolia in April; and he was designated in the

PLAINTIFF'S EXHIBIT A-7



memorandum of understanding between the State Bar and the Mongolian Bar Association as someone who, along with Dunn and Layton, would "manage all activities" related to that memorandum. *See* Memorandum of Understanding, ¶ 6; *see also* Cal. Civ. Code § 2317 ("Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess."). For this reason, the Bar had an obligation to correct misstatements by Miller about the trip. *See* Restatement (Second) Agency § 256, cmt b ("If the principal discovers the untruth of a statement made by an agent on his account, he is under the same duty to reveal the truth to the other party as if he himself had innocently spoken an untruth.").

Indeed, quite apart from any legal obligations involved, Dunn's apparent insensitivity to the problems that could be created by perceived inaccurate statements by persons affiliated with the Bar—particularly in the area of how Bar funds are used—is troubling. The unique role of the organization he heads—administrator of the state's legal profession and the system of ethical rules governing the profession—heightens the need for the chief executive to be sensitive to such issues. This is particularly true in light of the Bar's recent pledge to make its commitment to transparency "paramount." *See* Five-Year Strategic Plan, p. 5.

At the very least, Dunn should have brought the inaccuracy of Miller's public statement to the Board's attention so that it could decide whether a correction was warranted. Instead, Dunn appears to have done the opposite, by taking steps to minimize attention paid to the trip-related expenditures. Communications officer Laura Ernde reported that Rex Bossert told her that Dunn was unhappy that she had circulated within the office a different article about the Bar's work with Mongolia—allegedly because Dunn believed the issue was causing problems with the Board. Dunn also asked Ernde to edit a draft of an article about the Mongolian delegation's visit to the Bar in June to remove a statement that no Bar funds were used for the two previous trips to Mongolia, presumably because he knew the statement was not true. According to Ernde, she told Dunn that the statement was from Miller's April article. Instead of

PLAINTIFF'S EXHIBIT A-8



telling Ernde that the Miller article was inaccurate, Dunn simply told her that that article was not authorized by the Bar.

Dunn's inaccurate disclosures, failures to correct, and/or failures to disclose violated various duties he had. Under his contract, one of Dunn's "essential duties" is to "keep the Board and its President fully informed on matters of significance." Employment Agreement § II(E)(1). Likewise, as a senior executive of the Bar and the Board's agent, Dunn has a fiduciary duty to disclose material facts to the Board. *See Salahutdin v. Valley of Cal., Inc.*, 24 Cal. App. 4th 555, 562 (1994) ("The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud . . . ."); *People ex rel. Harris v. Rizzo*, 214 Cal. App. 4th 921, 950-51 (2013) (city reposed trust and confidence in its assistant chief administrative officer giving rise to fiduciary duties owed by the officer); *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (liability for nondisclosure of information may lie where the defendant is in a fiduciary relationship with the plaintiff). Other duties could also be implicated by Dunn's lack of candor with and failures to make disclosures to the Board.[2]

### 2. Improper accounting of the Mongolia travel expenses

As noted above, the Bar has charged the $6,041.72 in expenses for the January trip to a mandatory dues account. Although Van Horn stated that she thought a case might be made for use of mandatory funds for the trip, no one else has suggested that this would be appropriate, and

[2]Although our findings and recommendations do not depend on it, Dunn's failure to keep the Board informed also could implicate his ethical duties as a lawyer. *See Sodikoff v. State Bar*, 14 Cal. 3d 422, 429 (1975) ("When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct."); Cal. Ethics Op. 1995-141 at *3 ("[W]hen rendering professional services that involve a fiduciary relationship, a member of the State Bar must conform to the professional standards of a lawyer even if the services performed could also be rendered by one licensed in a different profession."); *cf.* Cal. R. Prof. Conduct 3-500 ("A member shall keep a client reasonably informed about significant developments relating to the employment or representation . . . .").

PLAINTIFF'S EXHIBIT A-9



it plainly would not be. *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990), requires that expenditures of mandatory dues be "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of legal service available to the *people of the State*." *Id*. at 13-14 (emphasis added). Helping Mongolia to implement a new regulatory regime, though a laudable goal, hardly satisfies this standard, and the accounting for these expenses raises two concerns.

First, although Van Horn has stated that she intends to change the accounting of these expenses so that they are no longer charged to mandatory dues, as of the date of her interview that had not happened. Under these circumstances, it is unclear whether, absent this investigation, Van Horn would have changed the accounting for these expenses to an appropriate voluntary account.

Second, Dunn himself showed a troubling lack of attention to whether expenses for the trip would be charged to mandatory or voluntary fees. The expense report he submitted for his own expenses for the January trip included an account code for mandatory fees. Seeking to disclaim responsibility for this allocation, he noted that his practice is to give his travel expenses to his administrative assistant and to let her and Van Horn decide how the expenses should be treated.

This explanation is not adequate. Given the unusual nature of the Mongolia trip, Dunn should have taken pains to direct Van Horn to make sure that *all* expenses were allocated to voluntary fees, which he did not do. Indeed, Sonja Oehler reported that she received no training on the circumstances under which mandatory Bar dues may be used to cover expenses. His failure even to ensure that his *own* expenses were properly allocated shows an inadequate sensitivity to what is a centrally important issue for the Bar, its reputation, and its relationship with its constituencies.

At a minimum, the Board should reprimand or counsel Dunn on his lack of leadership on this issue. It should also direct him to institute additional internal controls or training to ensure

PLAINTIFF'S EXHIBIT A-10



that incidents of this kind do not occur in the future and that his CFO is more closely attuned to the need for scrupulous compliance in this area.

**B. Dunn's communications with the Board regarding A.B. 852**

After the Governor vetoed A.B. 888, the Bar was involved in promoting A.B. 852, which would have permitted it to bring civil enforcement actions against persons engaged in the unlawful practice of law (UPL). Last April, Beth Jay emailed Tom Miller (who forwarded it to Dunn) that the Chief Justice wants to "delay further action" – and emailed Dunn and Miller that the Chief Justice "wants this bill stopped" – pending the Bar's development of further information showing a need for the measure. The request that the Bar stand down on further efforts was repeated at a May 1, 2014 regular quarterly meeting attended by three Court and eight Bar representatives, including Dunn.

Dunn nonetheless thought it appropriate to ask the Board at its May meeting, just over a week later, to authorize the Bar to sponsor the legislation. Given constraints in the legislative calendar, Dunn says, the bill would have died had it not proceeded further that month, and he believed that killing the bill for this legislative session went beyond the Court's request. Dunn reasoned he could always pull the plug later if the Court ultimately so directed, but he could not later resurrect it if the Court ultimately were persuaded to let the bill proceed. He did not discuss this rationale with Court representatives, however, before making the request to the Board at its May meetings.

Nor did Dunn mention the Supreme Court's concerns to the Board so it could make its own decision on the wisdom of his rationale for proceeding despite the Court's request to stand down. In a memorandum dated May 6, 2014, to the Board Committee on Operations and the Board of Trustees outlining the proposed legislation, Dunn stated "[t]here is no known opposition to the measure." Dunn did not mention the Supreme Court's concerns in this memorandum, in his presentation to the Board Operations Committee on May 8, or in any discussions with the full Board on May 9, where the measure was on the consent calendar.

PLAINTIFF'S EXHIBIT A-11



Dunn said that he felt constrained not to mention directly to the Board the Court's possible opposition to the bill, because the Board meeting was held in public, and Beth Jay had previously said that Court views should not be mentioned in public, especially on possible legislation that might come before the Court later. He claimed in his interview, however, that he reconciled this dilemma by giving the Board a coded reference to the Court's directive, stating to the Board that a "critical stakeholder has concerns" and "we are trying to resolve them to decide if the bill can move forward." When Beth Jay asked Dunn after the Board meeting why he had not shared the Court's position with the Board, Dunn claimed in an email to her that the Board was "quietly aware" of the Supreme Court's interest.

The weight of the evidence contradicts Dunn's claim that he told the Board at one or more of the May meetings that a "critical stakeholder has concerns." No trustee we interviewed recalled any such reference, nor did his co-presenter at the May 8 meeting Jennifer Wada (though she said she could not rule it out). Moreover, two people who were present at one or more of the meetings, Jayne Kim and Jim Fox, were keenly listening to Dunn's remarks on this subject, because they were present at the May 1 meeting with Court representatives and were expecting some form of disclosure about the Court's concerns. Both are quite certain Dunn made no such reference, and they complained to Beth Jay afterwards precisely because they say he did not.

Indeed, Fox was so upset with the lack of disclosure that he says he specifically requested an exit interview with Dunn before leaving his employment at the Bar so he could voice his objection. Dunn and Fox met for that interview on July 29, 2014. When Dunn defended his conduct at that meeting by noting the constraints on mentioning Court views at open meetings, Fox told us (without any prior prompting) that he told Dunn he could easily have advised the Board that "there are unresolved issues with some of the key stakeholders that need to be resolved." The similarity between this phrase and the phrase that Dunn *claimed* during his interview with us to have used at the Board meeting is too striking to be pure coincidence—and

PLAINTIFF'S EXHIBIT A-12



it seems unlikely that it was he who borrowed the phrase from Dunn rather than the other way around.

For these reasons, we think a factfinder would most likely conclude that Dunn did not tell the Board, either directly or through a veiled reference, about the Supreme Court's concerns regarding the bill. Further, the Court's concerns were plainly material to the decision Dunn was asking the Board to make and therefore should have been disclosed—as he implicitly concedes when he claims that he in fact attempted to make a disclosure of some kind. Finally, Dunn's evident violation of his duties discussed above to disclose material information to the Board was compounded by his (evidently) false claims to us in his interview that he in fact made a disclosure of some kind.

**C. Misstatements Regarding Move to Sacramento**

Our investigation has uncovered misrepresentations that Rodriguez and Dunn made to a Board committee about the Supreme Court's views regarding the Bar's possible move to Sacramento following a sale of its building in San Francisco. Rodriguez told the Board Operations Committee at a meeting held September 2, 2014, as well as at one or more earlier meetings in August, that the Supreme Court was aware of the possible move to Sacramento and supported or was amenable to it. Some present at that September 2, 2014 meeting also recall that Dunn made similar statements to the effect that the Chief had no problem with moving the Bar to Sacramento, that the issue had been "socialized" through both the Supreme Court and the Legislature, and that the Court was behind the Bar if it decided to move to Sacramento.

Rodriguez knew his statements were false. The Chief Justice told us that, although she said she was intrigued when she was told that the Bar's real estate brokers felt that the Bar could fetch an enormous sum for the building, she told him in the July 2014 time period that she did not think a move to Sacramento was a good idea. Specifically, she told him she was concerned about displacing long-term employees (which she said Rodriguez told her was a concern he shared). The Chief Justice also reported that, in a call held the day after the September 2

PLAINTIFF'S EXHIBIT A-13



meeting, she expressed the view that she did not think it was wise to have the Bar headquartered near the Legislature, though she does not believe she mentioned that concern in the call before that September 2 meeting. The Chief Justice did not believe that her comments to Luis Rodriguez could fairly be characterized as supportive of a move to Sacramento.

The evidence also indicates that Dunn knew that his statements about Supreme Court amenability to the move were severely exaggerated at best and false at worst. First, Beth Jay reported that she attended a lunch with Dunn in June or July 2014, where the possible sale of the building was discussed. She says that she told him: "I hope you won't be moving to Sacramento!" Ms. Jay reported that she made the comment because she knew that Dunn had an affinity for the Sacramento setting but she was concerned that such a move would be inappropriate. Second, the Chief Justice recalls having a few conversations with Dunn before or during the Summer of 2014 when Dunn mentioned the possibility of selling the building and moving to Sacramento. Although she was not asked and did not express her opinion on the move, let alone express the opinion of the full Court, the Chief Justice told us she said nothing from which Dunn could have fairly concluded that she or the Court supported the move.

Based on this input from Court representatives, Dunn's statements to the Board committee that the Court supported the move, that the matter had been "socialized" with the Supreme Court and the Legislature, and that the Court was behind the Bar if it decided to move to Sacramento were unfounded and inaccurate. Dunn's claim that he in fact told the Board committee that the Chief Justice saw both downsides and upsides to the move does not accord with committee members' recollections of his statements to them—nor with the Chief's recollection of the import of her statements to Dunn.

### D. Treatment of Dunn's expense reports

Hawley's memorandum provided twenty-three expense reports by which Dunn was seeking reimbursement for various expenses, which included some minor expenses associated with the Mongolia trip and other trips. Kim alleges that Van Horn knowingly concealed a

PLAINTIFF'S EXHIBIT A-14



Mongolia-related expense report in that set from the State Bar's auditors. While we are unable to conclude whether or not Van Horn knowingly concealed any of these expense reports, the treatment of the expense reports raises concerns regarding Van Horn's leadership and the Bar's internal controls.

On February 4, 2014, Van Horn received nineteen Dunn expense reports seeking reimbursement for meals and other travel expenses incurred between August and December 2013 (including for foreign travel). On or about April 7, 2014, Van Horn received four expense reports from Dunn seeking reimbursement for travel in the beginning of 2014 (including approximately $110 incurred on the January Mongolia trip). Van Horn signed the first seven expense reports and asked Office of Finance Director Andrew Conover to look into certain taxi expenses on one report. Van Horn never signed the remaining sixteen reports. It was not until late May or early June 2014 that she provided the expense reports to Hawley, who needed to approve them for late processing because the reports had been submitted beyond the Bar's 60-day limit.

According to Hawley, Van Horn told him in words or substance that the expense reports "are late from Joe" and that she had held onto the reports, including the reports submitted several months earlier in February, because she did not want the auditors to see them. Hawley stated that the Bar's auditors had recently concluded a review of the Bar's 2013 Statement of Expenditures of Mandatory Membership Fees at the time Van Horn made this remark. A primary focus of the audit was whether the Bar had properly accounted for 2013 expenditures as between those chargeable to mandatory fees or not, as required under *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990). Hawley expressed concern that Dunn and Van Horn proposed to charge the travel expenses to mandatory fees, even though in Hawley's view it would be improper to treat the expenses in that manner. Hawley also expressed concern that, in presenting the 2013 audit to the Board in July 2014, Van Horn failed to disclose that she had withheld these expenditures from the auditors. To date Hawley has not approved the expense reports.

PLAINTIFF'S EXHIBIT A-15



Van Horn does not deny that she gave the February expense reports to Hawley approximately two months after she received them. But Van Horn denied trying to conceal documents from the auditors, and she denied telling Hawley that she had done such a thing. Van Horn repeatedly stated that she never would have sent expense reports to Hawley without signing them first. During our initial interview with her (we had a few follow-up telephonic interviews as well), Van Horn stated that she felt so certain of this fact that she wondered whether Hawley had obtained the unsigned expense reports from her unlocked office. She further disputed that the *de minimis* amounts reflected in the expense reports would have been likely to prompt concerns with an auditor. Van Horn also noted that the auditors had conducted a review of expenses for calendar year 2013, and that the Mongolian travel all occurred during 2014.

When Andrew Conover of the procurement office was shown the unsigned expense reports during his initial interview, he did not supply an explanation for how Hawley would have received the reports unsigned. Conover told us in a subsequent email, however, that expense reports that are older than 60 days late are usually sent directly to Hawley for "late" approval before the procurement processing continues. Hawley rejected this explanation and stated that expense reports must be signed by the authorizing approver and submitted to him with an explanation (generally in writing) as to why they are late. Hawley reported that one of the reasons why he did *not* approve the late expense reports that he received in his in-box from Van Horn was that the vast majority of them had not been signed by Van Horn, the only person authorized to approve Dunn's expense reports.

Because there are no known other witnesses to the conversation between Van Horn and Hawley, we cannot definitively establish that Van Horn made the remarks attributed to her concerning the Bar's auditors, and the evidence points in conflicting directions.

On the one hand, it is difficult to understand why she would have confided in Hawley that she was withholding the reports from the auditors given that she does not like or trust

PLAINTIFF'S EXHIBIT A-16



Hawley, and he could have used such an admission against her. It also is hard to understand why Van Horn would have been motivated to conceal the expense reports from the auditors. In comparison to airfare and cell phone roaming charges associated with Dunn's overseas trips—which no one claims anyone sought to conceal—the amounts that Dunn claimed on the expense reports (for meals and taxis on those and other trips) are small. The reports for the Mongolia travel in particular reflect expenses that are *de minimis* by any measure—just over one hundred dollars. Moreover, because Dunn incurred the Mongolia trip expenses in 2014, the auditors would not have examined them in connection with the 2013 audit in any event.

On the other hand, certain idiosyncrasies in these reports raise questions that no one has been able to answer, and there is some reason to credit Hawley's recollection of the conversation.

First, Van Horn has been unable to explain why she delayed for so long in submitting the expense reports to Hawley and why she gave Hawley sixteen unsigned expense reports, some of which refer to foreign travel, when it is her responsibility to review Dunn's expense reports as part of the approval process.[3] Hawley vehemently denies Van Horn's speculation that Hawley may have taken unsigned Dunn expense reports from her office or that he would have had any reason to do so. Second, although the Mongolia trip expenses were small, the Mongolia trip expenses were the subject of some discussion among Bar employees, particularly in light of the Miller article published on April 23, 2014. Van Horn read the Miller article at the time and may have had on her mind these concerns about of the use of Bar funds before she gave the expense reports to Hawley. Third, Hawley has shown himself to be a careful individual with respect to

[3] Van Horn said that she reviewed the expense reports all at once and stopped reviewing the reports when she came across one with an apparent $70 error in taxi expenses. She asked Andrew Conover to investigate the taxi expenses, and Conover provided her with corrections on a copy of the expense report. For reasons that are unclear, Van Horn did not correct the original expense report, and gave that report and the rest of the reports in the set to Hawley at some later date.

PLAINTIFF'S EXHIBIT A-17



international travel and expenditures generally. When he travels internationally on behalf of the Bar, he does so on his personal time and refuses to have the Bar pay for any of his expenses.

In short, we cannot determine whether or not Van Horn knowingly concealed the Dunn expense reports from auditors as alleged by Kim. At the same time, the evidence suggests several deficiencies in how Van Horn is performing her duties.

- Although she criticizes Hawley for failing to process the expense reports since she provided them to him in late May or early June, Van Horn did not deal promptly with the expense reports she received in February and instead let them sit for over three months.
- She approved for payment expense reports for the Mongolian trip (*e.g.*, approximately $600 in cell phone roaming charges) using mandatory Bar dues coding.
- As of the date that this investigation commenced – nearly five months after the second Mongolian trip took place and seven months after the first trip – she had not taken any steps to ensure that ledger entries were made on the Bar's books and records to connect the $5,000 check from the Girardi firm to the Mongolian trip expenses.
- Van Horn did not ensure that Dunn and his assistant are familiar with the account coding system.

### E. Expense Budget Modifications

Van Horn's handling of Dunn's expense reports has fueled a troubling perception among Bar staff that Van Horn does not audit Dunn's expenses with the same level of attention and care afforded to other expenses. In particular, some witnesses reported that Van Horn polices each executive's use of the business expense account, except Dunn. Administrative Advisory No. 14-01 provides in part:

> Senior management may budget for "Business Expenses" (account code 40570). The amount in this account is determined by the Executive Director annually during the

PLAINTIFF'S EXHIBIT A-18



> budget planning process and is to be funded with non-mandatory fee revenues. This account is to be used at the senior managers' discretion in the course of their duties to cover applicable business expenses for themselves and others. . . .
>
> No reimbursement will be made against the Business Expense Account unless there is a sufficient amount budgeted in the account to cover the expense. . . .
>
> Business expenses that may be covered under this section include meals during which discussion of State Bar business occurs and there is a business need to keep participants together. Expenses for business meals will not be authorized for meetings where State Bar business is only nominally discussed or meetings with potential or existing vendors.

Administrative Advisory No. 14-01, VII A, C and D.

Both Van Horn and Hawley explained that the implementation of this policy changed sometime during Dunn's tenure. Before that policy change, senior executive staff members each had an individual expense budget of approximately $1,500 for their respective cost centers. Executives were expected to manage to the budgeted amount each year. Sometime during Dunn's tenure, all of the expense budget limits were aggregated into one budget line item. An expense budget limit of $50,000 was set for all senior management. Hawley, for example, explained that he no longer had visibility into how management was doing against the expense budget limit, and he does not have an individual expense limit to manage against.

Our review of financial records indicated that, during 2013, Dunn alone expensed at least $13,576.93 against the $50,000 limit, not including additional business expenses charged by employees within the Executive Director's business unit. Van Horn reported that the $50,000 limit was not exceeded even if all of the senior executives' expenses were combined. While we do not believe that this policy change constitutes a basis for discipline, the effect of this change was essentially to give Dunn an unlimited business expense budget. We recommend that the Board set a business expense budget limit for the Executive Director and that the finance committee of the board take over responsibility for review and approval of the Executive Director's expense reports.

PLAINTIFF'S EXHIBIT A-19



### F. Issues Related to General Counsel Thomas Miller

#### 1. Hiring Issues

Kim alleged that the Bar hired Thomas Miller as the General Counsel over allegedly more qualified candidates because he is friends with Dunn. The selection process, however, even if not perfect, did proceed with input and involvement by the Board, so we do not see a basis for finding wrongdoing in how Miller was selected. Rules & Regs. Pertaining to the Employment of Executive Staff Employees § 9(A) (senior executives are appointed by and serve at the pleasure of the Executive Director); Board Book, Tab 18 § 7(b) (Board approves selection of General Counsel); see also *id*. Tab 5, § 2(b)(11(D) (president's role is to manage the Executive Director by, inter alia, providing input with respect to the selection of the General Counsel).

#### 2. Travel issues

Kim also complained that Miller has improperly billed for travel between Southern California, where he lives, and San Francisco, where the Office of General Counsel is based. We have learned that, between March and July 2014, Miller spent some forty-three nights in hotels in the Bay Area for a total cost of $7,855.88. Air fare expenses for the same period totaled $8,746, and Miller incurred $4,415.76 in additional expenses in this period for ground transportation, lodging, meals, and other miscellaneous travel expenses. Total travel related expenses for the period were therefore $21,017.64.

Expenses at these levels are not surprising, as the Bar clearly appears to have contemplated that Miller would be incurring travel expenses in order to take the position. His employment offer letter provides that he "will work out of the San Francisco and Los Angeles State Bar offices with frequent travel. As the Office of General Counsel is based in San Francisco, that office will be your 'home base.'" Because everyone seems to have known that Miller lived in San Clemente and never committed to move to the Bay Area, but he was told he would be based in San Francisco, the travel expenses were an expected result of this arrangement. The travel records also confirm that, at least through July, he lived up to the

PLAINTIFF'S EXHIBIT A-20



requirement that he spend most of his time in San Francisco—something he did three or four days a week.

There is, however, a discrepancy in the parties' expectations going forward. Miller says that he told the Board members who interviewed him that he would spend most of his time (usually three days a week) in San Francisco for the first six months but that after he had established himself he hoped to spend most of his time (usually three days a week) in Los Angeles. Miller still believes that was the arrangement to which the parties agreed. At least one board member confirms that Miller said this in his first interview with a Board working group, which recommended he not be hired in part for that reason. But the board member also recalls Dunn and/or Rodriguez stating at a later time that Miller was now willing to commit indefinitely to having his home base be San Francisco—and that his hiring was approved on that basis. Miller was not aware of this but rather expects to wind down his San Francisco travel to two days per week rather than three. This suggests that Dunn and/or Rodriguez's representations to the Board about Miller's intentions and understanding were not accurate. For that reason, the Board will need to reach some common understanding with Miller about his future plans.

### 3. Disclosure Issues

Miller was aware that Beth Jay had directed the Bar to stand down on A.B. 852 before the May 8 and 9 Bar Board meetings and was present during Dunn's discussion of that bill, but he did nothing to inform the Board about the Supreme Court's concerns. Although he did not clearly recall that Dunn failed to mention Supreme Court concerns at the Board meetings, Miller said he would not have taken it upon himself to make this disclosure to the Board even if Dunn had not done so, for two reasons. First, he believed that Luis Rodriguez had been informed of the Supreme Court's concerns, though he admits he was not sure at the time of the May Board meeting that he knew this. Second, he thought the Board did not need to know about the Supreme Court's concerns, because he and Dunn were still trying to persuade the Court about the need for the bill and needed to keep the bill moving forward to avoid having it die for that

PLAINTIFF'S EXHIBIT
A-21



session. As with Dunn, Miller's nondisclosure raises questions about his commitment to giving the Board all of the information it needs to do its job.

**G. Perceived Girardi Keese Influence at the Bar**

Although we have not uncovered instances of any sort of misconduct involving or untoward influence exerted by Tom Girardi or his firm, the closeness of the relationship between some senior managers and that firm does raise potentially troubling perceptions that the Board should take action to rectify going forward.

The frequency with which Girardi's firm has surfaced in matters we investigated is striking.

- Kim alleged that Dunn violated Bar policy in sending OCTC employees to a seminar in Las Vegas for a group that Girardi supports or is affiliated with. Although we did not consider the policy so important that a deviation from it would be grounds for discipline, it is an example where Dunn bent (or attempted to bend) the normal rules to accommodate a request perceived as helpful to Girardi.
- Girardi surfaced in an extremely unusual meeting with Craig Holden before he was elected as Bar president. Luis Rodriguez indicated that Holden should have lunch with Tom Layton, because Layton was not yet sure if he would throw his support to Holden for president. That a bar employee is believed to have such an important role in who is elected bar president is unusual enough. But when Holden attended the meeting, Girardi showed up, suggesting that the "power broker" on whose support Holden's election depended was in fact Girardi.
- Girardi's name has also come up in other (disputed) allegations discussed below about offers of professional assistance to Jayne Kim.
- Dunn chose Girardi's partner Howard Miller to be an emissary for the Mongolia trip. We believe that Miller was eminently qualified for and deserving of this role, but others certainly would have fit the bill too. In light of the other accommodations

PLAINTIFF'S EXHIBIT A-22



Dunn has made for members of that firm, the selection forms a smaller piece of a larger pattern.

- In emails we reviewed on other topics, we noted that Miller was being consulted on matters related to A.B. 1515, a bill concerning client trust accounts. Again, we assume there are completely valid reasons for his involvement, and that he served admirably in whatever role he had, but the continuing connections are notable.
- During the investigation, Girardi suddenly and unexpectedly appeared as counsel for Sonja Oehler. In that capacity, he launched an unprofessional tirade of threats that we will recount more fully at the Board meeting. Although Girardi claims he became involved because our firm was rude during interviews and he is a long-time friend of Oehler's, his involvement also could be explained because he perceives a threat to Dunn as a threat to his possibly favored position with the Bar.

Although we do not believe that these incidents, either individually or collectively, form a basis for discipline, the pattern contributes to a potentially troubling perception that the Board should address.

### H. Interference with Investigation

Luis Rodriguez engaged in various improper efforts to impede or influence the course of this investigation. The extent to which Dunn may or may not have participated in these efforts cannot be established conclusively. Although these efforts do not form a basis for imposing discipline at this time, the Board should consider taking steps to avoid problems like these in the future.

*First*, after Kim's complaint was sent, Rodriguez recused himself from the investigation and set up a working group composed of then-President Elect Craig Holden and two members of the Audit Committee (Heather Rosing and Michael Colantuono). As we discussed at the September Board meeting, Rodriguez later decided to rescind his recusal and form a newly configured working group based on two dubious grounds.

PLAINTIFF'S EXHIBIT A-23



One such ground was that Holden had supposedly revealed to one of his partners information about the investigation. Rodriguez made this claim as a result of questions Tom Layton asked Rodriquez, which questions in turn arose from an oblique comment by Holden's partner at a lunch Layton had with him. In fact, Holden did nothing more than make a routine, confidential request to two of his partners for a referral without revealing the substance of the allegations or the identity of any complainant. Layton later told us he was wrong to leap to conclusions based on the stray comment from the partner—and said he had since apologized to the partner for doing so.

The second such ground was that the investigation might result in civil liability to the Bar by thwarting Dunn's chance to become Administrative Director of the Judicial Council. Rodriguez asserted that "Joe has been tapped" for that position and "is number one on [the Chief Justice's] list." Dunn told us the Chief Justice told him in the third week in July that he was "at the top of her list," something he repeated at the time to Rodriguez.

The Chief Justice told us, however, that this was not true. She told Dunn that, while some justices supported him, she had someone else in mind for the job, not Dunn; that she had not asked and would not ask him to apply for the job; but that, only in the event the other applicants did not work out, she might come back to him to offer him the job. When asked if there was any way Dunn could have concluded from their conversation that he was at the top of her list, she said there was not, because she was very clear that she had her eye on someone else (who in fact was offered the job).

*Second*, after rescinding his recusal and forming a new working group, Rodriguez attempted to influence the investigation by calling Van Horn just fifteen minutes before her interview was scheduled to begin and instructing her not to appear. During his call with Van Horn, Rodriguez raised a challenge to our firm's involvement in the investigation. When asked for his basis for advising Van Horn not to appear, he said that he did not think it was fair that Dunn's interview was postponed, while Van Horn's interview was not.

PLAINTIFF'S EXHIBIT A-24



*Third*, an issue arose at the last Board meeting whether our firm should question the Chief Justice on certain matters relating to the investigation. Apparently in an effort to stop this line of inquiry, Rodriguez advised Heather Rosing that the Chief Justice and Beth Jay were upset at the prospect of being pulled into the investigation as witnesses. The Chief Justice, however, denies that she ever conveyed such a sentiment to Rodriguez. According to the Chief Justice, Rodriguez told her that he was having disputes with Craig Holden, and she merely responded that any such dispute was between the two of them. Far from being reluctant to be questioned as part of this investigation, she told us she was happy to do so and spoke to us freely on more than one occasion. Beth Jay similarly reported that she was not at all reluctant to be interviewed in connection with this investigation and that she had never told anyone that that was the case.

Rodriguez's actions to interfere with the investigation were ill-advised and improper. Although they provide a cautionary tale for the Board about the handling of investigations in the future, we are not aware of any statute Rodriguez violated. Further, although he may well have violated his fiduciary duties, we see no reason to consider taking action against him unless he continues to receive Bar funding to permit him to represent the Bar as a past President.

If it could be shown that Dunn wrongfully participated in efforts to impede the investigation, this would violate his legal duty to "withdraw from any participation in" matters as to which he had a personal interest and to "refrain from attempting to influence" such matters[4] – violations that potentially could give rise to criminal liability.[5] However, evidence that he did so is inconclusive. The evidence does clearly show that Dunn misrepresented in July his status as the front-runner for the Administrative Director position. But we found no direct evidence that,

[4] Cal. Bus. & Prof. Code § 6036(d); *id*. (b) (Board members must disqualify themselves "where there exists a personal nonfinancial interest that will prevent the member from applying disinterested skill and undivided loyalty to the State Bar in making or participating in the making of decisions"); *id*. §6038 (subjecting to section 6036 employees designated in the Conflict of Interest Code of the State Bar); Conflict of Interest Code of the State Bar section 2, App. A (designating Executive Director).

[5] Cal. Bus. & Prof. Code § 6037.

PLAINTIFF'S EXHIBIT A-25



after the Kim complaint was lodged, he reasserted this falsehood in an effort to persuade Rodriguez to change the course of the investigation.[6] The misrepresentation may still be relevant to other issues raised in this investigation relating to Dunn's truth-telling propensities, but we have not concluded that it amounts to proof of interference with the investigation that would provide a basis for imposing discipline.

### I. Consultant Hiring Irregularities

We uncovered certain irregularities in connection with the contract for communications contractor Richie Ross. Ross had previously assisted Dunn in his races for Senate and Controller. At Dunn's request, the State Bar retained Ross on a sole source basis in June 2011 at $6,000 a month to provide communications services, especially in connection with the Sergio Garcia litigation. Although State Bar procurement rules require the approval of a written memorandum justifying a sole source contract, Ross provided services for three months without a sole source memorandum.

For consulting services performed in June, July and August of 2011, Van Horn placed Ross's contract within the budget of the Office of General Counsel as a litigation related cost, which is excluded from the Bar's procurement process. Van Horn pressured Cathy Torney, then Director of Administration in the Office of the General Counsel, to approve the first three $6,000 invoices, which were for amounts over her approval authority. Torney alerted then-General Counsel Starr Babcock to the situation, and Babcock apparently took steps to prevent Ross's contract from being added to his office's budget. It was only then that Hawley prepared a sole

[6] There is circumstantial evidence suggesting he likely did so. An email from Rodriguez stated that Dunn was "very upset" about possible violations of his privacy rights, which implies that they did have a conversation about Dunn's concerns before Rodriguez rescinded his recusal. Further, Dunn told us in his interview that he believed the timing of Kim's complaint was calculated to interfere with his chances as front-runner for the job. Given that Dunn apparently expressed to Rodriguez other concerns that made him "very upset," it seems highly likely he also expressed his concern that the complaint was designed to upset his chances for the new job, for which he inaccurately claimed he was the front-runner—but we have no admission from either Dunn or Rodriguez that he in fact did so.

PLAINTIFF'S EXHIBIT A-26



source memorandum, dated September 23, 2011. It was not until December 5, 2011 that a fully-executed contract was finalized for Richie Ross, though it was executed with a retroactive effective date of June 1, 2011.

On March 29, 2013, the Recorder published an article discussing the Bar's contracts with Ross and his daughter Esperanza Ross, as well as the Bar's refusal to release copies of the contracts. Kim alleges that Dunn did not inform the senior executive management team of Richie Ross's contract before this article was published. This claim is inaccurate at least with respect to Hawley, Van Horn, and Babcock—all of whom became aware of the contract relationship sometime in 2011. The article, however, does appear to have prompted another action by the Bar—an April 9, 2013 Request for Proposal for the consulting services that Ross had been providing since June of 2011. In May of 2013, seven contractors (including Ross) submitted competitive bids, and Ross was selected as the most responsive bid.

The gravamen of Kim's observations regarding Ross is that the Bar's competitive bidding and sole source contracting procedures lack sufficient controls and are potentially subject to abuse. The foregoing episode confirms some of those concerns. On the one hand, the Bar's decision to initiate a RFP after the publication of the Recorder article raises questions about the propriety of the Bar's decision to contract Ross on a sole source basis. Torney's account also suggests that Van Horn attempted to "fix" a paperwork error by accounting for the sole source requisition in a way that may have been inappropriate. On the other hand, several witnesses reported a misunderstanding that Richie Ross was performing legal work, as his services related in part to the Sergio Garcia matter. If Babcock had agreed that Ross's work fell within his office's budget, the contract would have been excluded from the procurement process.

Although the Ross contracting process, by itself, does not serve as a basis for discipline, we recommend that the Board instruct senior management to adhere strictly to the competitive bidding and sole source requirements. The Board may also wish to ensure that senior management has a clear, shared understanding of the cost center that will be charged for any

PLAINTIFF'S EXHIBIT A-27



contractor providing services on litigation related issues, directly or indirectly, *before* any fees are incurred. Finally, the senior manager who requests that the Bar retain a vendor on a sole source basis must take personal responsibility for the prompt completion of a memorandum supporting the sole source request.

**J. Governance Issues Arising From Promises of or Requests for Assistance**

We investigated certain governance issues arising from promises of assistance to Board members or others. In her interview, Kim said that Tom Layton came to her when she first became Chief Trial Counsel to offer assistance from Tom Girardi in helping her to become a judge or to achieve some other professional goal. Although Layton denies this, it is undisputed that Dunn made similar offers (without necessarily mentioning Girardi) to various Bar Presidents. Both Dunn and Craig Holden have confirmed that Dunn initiated a discussion in which Dunn asked how he could help Holden achieve any aspirations he had of becoming a judge or running for office. (Holden says that Dunn also offered Layton's assistance, and Layton and Holden both confirm that Holden later asked Layton to meet with a friend whom Holden recommended for a district court position.) While not recalling necessarily that he initiated other conversations, Dunn admits to making similar offers to Luis Rodriguez, who openly had political aspirations, and Jon Streeter, who wanted to become a judge.

Although we do not rely on these events as a basis to recommend discipline, we do believe that conversations like this during the term of a Bar President (or other trustee, if such conversations took place) pose unhealthy risks to proper governance. The provision of such assistance could make the Board President or trustee feel beholden to the chief executive or other staff member in a way that undermines the Board member's exercise of proper supervisory control.

## III. ISSUES AS TO WHICH NO RECOMMENDATIONS ARE MADE

Several issues arose during our investigation that either did not result in recommendations or that we did not investigate.

PLAINTIFF'S EXHIBIT A-28



- *UPL unit*. Kim complained that the development of the UPL unit raises concerns regarding cost inefficiency, overlapping jurisdiction with OCTC, and a lack of independence by the General Counsel. This appeared to us to be a turf issue that has been aggravated by a perception of favoritism and insularity within the organization. While we do not believe that this issue has resulted in any actionable wrongdoing, the Board may wish to consider giving an opportunity to be heard on this issue to Kim, who feels that her concerns on the issue have been ignored and disrespected.
- *Speakers fees*. Kim also raised concerns regarding the cost of outside speakers' fees. For reasons discussed on September 14, we did not see a problem here and have not pursued the issue further.
- *Retaliation*. Jayne Kim provided Hawley with a supplemental memorandum, dated September 16, 2014, regarding her concerns of a hostile work environment and potential retaliatory efforts towards her. Attachment 3. These issues seemed collateral to the thrust of our investigation, and with the agreement of the working group we have not pursued them. The Board should consider what if any additional action to take on the allegations.
- *Alleged manipulation of backlog numbers*. OCTC's Managing Director of Investigation John Noonen said during our interview that he believed Jayne Kim was manipulating her backlog numbers, but he expressed a fear of retaliation if Kim ever learned that he was making such accusations. We agreed with the working group that this matter was more appropriately addressed in some forum other than the present investigation.

## IV. RECOMMENDATIONS

### A. Joseph Dunn

Although certain other deficiencies in Dunn's performance would warrant counseling or reprimand only (such as his inattention to proper allocation of expenses between mandatory and

PLAINTIFF'S EXHIBIT A-29



voluntary fees), Dunn's repeated failure to provide adequate or truthful information to the Board plainly provides an adequate basis to terminate his at will employment. Whether the Board should do so is a slightly different question, which requires evaluation of factors including how strongly Dunn has been performing in other ways—something as to which the Board has more information than we do. Nonetheless, however strong his performance has otherwise been, the nature of the misconduct involved here and the attitude Dunn showed when questioned by counsel could certainly justify termination.

Dunn repeatedly provided inadequate or inaccurate information to the Board in a way that undermined its ability to exercise its decision-making authority. He told (or implied to) the Board that no Bar funds would be used for the trip to Mongolia, when that was not the case. He failed to inform the Board about the Supreme Court's concerns regarding A.B. 852 that were highly relevant to a decision it was being asked to make about sponsoring the legislation. He misrepresented the Supreme Court's views about moving Bar operations to Sacramento even though the Board's discussions made plain to him that the Supreme Court's views were a central factor the Board was considering in making a hugely important decision for the Bar's future.

His truth-telling tendencies have also been called into question more generally based on how he described (or allowed to be described) to the Board Tom Miller's intentions about working in San Francisco, how he described to Luis Rodriguez his chances for a Judicial Council position, and how he described to Beth Jay and to us in his interview his disclosures to the Board about A.B. 852.

One piece of information that is often relevant to termination decisions of this kind is how effective and valuable the individual has been to the organization. Boards may be willing to tolerate more problems associated with an executive who is bringing huge value than with an executive who is a more average performer. The Board is far better able to judge the importance of Dunn's contributions to the Bar than we are. At the same time, two considerations are relevant to weighing this factor in the termination decision.

PLAINTIFF'S EXHIBIT A-30



First, while Boards sometimes are willing to overlook or seek work-arounds for certain deficiencies in a high-performing executive, the deficiency of failing to be candid and truthful with the Board seems to strike at the very core of what a Board requires in its single employee.

Second, in assessing whether the problem is one that can be avoided in the future through reprimand or counseling, the Board should consider how Dunn responded on this issue when interviewed. It would be one thing if he were contrite and apologetic, acknowledging that his behavior in certain respects fell short of Board expectations. Dunn was the opposite: unapologetic, disingenuous, and (at least in one instance) untruthful. This reaction bodes ill for the possibility that future performance will be better.

Should it decide to do so, the Board plainly has the authority to terminate Dunn. Dunn's agreement provides that he is an at will employee who "serves at the pleasure and discretion of the Board and shall be terminable at will." Employment Agreement, § IV(C). "The Board as a whole has the authority to hire, supervise, and fire the Executive Director, and may do so through its designated leadership of Board President or other designate." Board Book Tab 18, Art. 3.

**B. Peggy Van Horn and Financial Controls**

Van Horn should be reprimanded for failing to perform her duties in accordance with applicable standards. There are constraints, however, on the extent to which the Board may do so directly.

Section 5 of the Rules and Regulations Pertaining to the Employment of Executive Staff Employees ("Exec. Staff Rules") provides: "Unless the Board has retained to itself the discretion to appoint or terminate an Executive Staff Employee, an Executive Staff employee serves at the pleasure of the State Bar and may be terminated, disciplined or demoted at will by the Executive Director." Exec. Staff Rules § 5(A) (emphasis added); see also Board Book, Tab 17, Art. 4, § 2 ("No personnel action . . . shall be undertaken without the approval of the Executive Director, or designee, through the Office of Human Resources."). The Board's Lines

PLAINTIFF'S EXHIBIT A-31



of Authority Policy Statement provides that the Board "may provide advice to the Executive Director to support her/his management, but will not assume the role of managing other staff members unless there is a compelling reason to do so. Such a step would be considered a temporary and emergency action." Board Book, Tab 18, Art. 3, p. 18.

If the Board decides that Van Horn should be reprimanded, we recommend that it instruct Dunn (or his replacement) to do so. If he refuses, the Board may (1) "assume the role of managing" Van Horn in light of the "compelling" concerns raised by the investigation's findings and Dunn's refusal to take appropriate action; and/or (2) take Dunn's conduct into account in his performance review and the re-negotiation of his contract.

Further, management should implement additional internal controls and/or training to ensure that State Bar funds are appropriately administered and accounted for in accordance with all legal requirements. Specifically, we recommend the following:

- All members of the Board, senior management, and any Office of Finance staff member responsible for auditing travel and business expenses should undergo training on the *Keller* requirements, as well as the business unit account codes applicable to chargeable versus non-chargeable expenses.
- At a minimum, management should ensure that travel expenses for the Mongolia trip are properly allocated to voluntary fees.
- The Board should instruct senior management to allocate each executive staff member with an individual business expense budget each year. These allocations should be included in the annual budget to be approved by the Board, and internal controls should be implemented to ensure that each executive staff member's business expenses are appropriately audited by the Office of Finance. The Executive Director's business expenses should be audited by the finance committee of the Board.

PLAINTIFF'S EXHIBIT A-32



### C. Thomas Miller

The Board should consider several matters with respect to Miller's position as General Counsel.

First, as noted above, unless it has changed its view, the Board should instruct Miller that it has always understood that he would spend a majority of his time in San Francisco indefinitely, and that it expects that practice to continue. It may deliver that feedback through the existing evaluation process. See Board Book Tab 18, Art. 3, p. 22 ("The General Counsel is subject to an annual performance review by both the Executive Director and the Board.").

Second, if the Board decides to reprimand but not terminate Dunn, it may want to revisit whether Miller is the best person for the General Counsel job. Having a strong General Counsel can act as a valuable check on a chief executive whose trustworthiness or candor has been called into question. Given the problems that have now come to light about Dunn, the Board may feel a greater need to have such a General Counsel in place than it did when Miller was hired, and it may question whether Miller is the right person if Dunn remains. Certainly, Miller failed to take action to correct the non-disclosure regarding AB 852 though he was in a position to do so, and his party-line explanation for failing to do so raises questions whether he has the gumption and independence to stand up to Dunn when the Board would want him to.

If the Board concludes that Miller should be replaced, we can discuss further at the Board meeting how to go about doing so. While the Executive Director must bring his or her choice for General Counsel to the Board for approval, it is unclear whether the Board has retained the discretion to dismiss someone from the General Counsel position. Compare Board Book Tab 18, Art. 1, § 7 (stating that Board must approve General Counsel hiring, but "otherwise all personnel decisions reside exclusively in the executive director"), with Board Book Tab 18, Art. 3, p. 17 ("The Executive Director will make recommendations for hiring and dismissal of these positions to the Board for their final approval.").

Finally, whoever continues in the role of General Counsel, the Board should reinvigorate the policy that the General Counsel reports directly to both the Board and the Executive Director.

PLAINTIFF'S EXHIBIT A-33



See Board Book, Tab 18 § 7 Authority of the General Counsel. The job description posted, and Miller's understanding of the reporting relationship, do not precisely track the stated policy. The Board should take steps to cultivate a direct relationship with the General Counsel and express an expectation that he or she perform a watchdog role.

### D. Other Recommendations

1. The State Bar should make a corrective public statement to clarify that Bar funds were in fact used for the Mongolia trip.

2. The Board should adopt a policy that prohibits Bar employees from providing or offering to Board members during their terms of service assistance in professional matters unrelated to Bar activities and prohibits Board members from requesting such assistance.

3. At some appropriate meeting, retreat, or other forum, the Board should receive from an outside expert training in protocols related to the proper conduct of independent investigations and should consider adopting written guidelines for the handling of such investigations in the future.

4. The Board should instruct senior management how important it is to cultivate and maintain a public perception that the Bar represents all attorneys, and that no one law firm or segment of the bar has a special position. It should further instruct management that its conduct to date may have created an unhealthy perception that Girardi and his firm have special influence or receive special treatment – and that management should take steps to dispel and avoid contributing further to this perception in the future.

5. The Board should instruct all senior management to ensure strict adherence to the Bar's competitive bidding and sole source requirements.

6. Bar management should be instructed to conduct all Bar business through their official email accounts and not to use personal email addresses for such matters (as it appeared to us that Dunn did on many occasions).

EXHIBIT 42

PLAINTIFF'S EXHIBIT
B

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE LION AIR FLIGHT JT 610 CRASH | No. 18 C 7686<br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Tragically, on October 29, 2018, Lion Air Flight 610 crashed shortly after takeoff killing all aboard. That tragedy was compounded when attorney Thomas Girardi stole some of the money five of his clients were owed from settlements with defendant Boeing of claims arising out of the crash.

The law firm Edelson P.C. (the "Edelson firm") served as Girardi's local counsel here in Chicago. On December 2, 2020, the Edelson firm filed a motion for rule to show cause alerting the Court to the fact that the clients had not been fully paid and arguing that Girardi and his firm should be held in contempt. *See* R. 842. In his response, Girardi admitted he had not paid the clients the full settlement amount and that he did not have the money to pay them the balance. *See* R. 847 at 2-3 (¶¶ 8-9). On December 14, 2020, the Court found Girardi and his firm, Girardi & Keese, in civil contempt and entered a judgment against them in the amount of the outstanding payments. *See* R. 848.

The Edelson firm's motion also implicated Girardi associates David Lira and Keith Griffin. The Edelson firm, Griffin, and Lira filed briefs and participated in a three-day hearing in December 2021, at which Griffin, Lira, and attorneys from the

Edelson firm testified. Subsequently, the Edelson firm brokered a settlement with its insurance carrier resulting in the clients being paid in full. *See* R. 1360. The Court commends Jay Edelson and his firm for being the first to pursue these issues and for doing what was necessary to see that the clients were made whole.

These settlements with the Edelson firm's insurer satisfy the Court's primary concern in addressing this motion. To the extent the Court was considering sanctioning Griffin, Lira, and/or Edelson firm attorneys for their roles in the misappropriation of the client's funds or their failure to protect the clients from Girardi, that concern is now moot because the clients have received the money to which they are entitled. To the extent any of the conduct at issue here was contemptuous or sanctionable (and at least some of it certainly was), there is no longer any party to be made whole, and no action that needs to be compelled, which removes these issues from the realm of civil contempt and the Court's power to sanction in this case. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738 (7th Cir. 1999) ("Civil contempt proceedings are coercive and remedial, but not punitive, in nature and sanctions for civil contempt are designed to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy."). For these reasons, the motion for rule to show cause is denied.

Evaluation of counsel's conduct is now left to more proper authorities, whether they be a state bar, criminal prosecutors, or one of the several ongoing civil proceedings addressing the relationship between these parties specifically or

Girardi's actions more generally. The Court alerted the U.S. Attorney for this district to the facts of this case when this motion was first filed because Girardi's conduct is unquestionably criminal. The Court is aware that the State Bar of California (the state in which Griffin and Lira are admitted) is monitoring these proceedings. Girardi and his firm are in bankruptcy proceedings. And the Edelson firm has sued Girardi, Griffin, and Lira. Additionally, Girardi's theft in this case, and apparently many others, has been well publicized nationally. In light of this Court's limited jurisdiction in this matter, and the ongoing investigations and proceedings in other venues, the Court finds that it need not take any further action with respect to Griffin, Lira, and/or the Edelson firm or any of its attorneys. Nevertheless, in the interest of the larger goal of unwinding Girardi's fraud, and identifying those responsible, the Court will review the salient facts that emerged from the three-day hearing.

By March 30, 2020, all the clients' settlements were funded by transfers from Boeing to the Girardi & Keese account. *See* R. 1319-48 at 4 (Ex. 247-4). According to the settlement agreements, the clients should have received their payments from Girardi within 30 days of the funding. But it wasn't until May 11, 2020, after the clients complained about not yet having been paid, *see*, *e.g.*, R. 1296-56 at 2 (Ex. 165-002), that partial payments were made. *See* R. 1319-48 at 11 (Ex. 247-11). Installment payments were of course not part of any agreement with the clients. When Girardi & Keese received the money, it should have been sent to the clients promptly.

Upon receipt of partial payments, the clients immediately and understandably inquired about the balance by email to Girardi, Griffin, and Lira. *See*, *e.g.*, R. 1296-

PLAINTIFF'S EXHIBIT B-3

63 (Ex. 172). In response, Girardi drafted a letter to one of the clients stating the following:

> I got enough of the problem taken care of so we were able to release 50% of the settlement. I feel pretty good about the next payment. There are tax issues etc. I am working very hard.

R. 1296-57 (Ex. 166-002). A similar letter to another client stated:

> We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%. I feel fairly confident the balance will be done within 30 days. There was also a tax issue that came up that I am trying to resolve.

R. 1296-58 at 2 (Ex. 167-002); *see also* R. 1296-61 at 2 (Ex. 170-002) (similar letter claiming that Girardi was "dealing with the head of the IRS" regarding the supposed tax issue). These letters contained outrageous lies. Before sending the letters, Girardi's secretary shared them with Griffin and Lira. *See* R. 1296-57 (Ex. 166); R. 1296-58 (Ex. 167). In response, Lira stated "There are no tax issues." R. 1296-59 at 1 (Ex. 168). Lira also shared the letters with co-counsel at another firm, noting that he (Lira) had "intercepted this letter from going out." R. 1296-60 at 1 (Ex. 169). Co-counsel responded that if the client read the letter, "Tom won't know how to put the fire out." *Id.* at 3. That attorney also cryptically noted that the letter "reminds me of the letter in the Blythe case." *Id.* To which Lira responded, "Indeed." *Id.* at 4. Lira told Girardi's secretary, "I wouldn't send any of these letters. They are lies and can come back to haunt Tom." R. 1296-62 at 7 (Ex. 171).

Griffin and Lira both testified at the hearing on this motion that the statements in these letters were false. *See* R. 1316 at 105 (105:13–106:2) (Griffin); R.

PLAINTIFF'S EXHIBIT B-4

1316 at 124 (124:8-15) (Griffin); R. 1317 at 23 (297:2-16) (Lira); R. 1317 at 25 (299:5-7). This series of email communications proves that Griffin and Lira knew that the clients should have been paid the full settlement amounts by April 30, 2020 at the latest and that Girardi was planning to and, in at least two cases where the letters were sent to clients, actually did lie to the clients about the reason for his failure to do so.

Even after Griffin and Lira "intercepted" Girardi's letters to the clients lying to them about the status of the funds, the Edelson firm remained unaware that the settlements had been funded by Boeing more than a month earlier. *See* R. 1317 at 194 (468:19-21); *id.* at 196 (470:8-24) (testimony of Edelson general counsel Rafey Balabanian); R. 1318 at 24 (575:10-14); *id.* at 25 (576:9–577:8) (testimony of Jay Edelson). At this point, the Edelson firm also did not know that Girardi was withholding settlement funds from the clients. Because they were under the impression that the settlements had not funded, getting the settlements funded was their primary concern. They considered independently contacting Boeing to investigate why the settlements had not been funded but decided against it in ultimately ill-advised deference to Girardi & Keese, who were the primary attorneys on the case. *See id.* at 197 (471:5-18) (Balabanian testimony). Apparently neither Griffin nor Lira ever informed anyone at the Edelson firm that Girardi had lied to the clients about the reasons for the delay in payment. *See*, *e.g.*, R. 1317 at 199 (473:23-25) (Balabanian testimony that Lira never told him); *id.* at 201 (475:8-10) (Balabanian testimony that Griffin never told him).

According to Balabanian, it wasn't until the middle of June 2020 that the Edelson firm first learned that Boeing had funded the settlements previously in March. *See* R. 1317 at 198 (472:16–473:12). Later in June, in a conversation with Griffin, Balabanian learned that Girardi had paid only part of the settlement money to the clients. *See* R. 1317 at 200-01 (474:25–475:7). On July 6, 2020, Lira sent the Edelson firm a check for $77,500 as partial payment for the Edelson firm's attorney's fees. *See* R. 1296-12 (Ex. 116). Balabanian testified that the Edelson firm never cashed this check due to their concerns about the clients not being fully paid. *See* R. 1317 at 201-02 (475:15–476:13). Balabanian told Lira (and Girardi) as much in a letter dated July 10, 2020. The primary purpose of that letter, however, was to express the Edelson firm's concern and displeasure with the fact that they had not been told that the settlements had been funded and that the clients had not been fully paid. *See* R. 1296-13 (Ex. 117). Lira responded with a letter focused on responsibility for paying the Edelson firm's fees and largely ignoring the more important concern of the clients' money. Lira devoted only two sentences to that issue stating: "Lastly as to the current status of payment to the [clients] . . . referred to Keith and Tom, I do not know the current status. I resigned from Girardi [&] Keese effective on June 13, 2020, and I do not have access to such information." R. 1296-14 (Ex. 118).

Balabanian eventually had a phone conversation with Girardi himself later in July. Girardi told him that the delayed payments were due the length of time it took to get releases of the clients claims, tax issues with the IRS, and Girardi's health issues. *See* R. 1317 at 203-04. Balabanian testified that to the extent he and the

PLAINTIFF'S EXHIBIT B-6

Edelson firm did not believe Girardi's explanations, they thought Girardi was simply motivated to delay in paying the Edelson firm its share of the attorney's fees. *Id.* at 207 (481:2-5); *see also* R. 1318 at 48 (599:1-10) (Jay Edelson testified similarly). They did not believe that Girardi was attempting to avoid paying the clients the settlement money. *See id.* (481:16-22). Yet, in text messages with Griffin in August 2020, Balabanian twice threatened that the Edelson firm would be forced to alert the Court if the clients were not paid. *See* R. 1296-15 at 8 (Ex. 119-008) (text from Aug. 3, 2020); *id.* at 10 (Ex. 119-110) (text from Aug. 24, 2020). According to Balabanian, however, the Edelson firm "ultimately felt as though the explanations were reasonable in terms of Mr. Girardi's ailments [and] in terms of it being the result of a mistake." R. 1317 at 215 (489:16-19); *see also* R. 1318 at 141 (692) (similar testimony from Jay Edelson).

Girardi made additional partial payment to the clients in September. After further communications with Griffin about these payments, Balabanian spoke with Girardi again on September 30. According to Balabanian, Girardi falsely assured him that he had finally paid the clients in full. *See* R. 1317 at 212-213. Balabanian and the Edelson firm took Girardi at his word.

Then on November 17, 2020, Griffin texted Balabanian that Girardi still had not fully paid the clients. *See* R. 1296-15 at 27-28 (Ex. 119-027-28). The Edelson firm attorneys had a phone call with Griffin thereafter, and Griffin told them he did not believe Girardi or the Girardi & Keese firm had the money to pay the clients and that he had contacted a malpractice attorney on behalf of the clients. *See* R. 1317 at 219 (493:3-14). It turns out, however, that the attorney Griffin recommended was



PLAINTIFF'S EXHIBIT B-7

formerly associated with Girardi & Keese, *see* R. 1317 at 85 (359:9-14), and he suspiciously urged the Edelson firm attorneys not to seek court intervention. *See* R. 1317 at 220 (494:14-22). The Edelson firm wisely disregarded this suggestion and finally alerted the Court regarding these circumstances by filing this motion two weeks later on December 2, 2020.

There was also evidence presented at the hearing regarding checks written to and from the Girardi & Keese accounts and how much money may have been in the accounts at various points in time. *See* R. 1332; R. 1333; R. 1334. There was evidence presented about Lira's authority as a signatory on those accounts and irregularities in the Girardi & Keese firm's compliance with bank signature requirements. *See*, *e.g.*, R. 1317 at 115-23. The Court was interested in this evidence as it is relevant to whether the delays in alerting the Court to Girardi's failure to pay the clients caused losses to the clients that could have been avoided if the Court had been informed earlier. This analysis is complicated by the large number of clients Girardi & Keese had and the large sums of money coming into and out of the firm's accounts almost daily. Ultimately, the fact that the clients have been made whole by the settlements with the Edelson firm's insurer means it is unnecessary for the Court to pursue these questions further.

While the money trail is complex and unclear, the knowledge of Griffin, Lira, and the Edelson firm is relatively uncontested and straightforward. Griffin and Lira knew from the start that Girardi did not pay the clients when he was supposed to. And they knew at least as early as May 12, 2020 that Girardi was lying to the clients

PLAINTIFF'S EXHIBIT B-8

about the reasons for the failure to pay the full amounts. Griffin and Lira both testified that they never believed that Girardi intended to steal the money, and that they always assumed he would eventually pay the clients. The Court is skeptical of these assertions, however. Evidence of Girardi's repeated malfeasance with clients has been well-documented in the press since these allegations surfaced. Griffin and Lira worked with Girardi for many years. Indeed, Lira is his son-in-law. It is not credible that Griffin and Lira were so completely unaware of the prior disputes over client payments that they had no suspicions of Girardi's conduct and motives.

Moreover, the email communications regarding this specific incident indicate that Griffin and Lira were not surprised that Girardi was lying to the clients. First of all, Girardi's secretary apparently found it appropriate and necessary to check with Griffin and Lira before sending the letters. This is a curious process unless the staff had some sense that Girardi was not to be entirely trusted. Furthermore, Griffin stated that he had "intercepted" the letters, implying that he was regularly playing defense with respect to Girardi's conduct. And Lira's communications referenced another previous instance of similar conduct. In short, it is difficult to believe Griffin and Lira were unaware that Girardi was running a Ponzi scheme with client money, which in fact he was.

In any event, even if Griffin and Lira were so naïve as to be unaware that Girardi was willfully misappropriating client money, once they witnessed him lie to clients about the status of settlement money, they should have informed this Court. Griffin and Lira argue that they were under no obligation to make such a report. In

PLAINTIFF'S EXHIBIT B-9

making this argument, they rely on the California Rules of Professional Conduct, which require only "reasonable remedial measures," and do not specifically require "disclosure to the tribunal," as do the ABA Model Rules. *See* R. 1343 at 14-15. But when, as was the case here, the attorney who controls the clients' money has already delayed more than a month in making payments and then actively lies to the clients about the reasons for the failure to pay, "reasonable remedial measures" must include alerting the relevant court. That is especially true here where the settlements in question required a Court order because they involved minor plaintiffs. Whether Griffin and Lira were directly beholden to the court orders is irrelevant. They have an obligation as officers of the Court to alert the Court to what amounts to using legal proceedings as cover for criminal activity. Griffin's and Lira's failures to do so here were entirely unreasonable and improper.

These failures were compounded by Griffin's and Lira's lack of candor with the Edelson firm. Once they learned that the settlements had been funded but the clients had not been fully paid, the Edelson firm inquired with Lira and Girardi about the reasons. Unsurprisingly, Girardi reiterated the lies he told his clients. Lira did not repeat Girardi's lies, but he already knew Girardi's excuses were false and kept that information hidden from the Edelson firm. His failure to inform Edelson that Girardi was lying is a lie by omission. This kept the Edelson firm in the dark, so when Balabanian finally had a conversation directly with Girardi, he had no solid basis to immediately question Girardi's excuses. Lira's decision to leave Girardi & Keese and, in his letter to Edelson, to rely on that departure as an implicit excuse to not reveal

PLAINTIFF'S EXHIBIT B-10

Girardi's lies and seemingly absolve himself of any additional responsibility for the clients' money, was at best disingenuous and at worst improper.[1]

Griffin's conduct was just as bad, if not worse. Like Lira, Griffin knew that Girardi's excuses were lies. And like Lira, Griffin abetted the lies by hiding them from the Edelson firm. Griffin was in regular communication with Balabanian through the summer and fall of 2020. Not only did Griffin not reveal Girardi's lies, he came perilously close to repeating them when he told Balabanian in a text message, "I know [Girardi] is working on this." R. 1296-15 at 8 (Ex. 119). Girardi was working on nothing but trying to hide the theft. Even when he finally informed the Edelson firm in November 2020 that the clients had not been fully paid and Girardi didn't have the money to pay them, Griffin did not reveal that he had known since May that Girardi was lying to the clients. Further, he continued to attempt to dissuade the Edelson attorneys from involving the Court by recommending they consult a conflicted former Girardi & Keese attorney who he claimed to have arranged to pursue malpractice claims. This conduct is at best an effort to pass the buck and at worst a knowing cover-up. None of it demonstrates concern with the money owed to clients whose family members were victims of a tragic accident. All of it is simply inexcusable.

[1] Lira was a signatory on the account that would have received the clients' settlement money. Lira testified that his signature was forged on some checks written from the account. It is not clear whether Lira signed checks drawing on this account when he should not have, considering his knowledge that the clients had not been paid. Obviously, if Lira signed checks from the account thereby reducing its balance while knowing that the money was owed to the clients from that account, then his culpability here is much greater. Regardless, it is undisputed that both Lira and Griffin accepted salaries from Girardi & Keese knowing that the firm had not met its obligations to the clients.

By contrast, there is no evidence that the Edelson firm ever had knowledge that Girardi was lying to the clients. Balabanian's and Jay Edelson's testimony regarding their communications with Griffin, Lira, and Girardi shows that they regularly inquired to confirm that the clients would be paid. Their inquiries were consistently met with excuses begging forgiveness and more time. The Court understands the desire to extend professional courtesy, but the Edelson firm should have acted sooner than they did. They admitted as much in their testimony. That being said, the evidence in the record indicates that, unlike Griffin and Lira, the Edelson firm never had any reason to believe that Girardi was perpetrating a massive fraud. In effect, they deferred to Girardi, who had a reputation as a titan of the plaintiffs' bar in California and throughout the country. Indeed, Girardi's gaudy displays of wealth and extravagant lifestyle furthered the fiction that he and his firm were successful and solvent. From the Edelson firm's perspective, based on the information available to them, the risk they were running was simply abetting delayed payment, not a risk of non-payment. The delay was contrary to the settlement agreements and to the Court's orders approving the settlements. But delays are often a fact of life for one reason or another, illnesses like Girardi's being one. Delays are not inherently criminal or unethical. And delayed monetary payments can be easily remedied, if necessary, with interest payments. This realm of potential risk the Edelson firm reasonably perceived is not so great that the Court could find that the Edelson firm or any of its attorneys bears any responsibility for the clients' potential losses. To the extent the Edelson firm or any of its attorneys did

bear any such responsibility, they more than made up for it in arranging for its insurer to pay the clients, which was the only somewhat positive development from this debacle.

* * * *

Thomas Girardi's actions are a stain on the legal profession and, due to the international nature of this case, have damaged the reputation of the American legal system. All of the plaintiffs in this case were citizens and residents of another country, many of whom do not speak English and have little to no experience with American society and certainly not its court system. Most are not very well-off. They all suffered the tragic loss of family members.

In need of help, they trusted American attorneys to shepherd them through the legal process and achieve at least some relief for their losses with amounts of money that are likely life-changing in their country. Girardi took advantage of vulnerable people at their most vulnerable moments, and he used the prestige of his profession, the reputation of American courts, and the imprimatur of this Court to do it. It is nearly impossible to mend such a breach of trust. The best we can do is demonstrate that the legal system Girardi besmirched has the ability to rectify its errors and bring bad actors to account. With the hearings and settlements initiated by the Edelson firm, a step has been taken in that direction.

For these reasons, the motion for rule to show cause [842] is denied.

ENTERED:

Thomas M Durkin

Honorable Thomas M. Durkin
United States District Judge

Dated: November 2, 2022

PLAINTIFF'S EXHIBIT B-14