RECEIVED
11/10/2026
KELLY L. STEPHENS, Clerk

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

FILED - LN
August 21, 2024
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: jlg / ____ SCANNED BY: VB 8/22

JEFFREY RYAN FENTON,
Plaintiff

v.

VIRGINIA LEE STORY,
MICHAEL WEIMAR BINKLEY,
KATHRYN LYNN YARBROUGH,
ELAINE BEATY BEELER,
MARY ELIZABETH MANEY AUSBROOKS,
ALEXANDER SERGEY KOVAL,
HENRY EDWARD HILDEBRAND III,
CHARLES M. WALKER,
THOMAS EARL EUGENE ANDERSON,
ROY PATRICK MARLIN,
SAMUEL FORREST ANDERSON,
JAMES MICHAEL HIVNER,
JOHN BRANDON COKE,
SANDRA JANE LEACH GARRETT,
Individually and in their official capacities,

FRANK GOAD CLEMENT JR.,
ANDY DWANE BENNETT,
WILLIAM NEAL MCBRAYER,
In their official capacities,

STORY AND ABERNATHY, PLLP,
ROTHSCHILD & AUSBROOKS, PLLC,
BANKERS TITLE & ESCROW CORPORATION,
HOSTETTLER, NEUHOFF & DAVIS, LLC,
MCARTHUR SANDERS REAL ESTATE,

SPRAGINS, BARNETT, & COBB PLC,
RUBIN LUBLIN TN, PLLC,
BANK OF AMERICA CORPORATION,
CADENCE BANK,

STATE OF TENNESSEE,
COUNTY OF WILLIAMSON TENNESSEE,
WILLIAMSON COUNTY SHERIFF'S OFFICE,
CHANCERY COURT FOR
WILLIAMSON COUNTY TENNESSEE,
TENNESSEE COURT OF APPEALS
MIDDLE DIVISION,
SUPREME COURT OF THE STATE OF TENNESSEE,
BOARD OF PROFESSIONAL RESPONSIBILITY
OF THE SUPREME COURT OF TN,
TENNESSEE ADMINISTRATIVE OFFICE
OF THE COURTS,
Defendants

**CASE NO. 1:23-cv-01097**

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT FOR TORTIOUS CONDUCT AND INJUNCTIVE RELIEF[1, 2]

Pursuant to F.R.B.P. Rule 7001 and Rule 9011; T.C.A. § 36-3-605, § 36-3-608, § 36-4-101, § 39-14-112, § 39-14-114, § 39-15-510, § 39-16-403, § 39-16-503, § 39-16-504, § 39-16-702, § 39-17-309, and § 66-27-123; 11 U.S. Code § 341, § 362, § 363, § 541, § 542, § 543, § 707, § 725, § 1204, § 1205, § 1206, § 1207, and § 1208; 18 U.S. Code § 4, § 152, § 157, § 241, § 242, § 402, § 1341, § 1503, § 1519, § 1951, § 1957, § 1961, § 1962, and § 1964; 28 U.S. Code § 1331, § 1332, § 1334, § 1335, and § 1927; 42 U.S. Code § 1983, § 1985, and § 12101 *et seq*; the Constitution of Tennessee; and the U.S. Constitution, Plaintiff brings this complaint as a result of the defendants' tortious and criminal acts committed on many dates, the first of which began after April 25, 2019. "Defendant" will mean both the singular and the plural herein, but the term will be clarified with an associated name whenever necessary. Amended per F.R.Civ.P. 15(a)(1)(A).

## TABLE OF CONTENTS

**I. JURISDICTION AND VENUE** 4

**II. PARTIES** 4

**III. INTRODUCTION** 6

(1) General Background ........ 6
(2) Primary Power Players ........ 11
(3) Fraud Upon both State & Federal Courts ........ 12
(4) Predatory Litigation ........ 17
(5) Setting the Stage—the Engineered Emergency ........ 20
(6) The Strategic Distraction in Chancery Court ........ 23
(7) "Dissipating Marital Assets" ........ 27
(8) Motion to Sell the Marital Home ........ 29
(9) The Crime Scene: Brentwood, Williamson County, Tennessee ........ 31
(10) Inappropriate Relationships/Conflicts of Interest ........ 34

[1] Web Docket Login: https://rico.jefffenton.com/l-23-cv-01097/ | Username: 1-23-cv-01097 | Password: 1-23-cv-01097

[2] Citations to the court record in this lawsuit will be notated without the case name or number, using the starting ECF Number, followed by both the beginning and ending Page ID, which is abbreviated as "PID."

(11) IRREFUTABLE PROOF OF A CRIMINAL CONSPIRACY SPANNING STATE AND FEDERAL COURTS ... 36
(12) PLAINTIFF TEACHING HIMSELF THE LAW ... 40
(13) PLAINTIFF'S ADA REQUEST FOR MODIFICATION ... 45
(14) MISCELLANEOUS INTRODUCTORY INFORMATION ... 46

**IV. CAUSES OF ACTION** **56**

COUNT ONE: VIOLATION OF T.C.A. § 66-27-123, NOTICE TO TENANT OF INTENT TO CONVERT RENTAL UNITS TO UNITS FOR SALE ... 57
COUNT TWO: VIOLATION OF T.C.A. § 39-16-507, COERCION OR PERSUASION OF WITNESS ... 58
COUNT THREE: VIOLATION OF T.C.A. § 39-15-510, OFFENSE OF ABUSE OF ELDERLY OR VULNERABLE ADULT ... 60
COUNT FOUR: VIOLATION OF T.C.A. § 36-4-101, GROUNDS FOR DIVORCE FROM BONDS OF MATRIMONY ... 61
COUNT FIVE: ABUSE OF PROCESS ... 63
COUNT SIX: INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ... 64
COUNT SEVEN: FRAUD/CONCEALMENT ... 71
COUNT EIGHT: CIVIL CONSPIRACY ... 77
COUNT NINE: VIOLATION OF 18 U.S. CODE § 1962(B), RICO ... 78
COUNT TEN: VIOLATION OF 18 U.S. CODE § 1962(C), RICO ... 80
COUNT ELEVEN: VIOLATIONS OF 11 U.S. CODE ... 83
COUNT TWELVE: VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S. CODE § 1983 AND § 1985 87
COUNT THIRTEEN: VIOLATION OF CONSTITUTIONAL RIGHTS ... 93
COUNT FOURTEEN: DISCRIMINATION/VIOLATION OF AMERICANS WITH DISABILITIES ACT, 42 U.S. CODE § 12101 *ET SEQ.* ... 99

**V. DEMAND FOR JUDGMENT** **103**

**VI. DEMAND FOR JURY TRIAL** **103**

DECLARATION ... 103

**VII. EXHIBITS/APPENDICES** **104**

APPENDIX 1 ... 111
APPENDIX 2 ... 118
APPENDIX 3 ... 120
APPENDIX 4 ... 124

<u>DIGITAL MEDIA</u>: On 8/19/2024, in ECF 65, PID.4796 (explained in PID.4794-4795), plaintiff filed "1-23-cv-01097_plaintiff-flash-drive-1.zip". This flash drive contains digital media files, including the entire docket in this lawsuit, prior to that date, specifically including all filings from ECF 1-59, PID.0001-4735. That flash drive was filed in preparation for filing this first amended complaint, to greatly reduce the bulk, cumbrance, and expense of producing, organizing, and distributing such a substantial record using a conventional paper media format. A copy of this flash drive is being served to each defendant, as a companion resource by which to reference the citations throughout this complaint, as well as in supporting documents filed earlier in this lawsuit. Plaintiff has also made these digital media files (as scanned by the court and sold through PACER) available to each defendant, free of charge, using an electronic web docketing system styled after PACER, to mimic their familiar technology while providing a quick, easy, cost-effective solution to all involved. A detailed Website Instructional Video has been filed in ECF 65-1, PID.4798, a copy of which is provided on each flash drive. More information about these systems can be found in ECF 65, PID.4794-4869.

## I. JURISDICTION AND VENUE

"[T]he traditional justification for diversity jurisdiction is to minimize potential bias against out-of-state parties." *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 991 (7th Cir. 2001) (citing *Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 111 (1945); *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir.1990)). Diversity jurisdiction is meant to "open[] the federal courts' doors to those who might otherwise suffer from local prejudice against out-of-state parties." *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010) (citations omitted) (reversing district court's finding that jurisdiction was lacking). The facts and evidence clearly show that Plaintiff has suffered prejudice on many occasions in the Chancery Court for Williamson County Tennessee—and in the United States Bankruptcy Court Middle District of Tennessee (hereinafter "bankruptcy court").

The district court has subject matter jurisdiction pursuant to 28 U.S. Code § 1332 since litigants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, and pursuant to 18 U.S. Code § 1964 because counts 9 and 10 involve RICO, and pursuant to 28 U.S. Code § 1331 because counts 11 through 14 involve other federal laws/constitutional issues. Litigants in this matter are residents of at least two different states.

## II. PARTIES

**Plaintiff:**

- **Jeffrey Ryan Fenton** is a U.S. citizen residing and domiciled in Genesee County, Michigan, with an address of 17195 Silver Parkway #150, Fenton, MI 48430-3426.

**Defendants:**

- **Virginia Lee Story** (BPR# 011700) is believed to be a U.S. citizen residing and domiciled at [redacted] Franklin, TN [redacted]
- **Michael Weimar Binkley** (BPR# 005930) is believed to be a U.S. citizen residing and domiciled at [redacted] Franklin, TN [redacted]
- **Kathryn Lynn Yarbrough** (BPR# 032789) is believed to be a U.S. citizen residing and domiciled at [redacted] Thompsons Station, TN [redacted]

- **Elaine Beaty Beeler** (BPR# 016583) is believed to be a U.S. citizen residing and domiciled at [redacted] Franklin, TN [redacted]
- **Mary Elizabeth Maney Ausbrooks** (BPR# 018097) is believed to be a U.S. citizen residing and domiciled at [redacted] White House, TN [redacted]
- **Alexander Sergey Koval** (BPR# 029541) is believed to be a U.S. citizen residing and domiciled at [redacted] Nashville, TN [redacted]
- **Henry Edward Hildebrand III** (BPR# 032168) is believed to be a U.S. citizen residing and domiciled at [redacted] Nashville, TN [redacted]
- **Charles M. Walker** (BPR# 019884) is believed to be a U.S. citizen residing and domiciled at [redacted] Nashville, TN [redacted]
- **Thomas Earl Eugene Anderson** is believed to be a U.S. citizen residing and domiciled at [redacted] Nashville, TN [redacted]
- **Roy Patrick Marlin** is believed to be a U.S. citizen residing and domiciled at [redacted] College Grove, TN [redacted]
- **Samuel Forrest Anderson** (BPR# 017022) is believed to be a U.S. citizen residing and domiciled at [redacted] Nashville, TN [redacted]
- **James Michael Hivner** (BPR# 020405) is believed to be a U.S. citizen residing and domiciled at [redacted] Bartlett, TN [redacted]
- **John Brandon Coke** (BPR# 029107) is believed to be a U.S. citizen residing and domiciled at [redacted] Nashville, TN [redacted]
- **Sandra Jane Leach Garrett** (BPR# 013863) is believed to be a U.S. citizen residing and domiciled at [redacted] Brentwood, TN [redacted]
- **Frank Goad Clement Jr.** (BPR# 006619) is believed to be a U.S. citizen residing and domiciled at [redacted] Nashville, TN [redacted]
- **Andy Dwane Bennett** (BPR# 009894) is believed to be a U.S. citizen residing and domiciled at [redacted] Hermitage, TN [redacted]
- **William Neal McBrayer** (BPR# 013879) is believed to be a U.S. citizen residing and domiciled at [redacted] Brentwood, TN [redacted]
- **Story and Abernathy, PLLP** is a law firm located at 136 4th Avenue South, Franklin, TN 37064 (hereinafter "SA").
- **Rothschild & Ausbrooks, PLLC** is a law firm located at 110 Glancy Street, Suite 109, Goodlettsville, TN 37072 (hereinafter "R&A").
- **Bankers Title & Escrow Corporation** is a closing and title insurance company located at 3310 West End Avenue, Suite 540, Nashville, TN 37203 (hereinafter "BT&EC").
- **Hostettler, Neuhoff & Davis, LLC** is a real estate brokerage and auction company located at 421 East Iris Drive, Suite 300, Nashville, TN 37204-3140. (hereinafter "HN&D").
- **McArthur Sanders Real Estate** is a real estate brokerage located at 203 North Royal Oaks Boulevard, Franklin, TN 37067-3012 (hereinafter "MSRE").
- **Spragins, Bartnett, & Cobb, PLCNS** is a law firm located at 312 East Lafayette, Jackson, TN 38301-6220 (hereinafter "SB&C").
- **Rubin Lublin TN, PLLC** is a law firm located at 1661 International Drive, Suite 400, Memphis, TN 38301-6220 (hereinafter "RLTN").
- **Bank of America Corporation** is a financial institution located at 4909 Savarese Circle, Tampa, FL 33634-2413 (hereinafter "BOA").

- **Cadence Bank**[3] is a financial institution headquartered at One Mississippi Plaza, 201 South Spring Street, Tupelo, MS 38804-4811 (hereinafter "CB").
- **State of Tennessee*** is a government entity with an office located at 600 Dr Martin L King Jr Blvd, TN 37243-9100 (hereinafter "the State").
- **County of Williamson Tennessee*** is a government entity with an office located at 1320 West Main Street, Franklin, TN 37064-3731 (hereinafter "the County").
- **Williamson County Sherriff's Office*** is a government entity with an office located at 408 Century Court, Franklin, TN 37064-3986 (hereinafter "WCSO").
- **Chancery Court for Williamson County Tennessee*** is a government entity with an office located at 135 4th Avenue South #236, Franklin, TN 37064-2538 (hereinafter "Chancery Court").
- **Tennessee Court of Appeals Middle Division*** is a government entity with an office located at 401 7th Avenue North, Nashville, TN 37219-1400 (hereinafter "Appellate Court").
- **Supreme Court of the State of Tennessee*** is a government entity with an office located at 401 7th Avenue North, Nashville, TN 37219-1400 (hereinafter "Supreme Court").
- **Board of Professional Responsibility of the Supreme Court of Tennessee*** is a government entity located at 10 Cadillac Drive, Brentwood, TN 37027-5078 (hereinafter "BPR").
- **Tennessee Administrative Office of the Courts*** is a government entity with an office located at 511 Union Street, Suite 600, Nashville, TN 37219-1768 (hereinafter "Admin Office").

* The last eight defendants will be collectively referred to hereinafter as "State Defendants." Venue for diversity jurisdiction cases is governed by 28 U.S. Code § 1332, which allows Plaintiff to file this complaint in the U.S. district court in his home state. See *Ferens v. John Deere Co.*, 494 U.S. 516 (1990).

## III. INTRODUCTION

### (1) GENERAL BACKGROUND

1. The genesis of this complaint came colored as a domestic divorce action[4] (with no children), executed in Chancery Court—bundled along with a completely unnecessary, strategically engineered, precisely timed, fraudulent[5] bankruptcy filing[6] to cheat Plaintiff out of his property interests[7] while alleviating his ex-wife of all financial responsibility[8] for paying the

[3] Plaintiff's injuries were inflicted by BancorpSouth, Inc. and occurred before the merger with Cadence Bank.

[4] ECF 1-17, PID.641-1369

[5] ECF 19-2, PID.2632-2646 | https:/rico.jefffenton.com/evidence/2019-04-26_ausbrooks-story-fraudulent-bk-petition.pdf

[6] ECF 1-8, PID.74-478

[7] ECF 52, PID.4211-4217 | https://rico.jefffenton.com/evidence/2023-05-31_1986-sunnyside-brentwood-tn-appreciation.pdf

[8] ECF 27, PID.3260-3275 | https://rico.jefffenton.com/evidence/2018-07-12_arons-and-associates-divorce-planning.pdf

significant transitional alimony[9] Plaintiff and his ex-wife had repeatedly agreed upon.

2. This is a *pro se*[10] complaint entitled to a liberal reading and less stringent standards since it was prepared without assistance of counsel. See *Haines v. Kerner, et al.*, 404 U.S. 519, 92 S. Ct. 594 (1972).

3. Plaintiff is a qualified Americans with Disabilities Act (hereinafter "ADA") party and requests any accommodations[11] the court can provide to help him fully participate in, benefit from, and receive justice through the federal judiciary. His most significant challenges—in addition to living in extreme poverty caused by the defendants—include, but are not limited to, being very slow, meticulous, and repetitious in research and writing; having difficulty articulating succinctly; overly complicating most life activities; not communicating concisely with regard to complex problem solving; and having an inability to effectively multi-task, which includes handling multiple concurrent legal tasks. Specifically, Plaintiff suffers from the following cognitive disabilities: Obsessive-Compulsive Personality Disorder (OCPD) DSM-5 301.4 (F60.5), Generalized Anxiety Disorder (GAD) DSM-5 300.02 (F4L1), Attention-Deficit Hyperactivity Disorder (ADHD) DSM-5 314.01 (F90.2), Circadian Rhythm Sleep Disorder (CRSD) Non-24-Hour Sleep-Wake Disorder (Non-24) DSM-5 307.45 (G47.24). Letters regarding his disabilities are included in Appendix 1.

4. Without medications and ADA accommodations, the preceding disabilities prevent Plaintiff from defending himself against multiple concurrent high-pressure attacks waged against his life, liberty, and property, especially when they are fast and furious and have multiple components that attack him

[9] ECF 44, PID.44 | https://rico.jefffenton.com/evidence/2019-01-08_wifes-claims-about-alimony-and-lawyers.pdf
ECF 1-26, PID.1317-1318 | https://rico.jefffenton.com/evidence/2018-10-27_verbal-settlement-agreement.pdf

[10] ECF 1-35, PID.1960

[11] ECF 1-38, PID.2032-2045

from multiple angles in multiple courts. This is precisely what happened in the courts in Tennessee, without showing any honest interest, care, or concern for the real merits of the actions or the catastrophic impact the court's orders would have upon Plaintiff's life, ability to recover, and support himself again.

5. To stack the odds against Plaintiff even more, his then wife had assured him that all "contested" litigation was over and that they would obtain a divorce amicably without wasting more of their money or equity on attorneys. Then to make sure that Plaintiff didn't waste any family resources on his own defense, she strategically cut him off from all financial support right before the attack began, also with no notice.




**Figure 1 – Agreement to Pay Plaintiff Alimony and Proof of Agreement Not to Litigate**[12]

[12] ECF 44, PID.44 | https://rico.jefffenton.com/evidence/2019-01-08_wifes-claims-about-alimony-and-lawyers.pdf

6. This case does *not* attempt to re-litigate a divorce or a bankruptcy—which were, incidentally, never legally litigated in the first place—nor is the instant matter about the inconspicuous timing of both, which was portrayed as a coincidence, nor is it about the ravages of a failed marriage. Actually, this complaint revolves around unethical profiteering through the exploitation of family court conflicts and the weaponization of courts for a criminal agenda. The aforementioned matters were steered *not* to the benefit of either of the litigants, but to the benefit of others, by powerful and privileged members of the courts in a practice commonly referred to "predatory litigation."

7. Plaintiff's ex-wife had changed their mortgage account credentials roughly a year prior to the bankruptcy[13], promising to keep the bills for their marital residence paid[14] since she was the primary breadwinner[15] at that time and the property was the sum total of both of their life's savings and premarital retirement investments. Plaintiff had no idea that a single mortgage payment had ever been missed. Short of someone providing him with lawful and ethical notice, he literally had no access or way to find out.

8. Instead of mortgage payments being kept current, two law firms with four dedicated attorneys (to start) executed a scheme that included not one but several strategically missed mortgage payments without notice to Plaintiff. They created the fabricated "emergency" in the RICO counts herein, which the state and federal courts in Tennessee then pretended to "fix", as they stripped and liquidated Plaintiff's and his ex-wife's assets for the benefit of others.

---

[13] ECF 43, PID.3717-3719 | https://rico.jefffenton.com/evidence/2018-04-23_wife-locked-plaintiff-out-of-financial-accounts.pdf

[14] ECF 43, PID.3720-3721 | https://rico.jefffenton.com/evidence/2018-05-02_family-budget-living-apart.pdf

[15] ECF 27, PID.3260-3275 | https://rico.jefffenton.com/evidence/2018-07-12_arons-and-associates-divorce-planning.pdf
ECF 43, PID.3723-3724 | https://rico.jefffenton.com/evidence/2018-08-30_wifes-budget-for-husband-keeping-home.pdf
ECF 43, PID.3730-3739 | https://rico.jefffenton.com/evidence/2018-09-14_fair-settlement-offer-by-wife-with-tax-truth.pdf
ECF 1-26, PID.1317-1318 | https://rico.jefffenton.com/evidence/2018-10-27_verbal-settlement-agreement.pdf

9. Plaintiff was deprived of his constitutional rights, victimized by violations of civil and criminal law, and suffered great financial and emotional distress—all as a result of the defendants' actions, which at times were criminal. This complaint will prove with undeniable facts and evidence that the outcomes in Plaintiff's legal battles in the Tennessee state and federal court systems were predetermined and thus were some of the several instances of deprivation of his constitutional right to due process. Violations of his rights to free speech and equal protection, his Ninth Amendment right not to be exploited because of his mental disabilities, and being humanely treated are also the foundation of this complaint. Rules of procedure were not followed. Judicial canons were broken. Rules of professional conduct were ignored. Crimes were committed. The U.S. Constitution was trampled.

10. In any legal action, the damage caused by unethical behavior needs to be examined holistically. The legal system in Tennessee failed to do that. Instead, even in a best-case scenario—that is, without corrupt intentions—it focused on the parts individually and ignored the cumulative wrongdoing that led to Plaintiff's plight—a condition that would be impossible to attain without such a myopic paradigm. Regarding the instant action, it is particularly important to consider the landscape of the litigation prior to and precipitating it.

11. This complaint seeks a cure for two fraudulent[16] predatory actions in Tennessee during 2019, from which flowed four court orders depriving Plaintiff of liberty and/or property, allegedly on behalf of Plaintiff's then wife, Fawn Fenton (hereinafter "Ms. Fenton," "then wife," or "ex-wife"), though she and Plaintiff were both financially destroyed as a result and to the sole benefit of outsiders.

[16] Fraud on the Court(s), by Members of the Court(s), spanning both State and Federal Courts in Middle Tennessee concurrently.

### (2) PRIMARY POWER PLAYERS

12. Court specifics in precipitating actions:

(1) Chancery Court, doc. no. 48419B[17]

- Divorce Filed: June 4, 2019, by defendant SA
- Court Clerk & Master: defendant Beeler (BPR# 016583)
- Presiding Chancellor: defendant Binkley (BPR# 005930)
- Opposing Counsel: defendants Story (BPR# 011700), Yarbrough (BPR# 032789), SA

(2) U.S. Bankruptcy Court – Middle District of Tennessee, doc. no. 3:19-bk-02693[18]

- Chapter 13 Filed: April 26, 2019
- Presiding Judge: defendant Walker (BPR# 019884)
- Chapter-13 Trustee: defendant Hildebrand (BPR# 032168)
- Counsel for Ex-wife: defendants Ausbrooks (BPR# 018097), Koval (BPR# 029541), and R&A

(3) Appellate Court, doc. no. M2019-02059-COA-R3-CV19

- Appeal Filed: November 20, 2019
- Judges: defendants Clement (BPR# 006619), Bennett (BPR# 009894), and McBrayer (BPR# 013879)
- Counsel for Ex-wife: defendants Story (BPR# 011700), Yarbrough (BPR# 032789), SA
- Dismissed[20] Plaintiff's appeal, without correction, assistance or cure—despite the clearly disclosed judicial and attorney misconduct—either because of error, bias, collusion, and/or negligence

---

[17] ECF 1-17, PID.641-1369

[18] ECF 1-8, PID.74-478

[19] ECF 1-29, PID.1684-1691

[20] ECF 1-29, PID.1693

- Closed Date: April 9, 2021

(4) Supreme Court, doc. no. M2019-02059-SC-Rl1-CV[21]

- Application for permission to appeal improperly denied[22]

### (3) FRAUD UPON BOTH STATE & FEDERAL COURTS

13. The very first action, the ***predicate fraud***[23] which became the foundation for every other fraud, crime, unnecessary and unconscionable loss to follow, within this complaint, was a secretly executed, falsified, fraudulent bankruptcy petition (Case 3:19-bk-02693[24]) executed and filed by defendant Ausbrooks through her Nashville law firm, defendant R&A[25], allegedly on behalf of Plaintiff's ex-wife. This matter gave birth to criminal activity and was the springboard to steal Plaintiff's home, retirement, and future. Plaintiff was strategically deprived of lawful notice[26] about this bankruptcy action in which his home was secretly included *by special request.*

14. Entered on April 26, 2019, on Appendix D, Part 9, "Nonstandard Plan Provisions", the following request was included by defendant Ausbrooks[27]: "Debtor moves for permission to sell real property located at 1986 Sunny Side Drive Brentwood, TN 37027 Williamson County, within 180 days of confirmation with no payments being made in the interim. The liens of Bank of America, NA and BanCorp South shall be satisfied in full and all remaining proceeds after Debtor's homestead exemption and costs of sale shall be paid to the Chapter 13 Trustee for the benefit of the estate."

---

[21] ECF 1-27, PID.1370-1683

[22] ECF 1-29, PID.1692

[23] ECF 19-2, PID.2632-2646 | https://rico.jefffenton.com/evidence/2019-04-26_ausbrooks-story-fraudulent-bk-petition.pdf
ECF 45, PID.3817-3819 | https://rico.jefffenton.com/evidence/2019-04-26_bankrupcy-planned-for-when-employer-retires.pdf

[24] ECF 1-8, PID.74-478

[25] https://rico.jefffenton.com/evidence/2019-04-26_wifes-ch13-petition-3-19-bk-02693.pdf

[26] ECF 1-13, PID.565-566 | https://rico.jefffenton.com/evidence/2022-03-15_ustp-bk-fraud-referral-confirmed-no-notice.pdf

[27] ECF 1-8, PID.144

15. To be clear, this language asked for permission to sell real property owned by Ms. Fenton *and* one other equally deeded party, the plaintiff, as tenancy by the entirety. This can be easily verified by checking the property deed[28] and/or the property tax records[29] on which Plaintiff was clearly named, the same being the legal responsibilities of both defendants Ausbrooks and Hildebrand.

16. Examining this request on its face, imploring no more than common sense and the most fundamental knowledge about natural and constitutional rights in the United States of America, this request does not appear that it could have reasonably been made in good faith by defendant Ausbrooks for at least the following two reasons:

- Firstly, the request sought to sell the property owned by another.
- Secondly, the language promised all the proceeds of the sale to benefit only the party who made this request (and her creditors), without any language indicating if or how the proposed sale might be of any benefit to the other equally deeded and mutually interested property owner, namely, the plaintiff.

17. That immediately reeks of foul play, yet defendant Ausbrooks filed the motion, all while personally and professional certifying[30] that her request was well grounded in law and made in good-faith and without bringing any of the obvious concerns and potential conflicts of interest to light. She failed or refused to perform any due diligence to protect the property interests of Plaintiff and to provide both Plaintiff and his two lawful tenants/roommates[31] with "adequate protection"

[28] ECF 19-1, PID.2624-2628 | https://rico.jefffenton.com/evidence/2011-04-29_1986-sunnyside-brentwood-tn-deed.pdf

[29] ECF 19-1, PID.2629| https://rico.jefffenton.com/evidence/1986-sunnyside-brentwood-tn-2019-property-taxes.pdf

[30] F.R.B.P. Rule 9011 and 11 U.S. Code § 707

[31] ECF 45, PID.3800-3807 | https://rico.jefffenton.com/evidence/2019-03-26_fenton-sunnyside-roommate-lease-merriman.pdf
ECF 45, PID.3808-3813 | https://rico.jefffenton.com/evidence/2019-04-09_fenton-sunnyside-roommate-lease-garcia.pdf

as is required by law[32] and rules of professional conduct.

18. Defendant Ausbrooks was well aware that Ms. Fenton was still married. She also knew that the state of Tennessee is a "deed of trust" state, not a mortgage state, meaning that the name on a mortgage does not define who owns the property or holds legal title to it, but instead, that the property's deed of trust is the sole instrument. Furthermore, real property owned by a husband and wife in Tennessee is by default held as tenancy by the entirety[33]. Even if Plaintiff wasn't named on the deed of trust—which he was—the property still can't *legally* be sold with a clear title without Plaintiff signing a quit claim deed or some other instrument conveying or forfeiting his marital interest in the property. But if that was to be compelled by *any* court, it could not be lawfully or ethically done without due process.

19. Choosing not to notify Plaintiff[34] or his two lawful tenants, defendant Ausbrooks had requested that *all* Plaintiff's lawful real property interests be usurped and liquidated, with the funds being disbursed entirely to others. Such thievery is clearly unethical and also illegal pursuant to 11 U.S. Code § 707(b)(4)(C)[35]:

> The signature of an attorney on a petition, pleading, or written motion shall constitute a certification that the attorney has—
> (i) performed a reasonable investigation into the circumstances that gave rise to the petition, pleading, or written motion; and
> (ii) determined that the petition, pleading, or written motion—
> (I) is well grounded in fact; and
> (II) is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and does not constitute an abuse under paragraph (1).

20. The actions between the state and federal courts were conducted under the pretense of

[32] https://www.law.cornell.edu/uscode/text/11/363

[33] ECF 1-13, PID.541-542

[34] ECF 1-13, PID.565-566

[35] ECF 1-34, PID.1894





https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

"legal" actions and under the guise of a divorce, except that none of the actions taken were actually legal in accordance with the rule of law—neither state nor federal, including their constitutions. Nor was any interest or care shown about any real merit involving the litigants' marriage or subsequent dissolution of that marriage through a divorce. In fact, discovery for the divorce was strategically prevented by defendants Chancery Court, Binkley, Beeler, and Story from ever getting started.

21. Once defendants seized possession of Plaintiff's marital residence, they fraudulently terminated all litigation under the guise of "default" judgments, claiming that Plaintiff chose to relocate to Michigan and had no interest in participating further or defending his case, none of which was true nor remotely reasonable given the 250 +/- pages of sworn testimony Plaintiff had filed in the Chancery Court on August 29, 2019, which included an *ad hoc* divorce answer and counterclaim as well as an answer/rebuttal of the egregiously false claims in the "Ex Parte Order of Protection." Plaintiff's August 29, 2019, filing in Chancery Court also contained clear and convincing evidence that literally every allegation brought against him by defendants Story and Yarbrough was substantially fraudulent.

22. Yet it appears that not one word of those 250 +/- pages of testimony and evidence was ever used to Plaintiff's benefit. There is a solid reason for this. Understand that the due date for any answer and counterclaim was extended beyond August 29, 2019, the date of *only the second hearing* in the contested divorce. Such an action typically takes years to litigate. During this hearing, defendant Story twice used the term "final hearing." Plaintiff believed this to mean final hearing for the fraudulent motions and other papers that she had thus far filed. As it so happened, it was the last hearing for the *entire* divorce. How could anyone legitimately know and proclaim that a "final hearing" had already been set before even reading the response to the complaint

Plaintiff filed that very day, before most pre-trial activity, and before *any* discovery whatsoever if the proceedings were at all constitutional? Moreover, the term "final hearing" was used as early as August 6, 2019, in the EX PARTE ORDER OF PROTECTION EXTENDED PENDING FINAL HEARING AND ORDER GRANTING MOTION TO SELL MARITAL RESIDENCE BY AUCTION indicating that a plan to short circuit everything was put in place early in the game. Curiously, the phrase "the hearing date is waived" is used in this document.

23. "We're not going to be talking about the violation of the Order of Protection. That's going to be reset. So all of these documents you have don't apply to today" (emphasis added).[36] Examining this statement defendant Binkley made during the hearing on August 29, 2019, leaves no doubt that corruption and fraud were at play during the entire divorce "proceeding." Plaintiff had just given his written answer/counterclaim/objection to the court that very day. There is no possibly way defendant Binkley would have had time to scan through it, much less read it in detail.

24. Even when Plaintiff corrected him, "Well, the back portion of them does talk about the marital residence.....,"[37] defendant Binkley ignored that. He intentionally made the wrong determination that everything in Plaintiff's document was related to the order of protection.....and nothing else. Such was not a mistake; it was a deliberate act intended to drive the case to a certain destination. Moreover, Plaintiff's filing *did*—as he stated—contain objections to sell the marital residence and so much more. Defendant Binkley may as well have said, "The outcome was already decided beforehand. We can't let facts, evidence, and the law get in the way of that." The statement he made in court is certainly *not* biased. It jumps well beyond bias and goes straight into corruption, if not outright criminal conduct! Clearly, the outcome of the divorce had already been

[36] Case 1:23-cv-01097-PLM-RSK, ECF No. 23, PageID.2872

[37] Case 1:23-cv-01097-PLM-RSK, ECF No. 23, PageID.2872


https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

predetermined à la WWE: the marital home was to be stolen, and that was the end of it.

25. The entire Chancery Court action is an overwhelming litany of abuse of process, power, jurisdiction, and alleged authority under the fraudulent pretense of some lawful judicial function, which was simply smoke and mirrors.

### (4) PREDATORY LITIGATION

26. Predatory litigation comes in many shapes and sizes but often includes a few core elements that empower bad actors to exert more dominance and control—thus causing exponentially greater harm—than the courts have the lawful jurisdiction and authority to exercise. Often in predatory litigation, both litigants "lose"—typically to the benefit of third parties, such as law firms/attorneys, judges, auctioneers, real estate professionals, investors, physicians, psychiatrists, healthcare providers, expert witnesses, and more. Unfortunately, Plaintiff's matters in Tennessee were such cases. One of the most common elements of predatory litigation is the misuse of various "protection orders." Under the guise of protecting one party, protective orders can be used to both bind and gag the opposing party, while doing serious damage to how his character is perceived by the court. This effectively steals the litigant's voice.

27. Whatever a party says after a protective order has been issued against him will be heard with the stigmatized presumption that the litigant is abusive, unstable, or dangerous; that he is not operating in good faith; that he has ulterior motives and/or malicious intent; and that he is likely in the wrong. The "abuser" and the "loser" in any related litigated case are then synonymous. The case is unequally yoked straight from the start, often by design.

28. Another common element of predatory litigation is that counsel for one party often has the favor of the presiding judge. While this can be extremely difficult to prove, at times enabling abuses to continue in a court for decades, it is next to impossible to win a case whereby both the

court and the opposing counsel are against the other litigant as the evidence in relevant previous cases clearly shows.

29. One way to catch biased judges or case "fixing" is by studying the "administration of justice" in the case, particularly by studying the dialogue between the judge and opposing counsel during the hearings as recorded in the transcripts of evidence. Compare both the content of their conversations along with the language they used with the relevant law as well as with the state or federal rules of judicial and professional conduct.[38] Then use this information to determine if the officers of the court were acting honorably, referencing the law accurately, and presenting the facts unbiasedly while they honestly worked toward the pursuit of justice or whether their words and/or actions appear to be focused toward another agenda.

30. Fact check the purported statements of law made in court to see if the law was being cited accurately and, if not, whether the judge corrected or allowed attorney misconduct—or otherwise turned a blind eye to it thus indicating bias or complicity. Don't worry about whether the facts being cited in court were true or false, but make sure that they are consistent with the record as a whole to date. There is no quick and definitive way to test the validity of the alleged "merits" in this exercise. They could be entirely fraudulent as was the case in defendant Story's filings in Chancery Court—engineered as a strategic distraction—so completely disregard that aspect. The test here is on the "administration of justice" and whether or not the actions and words in court were executed fairly and impartially in compliance with the rules of judicial and professional conduct.[39] The "administration of justice" should not be affected by the "merits of the case."

---

[38] ECF 1-40, PID.2068-2090

[39] ECF 1-40, PID.2068-2090

31. In this test, you are looking to see if the law was obeyed (Tenn. R. Sup. Ct. 1.1), how a judge handled his supervisory duties (Tenn. R. Sup. Ct. 2.12), whether he allowed or corrected false statements of law and attorney misconduct (Tenn. R. Sup. Ct. 2.15), whether he protected and maintained a fair and impartial atmosphere in the courtroom (Tenn. R. Sup. Ct. 2.2), whether he protected litigants from attorney bias, prejudice, and harassment (Tenn. R. Sup. Ct. 2.3), and whether he protected the rights of all litigants with an equitable and lawful interest in the suit to be fairly and equally heard (Tenn. R. Sup. Ct. 2.6). Likewise, did counsel comply with the rules of professional conduct regarding candor toward the tribunal (Tenn. R. Sup. Ct. 3.3), fairness to the opposing party and counsel (Tenn. R. Sup. Ct. 3.4), impartiality and decorum of the tribunal (Tenn. R. Sup. Ct. 3.5), truthfulness in statements to others (Tenn. R. Sup. Ct. 4.1), and whether or not attorneys also reported professional misconduct (Tenn. R. Sup. Ct. 8.3) as the rules require?

32. By applying the aforementioned test, it would show that during every phase of the action in Chancery Court, doc. no. 48419B, defendants Binkley and Story disqualified themselves because of their repeated misconduct, including bias, discrimination, and harassment.

33. The only evidence needed to prove that not one legal, equitable, honest, or honorable order was issued by defendant Chancery Court in doc. no. 48419B is the August 1, 2019, transcript of evidence[40] and the August 29, 2019, transcript of evidence[41] of the proceedings, which should then be compared to the state of Tennessee's rules of judicial and professional conduct.[42] The other 4,000+ pages filed in this matter prove just how horribly corrupt and criminal certain defendants' actions were, particularly Binkley's and Story's.

34. Every division of the Tennessee court system has refused to intervene and denied

[40] ECF 1-24, PID.1184-1225

[41] ECF 1-24, PID.1154-1183

[42] ECF 1-40, PID.2068-2090

Plaintiff the slightest bit of humanitarian consideration or common sense relief by which he might simply be able to move forward, obtain critically needed employment, and survive the devastation caused by the courts and its associated actors, not just to him but also his family. Such destruction is explained in more detail later herein.

35. Since the administration of justice never took place in court, in compliance with the rules of conduct, then likely nothing else lawful ever took place either. The court failed to provide an atmosphere free of bias and harassment where the truth could be fairly expressed, equally heard, compared, weighed, and decided and where *real* justice could prevail. Providing such an atmosphere doesn't happen by accident; it requires the deliberate duties, honest discipline, and good faith actions of the court.

### (5) SETTING THE STAGE—THE ENGINEERED EMERGENCY

36. Defendants Story and Binkley worked with defendants Ausbrooks, Koval, and Hildebrand to "set the stage" in advance in the bankruptcy court for the predatory litigation they had planned, which they then executed in the Chancery Court. These defendants created the "emergency" in the bankruptcy court that the Chancery Court would afterward come in with a heavy hand and pretend to remediate.

37. Strategically placing the mortgages for 1986 Sunnyside Drive, Brentwood, Tennessee (hereinafter "the home," "the marital home," or "the property"), in default without Plaintiff having any knowledge of this was step-one for the entire scam and the engineered "emergency" that defendant Story perpetuated in Chancery Court. The email and U.S. mailing addresses associated with the mortgage accounts had been clandestinely changed. Thus, Plaintiff—who previously had this information—was deliberately blocked from having any knowledge of any default whatsoever.

38. Defendant Story repeatedly emphasized that if the court failed to take immediate action and sell the marital home—before discovery even began in the divorce—then the marital home would go into foreclosure. Foreclosure was not at all a certainty though, and Plaintiff tried to immediately cure the default on the mortgages in order to keep his home, but defendant Story told him, "No, it's already too far along in the bankruptcy." That is a violation of multiple bankruptcy laws as well as being plainly unconstitutional by the Fifth and Fourteenth Amendments of the United States Constitution.

39. Foreclosure actually would have triggered a host of federal protections for Plaintiff and his two lawful tenants/roommates with legitimate one-year leasehold property interests, which the bankruptcy court would have been required to honor and provide "adequate protection" for all involved. Had the marital home entered foreclosure, the tenants would have been protected through the federal Protecting Tenants at Foreclosure Act (PTFA). Whether the sale was compelled via bankruptcy laws or foreclosure, the legitimate property interests of those who had lawful possession and a beneficial interest in the marital home were required to be provided "adequate protection." Plaintiff should have also been provided with the right of redemption, which was all illegally circumvented through the conspiracy between courts and certain defendants. This scam intentionally avoided every protection, right, and freedom of the Plaintiff and his two tenants/roommates.

40. Instead of proceeding legally and in proper form for either of the courts involved, all "adequate protection" and rights to save or redeem Plaintiff's and his tenants' property interests were denied by an expedited forced pre-foreclosure liquidation sale via a Chancery Court-ordered auction with "no minimums."

41. Had the bankruptcy been filed properly—legally and honestly disclosing Plaintiff's

equal investment and property interest—and proceeded in proper form, any collection of the defaulted mortgages and potential foreclosure would have been stayed, and there would have been no "emergency" that demanded or justified such a rash, immediate, wasteful decision. Regardless, the Chancery Court was specifically prohibited from exercising jurisdiction over the marital home because it had already been included in a bankruptcy estate. It was "core" to the bankruptcy that was filed thirty-nine days before the divorce was filed and ninety-seven days before Plaintiff first stood in Chancery Court in what he expected to be a year- to a year-and-a-half-long fully contested divorce as demanded by Ms. Fenton.

42. While intentionally defaulting upon the mortgages without notice to Plaintiff was the first step in this conspiracy which "set the stage" for the miscarriage of justice that took place in the Chancery Court, secretly filing for bankruptcy without notice to Plaintiff was the second step. Defendant Ausbrooks specifically requested in the bankruptcy filing that the marital home be sold, all while fraudulently hiding and misrepresenting Plaintiff's equal property interest—not just having a "marital interest" as fraudulently claimed, but an equal or greater cash investment in the marital home, which included *all* of Plaintiff's pre-marital retirement funds. Unconscionably denying him notice—keeping him in the dark regarding the foul-play about to take place—is reprehensible.

43. In doing so, the defendants acting on behalf of R&A, as well as those defendant-actors within the bankruptcy court, "dug Plaintiff's grave" before defendants Story and Yarbrough ambushed Plaintiff for the "kill" with the help of defendants Binkley and Chancery Court. This was the engineered "emergency" created in the RICO counts herein. The bankruptcy filing was completely unnecessary and fraudulent. If any doubts about this fact remain, the bankruptcy only

provided $44k of alleged "bankruptcy relief" to Ms. Fenton in the end[43], while legal fees were likely twice as much, and $250,000[44] was immediately lost the minute the property auctioned with another $400,000[45] being lost in appreciation since then.

44. This is also further evidence of the conspiracy because none of the actions in either court could have been lawfully executed without the criminal misconduct by members of the other court. Had anyone in either of the courts acted morally and in accordance with law, then they would have reported the attorney and judicial misconduct by the bad actors and their fraudulent schemes. Misconduct included, but is not limited to, disobeying applicable state and federal laws, judicial canons, Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, and Tennessee's rules of both judicial and professional conduct. There was no way to have participated or observed without knowledge of the criminal misconduct. The problem was that the people who were charged and trusted with obeying the laws were in fact the ones intentionally violating them.

### (6) THE STRATEGIC DISTRACTION IN CHANCERY COURT

45. In a best-case scenario, the divorce matter was a fraudulent case encrusted in a tough bankruptcy outer shell. In a worst-case scenario, there was fraud across the board and top to bottom, with fraud also being the driving factor in the bankruptcy court. In either case, bankruptcy and other laws—both civil and criminal—and the federal rules of bankruptcy procedure were circumvented or violated, which paved the way for injustice to flourish. By liquidating bankruptcy estate assets in the Chancery Court, a court more favorable to defendant Story due to her relationship with defendant Binkley, certain defendants were able to circumvent federal rules and

[43] ECF 1-13, PID.569-576 (After subtracting defendant Story's outstanding fees, because without this scam there would be no need for defendant Story or her exorbitant fees.)

[44] ECF 1-12, PID.501-511

[45] ECF 1-12, PID.485

laws governing bankruptcy. Had the matter proceeded in the federal court, the result may not have been the outcome that defendant Story wanted.

46. There were only two orders issued by the Chancery Court while Plaintiff was still located in Tennessee whereby he was able to participate in the proceedings and whereby he was permitted to participate—at least in a limited capacity—by the Chancery Court. Those were the August 1, 2019, hearing and the August 29, 2019, hearing, both of which Plaintiff personally attended. Additionally, the orders arising from these two court dates seriously lack continuity.

47. The transcript of evidence from the August 1, 2019, hearing along with its subsequent court order compared with the transcript of evidence from the August 29, 2019, hearing along with its subsequent court order reveal foul play by the court. Comparing both with the initial divorce complaint by defendant Story along with the state of Tennessee's Rules of Professional Conduct while fact checking defendant Story's statements of "fact" and "law" made in court and on the record makes it clear that criminal misconduct took place in the Chancery Court.

48. During the first hearing, Plaintiff had limited counsel, emergency replacement counsel that had only been on his case for three days. Defendants Binkley and Story refused them any additional time to become familiar with the case. However, defendants Binkley and Story had no legal right to do so since counsel should have had *at least* an additional four days if T.C.A. § 36-4-101 had been followed.

49. Subsequent to the August 1, 2019, hearing, an order was issued for the forced deprivation of the marital home, but Plaintiff was allowed to continue to reside there until proceeds from the sale provided him with a means to obtain replacement shelter and pay for his move.

50. After the August 29, 2019, hearing, once Plaintiff has completely exhausted all his funds, a total of $9,500, on counsel fighting solely vexatious and false claims while the crux of the





https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

divorce itself had yet to be addressed or to even begin discovery, he was forced to proceed *pro se*.

51. Plaintiff's counsel tried to entice his elderly mother to sign a guarantee for payment, explaining to Plaintiff that because his wife was in bankruptcy and the court was trying to take his home and because his wife was the primary breadwinner and he was amidst a season of unemployment, he was essentially "uncollectible" should the court take his home, which is precisely what happened. Therefore, as a condition of representation, Plaintiff's counsel required his elderly mother to sign a personal guarantee for an open-ended amount of debt with his counsel, which his mother was both unwilling and unable to do. Plaintiff's counsel explained that the court could essentially force them to continue representing him after his funding for defense was exhausted thus causing them essentially to work for free to which his counsel objected. Plaintiff had no desire to ever force counsel into those circumstances. As such, since his family is not at all wealthy and he only had access to $10,000 for legal fees, Plaintiff promised his counsel that in the event his legal fees were exhausted, or due to a turn of events in the case it no longer made financial sense for Plaintiff to try to borrow more money from his elderly mother to continue paying counsel, then Plaintiff promised to release his counsel by any method and means necessary, even forcibly terminating their representation if need be to protect their interests by preventing them from working for free if forced by the court.

52. Exhaustion of Plaintiff's reserves occurred his very first day in court, August 1, 2019, while that same day defendants Binkley and Story forced the auction of Plaintiff's marital home "without reserve," essentially discarding the property the cheapest way possible.

53. Plaintiff was contacted on the evening of August 1, 2019, (or possibly August 2) by the owner of his counsel's law firm and informed that he needed to pay an additional $6,000 to maintain representation, which he both could not afford and made no financial sense since he had

at that point no realistic expectation of being able to recover the funds through the litigation to repay his mother.

54. For that reason and that reason alone, Plaintiff terminated his counsel. However, they were not allowed to immediately end representation, but needed to wait until the next court date on August 29, 2019, to appear in the Chancery Court and request withdrawal by defendant Binkley. Plaintiff kept his promise and gave his verbal approval for counsel to be released from his case. There was no means by which to compensate them further. The only major asset he had was being heavily devalued and discarded as a result of the foul play between the Chancery and Bankruptcy Courts and its actors.

55. At that point, during the hearing on August 29, 2019, defendants Binkley and Story essentially threw out any pretense of performing anything lawful and "tag teamed" Plaintiff while denying him the ability to stay in his home throughout the auction as previously agreed. Instead, under completely fraudulent allegations, defendant Story demanded that Plaintiff be forcefully evicted from his home and literally rendered homeless within Tennessee and with no replacement shelter or provision within the state. This was intentional synchronized obstruction of justice by both defendants Binkley and Story. This was also an absurd level of fraud upon the court by them. Defendants Binkley and Story committed other crimes—some felonies—against Plaintiff that day, which is explained more in a later section herein.

### (7) "DISSIPATING MARITAL ASSETS"

56. Defendant Story accused Plaintiff of "dissipating marital assets"[46] when all marital assets were gone already except for a few minor items[47]. She demanded that he be forcefully removed from his home with only a five-day notice over a holiday weekend and that he be removed by sheriff's office personnel. Even more outrageous, defendant Story insisted that Plaintiff not even be allowed to take any of his personal property with him, not even his bed. Defendants Story, Binkley, and Chancery Court presented Plaintiff with a lose-lose proposition. The order entered in Chancery Court on August 6, 2019, clearly stated: "Husband will take such actions as necessary to move items of personal property that he would like to retain."[48]

57. However, at the hearing on August 29, 2019, defendant Binkley—while mischaracterizing what personal items/property really is—stated to the contrary, "Your personal items are your clothes, your personal jewelry, and that's it.....You are not to take with you any furniture, any furnishings, anything like that." He then affirmed, "We are not touching any of the furniture and furnishings." Defendant Story concurred, "We're not going to dispose of any of his personal items."[49] Things Plaintiff was forced to leave were then later stolen by defendants and/or others since Plaintiff failed to take said property—because he was prevented from doing so. Defendants Story, Walker, and/or Koval accomplished the theft with the assistance of the bankruptcy court via an EXPEDITED MOTION TO SELL REAL ESTATE AND PERSONAL PROPERTY. As a result, that court issued an order, part of which read, "[N]otice [was] given to all parties.....There being no objections raised at the call of the docket, the [m]otion is found to be

---

[46] ECF 1-35, PID.1966

[47] ECF 1-35, PID.1950, 1955-1959

[48] ECF 47, PID.3974-3976

[49] ECF 1-37, PID.2007-2031

well taken." There were no objections because Plaintiff was never notified; therefore, the motion—which, absent fraud, should have never been "well taken"—was granted.

58. Plaintiff was then forty-nine years old and a hard working, tax-paying, peaceful Tennessee resident for twenty-five years without so much as a single traffic citation during all that time. The defendants treated him like a hardcore felon, allowing him only to take one carload of his clothes, toiletries, and medications with him. Ironically, or perhaps not really, it was some of the defendants who were the actual felons. This mistreatment all came under false claims of "dissipating marital assets," which wasn't even physically possible in any meaningful capacity because defendant Story's own complaint for divorce stated on page 2, "Plaintiff would show that the parties have no assets other than personal property which has been divided with the exception of a few items. Husband and Wife have lived separately since April 2018" (emphasis added).

**IV.**

Plaintiff would show that the parties have no assets other than personal property which has been divided with the exception of a few items. Husband and Wife have lived separately since April 2018.

[illegible]

**Wife's Complaint for Divorce, Page 2, Section IV**
**Case 1:23-cv-01097-PLM-RSK, ECF 1-17, PageID.648**

**Figure 2 – Proof Marital Property Had Been Divided**

59. Every attempt by defendant Story to convert Plaintiff's personal property back into marital property—without doing the same with Ms. Fenton's personal property—was done in bad-faith.

60. Absolutely nothing in either the bankruptcy or divorce was done to benefit Plaintiff, but

instead, everything ignored both his critical and essential property interests, his right to earn and means of earning a living (via rental income at that time), and his only hope of ever regaining the standard of living that he built by himself prior to the marriage, let alone that which was enjoyed throughout a 13-year marriage, or any chance of ever being able to retire. His property was stolen and liquidated while his life was discarded like trash by the defendants.

### (8) MOTION TO SELL THE MARITAL HOME

61. First and foremost, the Chancery Court had no lawful jurisdiction to hear any sort of issue that would have ultimately changed ownership of the marital home because it had already been included in a bankruptcy estate. Of the three matters addressed by the Chancery Court—the forced deprivation of the marital home, the divorce, and the order of protection—the Chancery Court had no jurisdiction to hear or act on the first, while the last two were addressed after defendants Binkley, Story, Chancery Court, Williamson County, and the State had committed multiple felonies against Plaintiff, disqualifying some of them multiple times over.

62. The Chancery Court thus usurped—or the bankruptcy court abdicated—jurisdiction[50] over the marital home, in violation of 28 U.S. Code § 1334(e)(1),[51] which states: "The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction—of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." Defendants Binkley and the Chancery Court ordered the "sale" of the home in disregard of this federal law[52]. Of important note is the fact that the issue of *whether* to sell the marital home was never raised in the Chancery Court or in the bankruptcy court, but only *how*

---

[50] ECF 1-34, PID.1882 (See e.g., *In re Palmer*, 78 B.R. 402, 405-06 (Bankr. E.D.N.Y. 1987))

[51] ECF 1-34, PID.1882

[52] ECF 1-35, PID.1951-1953



Initials: [signature]



https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

*fast* it could be sold. In the end, this may be the only divorce in U.S. history whereby the parties had equity in real property but—legal fees aside—neither got a single cent from it at the conclusion of the divorce.[53]

63. Furthermore, the motion to sell the marital home was "core" to the bankruptcy, which merely reinforces the fact that a federal court was required to "prohibit or condition such use, sale, or lease as is necessary to provide adequate protection" throughout the bankruptcy.

64. In addition to that, the bankruptcy action was on its face fraudulent, with false details about the couple's property interests in the marital home. Any action planted squarely inside a fraudulent action in another court, especially for the express purpose of intentionally deceiving both courts while circumventing the rights and protections required to be obeyed in that court prior to the deprivation of the property, is fraud sowed upon fraud and can beget nothing other than fraud compounded.

65. In addition to that, the MOTION TO SELL THE MARITAL RESIDENCE signed and submitted by defendant Yarbrough and argued in Chancery Court on August 1, 2019, by defendant Story, was highly harassing, abusive of process, and obscenely fraudulent.

66. There are so many violations of the rules of professional conduct, judicial canons, Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, statutory laws, and state and U.S. Constitutions that the best way Plaintiff knows how to try to describe it all is with an extremely heavy markup of Yarbrough and Story's aforementioned motion.[54]

---

[53] ECF 1-13, PID.557-558

[54] https://rico.jefffenton.com/evidence/2019-07-17_chancery-motion-to-sell-marital-residence.pdf

## (9) THE CRIME SCENE: BRENTWOOD, WILLIAMSON COUNTY, TENNESSEE

67. According to Wikipedia[55]: "Williamson County[56] is ranked as the wealthiest county in Tennessee, as well as among the wealthiest counties in the country. In 2006 it was the 17th-wealthiest county in the country according to the U.S. Census Bureau, but the Council for Community and Economic Research ranked Williamson County[57] as America's wealthiest county (1st) when the local cost of living was factored into the equation with median household income. In 2010, Williamson County is listed 17th on the *Forbes* list of the 25 wealthiest counties in America."




**Figure 3 - Marital Home, Worth More than $900,000[58] Today (Only Owed Approximately $300,000[59] on Mortgages)**

---

[55] https://en.m.wikipedia.org/wiki/Williamson_County,_Tennessee

[56] https://williamsoncounty-tn.gov/

[57] ECF 1-12, PID.497-500

[58] ECF 1-12, PID.485

[59] ECF 1-12, PID.505; ECF 1-13, PID.567

68. Plaintiff co-owned a beautiful home[60] in coveted Brentwood, Tennessee, in which he had invested everything that he had—including all his premarital retirement funds and proceeds from his own premarital home. This piece of real estate was further complemented by nearly a decade of his "sweat equity," including thousands of hours of labor and making and/or supervising roughly $200,000 worth of improvements[61] in the property. The marital home was purchased on April 29, 2011, for $350,000.[62] Between Plaintiff and his ex-wife, they had roughly $550,000 invested into the marital home. Improvements to the property were Plaintiff's primary work product between 2011 and 2018, during which time his ex-wife built her career in architecture.

69. The home is currently worth more than $900,000[63] and was Plaintiff's sole major asset and retirement investment. The Chancery Court illegally forced the liquidation of the property for just $324,360, which was, suspiciously, exactly what was due on the mortgages plus the auctioning fees and closing costs—without so much as one penny going to either Ms. Fenton or Plaintiff to compensate them for their life's savings and the entirety of both of their premarital retirement funds that had been invested into the property.

70. The money Plaintiff and his then wife invested into their home wasn't to raise its curb appeal or add flashy appurtenances which could realize immediate returns upon investment if sold. The family invested into the structural features of the home, replacing the roof, remediating mold, and replacing all electrical and mechanical systems for improved health, safety, efficiency, and comfort. The work performed on the property was done with the expectation that they would live there for at least the next twenty years, not for a quick "flip." It was not possible in 2019 for the

60 ECF 1-12, PID.485; 494-512

61 ECF 1-12, PID.508-511

62 ECF 1-27, PID.1416-1431

63 ECF 1-12, PID.485; PID.494-510

home to be sold either by auction or on the open market without the loss of a substantial amount of money, which could not be recovered. However, over the next few years, the property nearly doubled in value due to its location as expected. The market needed time, and the property needed to be held for at least another year or two in order for Plaintiff not to lose any money in it. The property has appreciated at approximately $100,000 per year for the past four consecutive years.

71. It is common knowledge amongst residential real estate professionals and investors alike that a "pre-foreclosure sale" is usually the best possible deal when purchasing residential real property because it happens before the expenses of a foreclosure combined with holding costs are incurred. However, such deals are exceedingly difficult to find—especially on properties that are not distressed, but instead the owners are in a distressed relationship likely due to a divorce. It appears that the defendants here devised their own scheme for bringing these bargain basement deals to the market. At this point, the scope and depth of everyone who has financially benefitted from the liquidation of the Fentons' marital home is not known, nor is it known if said scheme is something more endemic. One thing is obvious: neither Plaintiff nor Ms. Fenton benefitted from the forced auction of their marital home.

72. In an interview for *Attorney at Law* magazine[64] on April 20, 2016, defendant Story shared that she and her husband are involved in real estate investing and development throughout Williamson County. Defendant Story stated, "My husband and I.....are developing and building. Williamson County is the land of opportunity." She followed shortly after with, "My father practiced law for 60 years in Kentucky. He took me to the courthouse with him when he prosecuted cases from age 12. He became the attorney for the county in condemnation proceedings acquiring the property known as the land between the lakes. While real estate law was

[64] ECF 1-16, PID.626-629

never for me, my husband and I have been developing property for the last 10 years. I guess the real estate bug laid dormant for a time." Clearly she knows the ins and outs of being a real estate investor and how to get the best deals with significant returns on investments.

### (10) INAPPROPRIATE RELATIONSHIPS/CONFLICTS OF INTEREST

73. In the same article[65], defendant Story disclosed that she had been a close family friend of defendant Beeler and her husband, Dan Beeler, for over forty years. This relationship was not disclosed to Plaintiff. He learned about it in the article. Unsurprisingly in hindsight, defendant Beeler repeatedly discriminated against Plaintiff and interfered with his access to the Chancery Court records—clearly favoring defendant Story while covering up for misconduct throughout the Chancery Court action.

74. During Plaintiff's legal research when his head was spinning as he tried to discover what happened to him in the Chancery Court and exactly how something seemingly impossible could have actually happened, he stumbled upon a Facebook page called "Investigate Michael W. Binkley Circuit Court Judge."[66] This page had been set up by victims of defendant Binkley. Until then Plaintiff was unaware of the relationship between defendants Binkley and Story. He quickly learned that they are somewhat infamous in Tennessee, being close family friends who have been publicly exposed for vacationing and socializing together. Defendant Story was known to throw lavish parties[67] at which defendant Binkley[68] and other powerful people frequented. Many people have shared concerns about the conflicts of interest and bias encountered when Binkley heard cases in which one of the litigants was represented by Story, yet the Tennessee courts permitted this

[65] ECF 1-16, PID.626-629

[66] https://www.facebook.com/judgebinkley

[67] ECF 1-15, PID.621-624

[68] ECF 1-15, PID.625; ECF 1-14, PID.611

despite their incestuous relationship as in Plaintiff's case.

75. Some litigants have spent a small fortune trying to force the recusal of defendant Binkley in such cases, yet he has refused to concede to those legitimate requests and tried to conceal the relationship. More than one family tried to demand an impartial tribunal, some spending six figure legal fees, and at least one approaching, if not exceeding, seven figures, merely trying to get an unbiased judge who was not friends with their opposing counsel. Binkley refused, and the State allowed him to compromise the judicial integrity throughout the mid-state time and time again. It is believed that Binkley has recently been forced into "retirement." As so often happens in the U.S. legal system, bad actors "retire" or "resign" rather than the system exposing their wrongdoing or taking remedial action. Thankfully, Binkley is off the bench, but there is much damage to be repaired throughout parts of Tennessee. Importantly, he is not the only one of his kind.

76. After Plaintiff stumbled upon the Facebook page and followed some links to news articles by *The Tennessean* newspaper, he was absolutely amazed to learn that defendants Binkley and Story were so obviously compromised, yet they had never disclosed to Plaintiff that they even knew each other. Furthermore, the Chancery Court makes no audio or video recordings of its civil proceedings. Neither the clerk nor anyone else, except for a privately hired court reporter when one can be afforded and is hired by the litigants, records anything that takes place in court. Furthermore, people such as defendant Story can and have testified in person during a hearing, with their testimony taken as fact—without the person's name being recorded in court documents[69].

---

[69] ECF 48, PID.4014-4017 | https://rico.jefffenton.com/evidence/2019-10-21_chancery-final-decree-of-divorce.pdf

For example, see the first paragraph in the "Final Decree of Divorce", in ECF 48, PID.4014-4017, wherein toward the end of the first paragraph it states in part, "The Court finds, based upon...a witness for Wife as to the grounds for the divorce..." No known court record exists stating who this mystery witness was, when or by what means s/he appeared before the court, or what

77. Studying the court records from Chancery Court, it was next to impossible for Plaintiff to immediately discover what laws were broken in the massively fraudulent scheme that allowed his home to be stolen. Finally, after three years of studying law with the last year spent almost exclusively studying the bankruptcy code, Plaintiff finally discovered the heart of the fraud upon the court certain defendants had executed in order to steal his home.

78. Unlike searching from just the Chancery Court side where the question was "what laws did they break?", once Plaintiff understood the bankruptcy code, the Federal Rules of Bankruptcy Procedure, and the related statutory laws in U.S. Code Titles 18 and 28, the question changed radically to **"**what laws *didn't* they break?**"** Nearly everything defendants did in both courts related to Plaintiff's divorce and his ex-wife's bankruptcy was a flagrant violation of the rules of procedure, laws, ethical codes, and U.S. Constitution.

## (11) IRREFUTABLE PROOF OF A CRIMINAL CONSPIRACY SPANNING STATE AND FEDERAL COURTS

79. No matter what any defendant named in this complaint claims, the evidence of the conspiracy against rights and property under the color of law, office, and official right by bad actors working with and in both state and federal courts concurrently can be definitively proven beyond any reasonable margin of "error" by applying the F.R.B.P. and Titles 11, 18, and 28 of the U.S. Code[70] to the facts below, which are irrefutably encapsulated in the court records:

the testimony was—none whatsoever. Likewise, defendant Story has refused to provide Plaintiff this information despite his request. Yet the plaintiff's life, liberty, and property have been unreasonably deprived and/or destroyed by these defendants as a result without even recording the witness's name or his or her alleged testimony.

Certain defendants chose to use the alleged testimony of this "witness" as part of their justification for unreasonably harsh, punitive, "default" judgments levied against Plaintiff and refused to allow him the opportunity to participate in the October hearing "over the phone," as he was told he could do in court on August 29, 2019. Instead, all "rulings" were significantly to his detriment and against his interests as certain defendants discriminately chose to ignore facts, evidence, law, and Plaintiff's pleadings—sworn testimony and evidence filed that day—without *one single word* of his pleadings being used to his benefit, yet calling his ex-wife's pleadings, "the undisputed testimony of Wife" in the first paragraph of that same fraudulent "Final Decree of Divorce" executed by defendants Story and Binkley. None of this is, by any stretch of the imagination, reasonable.

[70] ECF 1-34, PID.1874-1924

(1) The date the bankruptcy[71] was filed: April 26, 2019.

(2) The date the divorce[72] was filed: June 4, 2019.

(3) Plaintiff was a titled owner of the marital residence as tenancy by the entirety and named on both the property deed[73] and tax records.[74]

(4) Plaintiff was never provided any notice or hearing[75] by the bankruptcy counsel, the bankruptcy trustee, or by the bankruptcy court as required in the Federal Rules of Bankruptcy Procedure Rule-7001.[76] As a result, these laws[77] were violated or circumvented: 11 U.S. Code §§ 363[78], 541[79], 542[80], 707[81], 1203[82], 1204[83], 1205[84], 1206[85], 1207[86], 1208[87]; 18 U.S. Code §§ 152[88], 153[89],

---

71 https://rico.jefffenton.com/evidence/2019-04-26_wifes-ch13-petition-3-19-bk-02693.pdf

72 ECF 1-8, PID.74 | https://rico.jefffenton.com/evidence/2019-06-04_wifes-complaint-for-divorce-48419b.pdf

73 ECF 19-1, PID.2624-2628 | https://rico.jefffenton.com/evidence/2011-04-29_1986-sunnyside-brentwood-tn-deed.pdf

74 ECF 19-1, PID.2629 | https://rico.jefffenton.com/evidence/1986-sunnyside-brentwood-tn-2019-property-taxes.pdf

75 ECF 1-34, PID.1881

76 ECF 1-34, PID.1898

77 ECF 1-34, PID.1874-1924

78 ECF 1-34, PID.1903-1906

79 ECF 1-34, PID.1908-1912

80 ECF 1-34, PID.1913

81 ECF 1-34, PID.1914

82 ECF 1-34, PID.1915

83 ECF 1-34, PID.1915

84 ECF 1-34, PID.1915-1916

85 ECF 1-34, PID.1916

86 ECF 1-34, PID.1916

87 ECF 1-34, PID.1916

88 ECF 1-34, PID.1917

89 ECF 1-34, PID.1918

154[90], 157[91], 158[92], 241[93], 242[94], 373[95], 401[96], 402[97], 1951[98]; 28 U.S. Code §§ 1334[99], 1335, 1927[100]

(5) The bankruptcy only reaped roughly $44,000[101] worth of alleged "bankruptcy relief" for Ms. Fenton in the end as shown on the "Chapter 7 Trustee's Final Account and Distribution Report (TDR)".[102] It probably cost her twice that in combined legal fees for both actions. Approximately $250,000[103] in cash investments was forfeited as of the day of the auction. Lost appreciation has been more than $400,000[104] since.

(6) 11 U.S. Code § 363(h): "Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners;"

(7) The bankruptcy code measures what is a benefit to the bankruptcy estate, in how much *unsecured* debt a sale could pay off, that is, above and beyond the

---

[90] ECF 1-34, PID.1918

[91] ECF 1-34, PID.1919-1920

[92] ECF 1-34, PID.1920

[93] ECF1-34, PID.1922

[94] ECF 1-34, PID.1922

[95] ECF 1-34, PID.1921

[96] ECF 1-34, PID.1921

[97] ECF 1-34, PID.1921

[98] ECF 1-34, PID.1923

[99] ECF 1-34, PID.1882

[100] ECF 1-34, PID.1893

[101] ECF 1-13, PID.569-576 (After subtracting out defendant Story's outstanding fees, because without this scam there would be no need for defendant Story or her exorbitant fees.)

[102] ECF 1-34, PID.1883 (BK Case 3:19-bk-02693, Doc 136, Filed 1/26/2021, Page 1 of 8)

[103] ECF 1-12, PID.501-511

[104] ECF 1-12, PID.485

mortgage notes on that property.

(8) The mortgage notes are secured by the property interest. They can stand alone and balance each other out and need not be involved in bankruptcy at all. The only reason to compel a forced sale of the property (in this circumstance) would be to leverage the debtor's equity in the property in order to pay off other unsecured debts after the mortgages on the property were completely satisfied.

(9) The forced sale of the marital residence was of absolutely no benefit to the bankruptcy estate. The home auctioned for exactly the amounts owed on the two mortgages, plus selling fees. While this came as absolutely no surprise to the defendants, it was by design. The sale proceeds did not pay off one dollar of unsecured debts, nor put a dollar in either Plaintiff's pocket or Ms. Fenton's.

(10) Even if Plaintiff and Ms. Fenton had another $100,000 to $200,000 of equity in the property, it would be almost impossible for the forced sale to outweigh the detriment to Plaintiff. Plaintiff needed this property to survive and not be rendered destitute and homeless. It also was a million-dollar retirement nest egg/investment for Plaintiff. As long as Plaintiff could have obtained the funds to pay the mortgages on time and keep them current, there was no lawful and ethical justification by which to deprive him of his opportunity and right to do so.

(11) The Chancery Court usurped—or the bankruptcy court abdicated—jurisdiction[105] over the marital home in violation of 28 U.S. Code § 1334(e)(1),[106] which states: "The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction—of all the property, wherever located, of the debtor as of the commencement of such

[105] ECF 1-34, PID.1882 (See e.g., *In re Palmer*, 78 B.R. 402, 405-06 (Bankr. E.D.N.Y. 1987))

[106] ECF 1-34, PID.1882

case, and of property of the estate."

80. Certainly, by the date Plaintiff was forced to seek shelter and refuge in the State of Michigan, the State Defendants lost all lawful jurisdiction to hear or decide any matter which could further harm Plaintiff. The law cannot legally be exercised solely for arbitrary deprivation while not benefiting and protecting evenhandedly. Nonetheless, the State Defendants went ahead and did so anyway.

### (12) PLAINTIFF TEACHING HIMSELF THE LAW

81. Plaintiff was told that defendant Coke, the General Counsel for the Tennessee Supreme Court, Administrative Offices of the Courts, was the state court's top ADA authority at the time. During a recorded phone call[107] on February 13, 2020, Plaintiff had with defendant Coke, Coke stated at 16:01 into that call: "…if you are going to be self-represented—and I know it's difficult because you can't afford an attorney…that's just how it is…you have to self-teach yourself. You've gotta go online. Read the law. That's all I can tell you here."

82. During a recorded phone call on July 2, 2020, with chapter 7 bankruptcy trustee John C. McLemore[108], Plaintiff reported the scam between the courts and its actors and that somehow Plaintiff was cheated out of his property interests. While asking Mr. McLemore what processes or procedures on the bankruptcy side didn't take place correctly as well as who was responsible for those tasks, his canned response was, "I can't be your attorney," which was also nearly everyone's response who Plaintiff asked this same question. However, this wasn't what Plaintiff wanted. Plaintiff sought information, not representation. He received minimal information with the calls he made seeking help. But slowly and surely he learned the sections of law which he literally

[107] 2020-02-13_tnsc-aoc-ada-gc-john-code-phone-call.mp3

[108] 2020-07-02_ch7-bk-trustee-john-mclemore-phone-call.mp3 (See also exhibit "D.")

devoted three years to studying almost all day every day before he could unravel the layers of fraud committed by both state and federal court actors and their minions, part of which was to intentionally obfuscate the facts between their separate court records.

83. At 41:24 during the phone call with attorney McLemore, he stated, "They just completely walk completely all over your rights, in the state of Tennessee, or perhaps under the Bankruptcy Code. That's where your problem is, but I can't answer your question because I don't have enough information. I'm sorry."

84. At 41:45 Plaintiff asked, "Is there some place in the code that you would just point me to, where I could start reading myself to try to understand? Because again, I don't have any money to hire an attorney."

85. At 41:58 attorney McLemore responded, "You are in an area of the law that is as difficult as tax. But write this down, 11 United States Code 363. And have a good nap because it's a long statute and you probably will not understand a great deal of it. That's where you look."

86. It needs to be noted that Mr. McLemore stated, "11 United States Code <u>363</u>" (emphasis added). Plaintiff completely missed the "363" part of his sentence at the time. It was only upon transcribing part of that phone call for this complaint that Plaintiff realized Mr. McLemore had provided him with such precise information. Although Mr. McLemore provided some useful information to Plaintiff, he, like everyone else, refused to take responsibility or invest the energy to provide Plaintiff with a cure within his reach.

**Adversary Proceeding in Federal District or Bankrupcy Court**

**The Trustee was required to provide Plaintiff and his two tenants/roommates with notices & hearings in federal court. Plaintiff had the following valid property interests: legal title, ownership, controlling, possession/enjoyment/use, beneficial, equitable, exclusion, investment, income, future. Plaintiff's tenants had secure one-year leasehold interests.**

**Rule 7001. Scope of Rules of Part VII**

An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings:

(1) a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under §554(b) or §725 of the Code, Rule 2017, or Rule 6002;

(2) a proceeding to determine the validity, priority, or extent of a lien or other interest in property, but not a proceeding under Rule 3012 or Rule 4003(d);

(3) a proceeding to obtain approval under §363(h) for the sale of both the interest of the estate and of a co-owner in property;

(4) a proceeding to object to or revoke a discharge, other than an objection to discharge under §§727(a)(8),[1] (a)(9), or 1328(f);

(5) a proceeding to revoke an order of confirmation of a chapter 11, chapter 12, or chapter 13 plan;

(6) a proceeding to determine the dischargeability of a debt;

(7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief;

(8) a proceeding to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination;

(9) a proceeding to obtain a declaratory judgment relating to any of the foregoing; or

(10) a proceeding to determine a claim or cause of action removed under 28 U.S.C. §1452.

**§363. Use, sale, or lease of property** **skipped**

(b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, trustee may not sell or lease personally identifiable information to any person unless—

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. **(skipped)**

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; **(failed)**

(2) such entity consents; **(failed)**

(g) Notwithstanding subsection (f) of this section, the trustee may sell property under subsection (b) or (c) of this section free and clear of any vested or contingent right in the nature of dower or curtesy.

(h) Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if— **(failed)**

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and **(failed)**

87. Plaintiff's overall takeaway from the conversation at the time was that Mr. McLemore had confirmed his suspicion that *something improper* had taken place, but Plaintiff still did not understand where, how, or by whom. The idea that the bankruptcy code is extremely complicated stuck with Plaintiff as did Mr. McLemore's suggestion to read "11 United States Code." After spending over thirty minutes on the call with Mr. McLemore, as he looked through the busy and complicated docket for the case, the overall tone that stuck with Plaintiff at the time was Mr.

McLemore's statement, "I can't answer your question because I don't have enough information. I'm sorry."

88. Some of Trustee McLemore's statements about "notice" were also not understood by Plaintiff at that time. Throughout much of 2020 to 2021, Plaintiff sought help through the Appellate Court, Supreme Court, Admin Office, and BPR. Each attempt absolutely consumed and overwhelmed Plaintiff as he tried to learn how to communicate with them with or without their rules and procedures as he struggled to articulate a series of crimes he still didn't even fully comprehend. Most offenses were buried under the most absurd domestic "dog and pony show" in the Chancery Court, which served as nothing more than a strategic distraction, but one that Plaintiff spent all of his energy fighting against for the first few years.....until he finally learned enough to see past it.....that none of it mattered.....that it was all fraud.

89. Plaintiff later filed complaints for bankruptcy fraud and racketeering with both the FBI[109] and the DOJ/USTP.[110] To Plaintiff's knowledge, nothing remedial was done as a result of these complaints and others. Plaintiff's third year of research was spent studying the bankruptcy code and seeking a federal cure since the State ardently refused to help Plaintiff in any way. Month after month, year after year, as Plaintiff reached out for help and studied the law as suggested by defendant Coke, he slowly learned as he assembled more pieces of the puzzle.

90. Neither court in Tennessee, state or federal, could legally force the sale of the marital home. It was of *zero benefit* to the "bankruptcy estate" since the amount due on the mortgages was about equal to the amount for which the home auctioned. As such, any legitimate court would have ordered the trustee to remove it as "burdensome to the estate."

---

[109] ECF 1-29, PID.1704-1707; ECF 1-30, PID.1771-1792

[110] ECF 1-30, PID.1758-1761

91. So why didn't this ever happen in accordance with the Federal Rules of Bankruptcy Procedure and bankruptcy laws? The reason is that defendants Binkley, Story, Yarbrough, Beeler, Ausbrooks, Koval, and Hildebrand skipped it. They leveraged the Chancery Court and defendant Binkley to literally circumvent the Federal Rules of Bankruptcy Procedure and multiple sections of bankruptcy laws even though the state court was specifically forbidden from exercising jurisdiction over property included in a bankruptcy estate.

92. Allegedly, there was a "witness" used to substantiate the fraudulent claims against Plaintiff for the "default" judgments, but there is no record of his or her name or testimony. Defendant Story has refused to disclose who the witness was, just as she has refused to disclose how Plaintiff's 1,200 pound $5,000 custom gun vault magically disappeared during Plaintiff's forced absence of the marital home. She has also refused to provide him a copy of the fully executed HUD-1 settlement statement from the home's sale. She refused to provide him a copy of the motion or even the cause for the 5-year extension of the fraudulent "Order of Protection" during the time when Plaintiff was attempting to bring his case into the Appellate Court about the misconduct between defendants Binkley and Story and much more. By the rules of professional conduct, defendant Story was required to provide all of this information in good faith, but she showed no regard for the law and certainly not for any rules of conduct.

## (13) PLAINTIFF'S ADA REQUEST FOR MODIFICATION

93. On Plaintiff's ADA "Request for Modification"[111] under "Tennessee Judicial Branch Policy 2.07", he wrote:

> Procedural and technical flexibility, additional time for deadlines to self-represent by necessity, communication modifications due to Covid-19 and excessive mailing times to Michigan, judgment based upon the laws - not just the technical codes which I am knowledgeable about, or able to research and cite (ignorance about the law is no excuse for breaking it, hence it shouldn't be for being protected by the law either). Please judge based upon the spirit of the law, not just the technical manipulation of words used to express, define, and communicate it. Thank you!
>
> I strongly believe that the narrative driving the basis for all the actions levied against me so far by the opposing counsel (Ms. Story) has been largely false, intentionally deceptive, bombarding me from every angle simultaneously, specifically to exploit my known disabilities, to strategically devastate me, using harassment by legal process (malicious litigation). Combined with Ms. Story's reputation, resources, and relationships. I don't believe that I ever had a chance at a fair trial. Ms. Story bound me with an OP obtained under false testimony, then took and destroyed everything of substance, which I have ever owned, in just two months.
>
> During my trial on August 29th, 2019, at "the Old Courthouse" in Franklin, as is recorded in volume-4 of my technical record, page-516, line-6, the judge told me, "Fair is something you do in the fall."
>
> Despite my many requests that the court differentiate this as a "Transcript of Evidence," it remains buried in my technical record, even though the Judge procured the Court Reporter himself. The remainder of that same transcript clearly reveals how open, objective, and impartial, the court remained, amidst my testimony versus Ms. Story's. I beg you look and see for yourself! Your intervention is requested and seriously needed!
>
> Documentation provided by my Psychiatrist and my Psychotherapist is included to prove that I have the disabilities listed, as well as a real need for the modifications sought herein.
>
> I hereby certify that the above information is true and correct to the best of my knowledge.
>
> Signed by Jeffrey Ryan Fenton on July 8, 2020.

[111] ECF 1-38, PID.2032-2045

94. This signed testimony by Plaintiff certified to the Appellate Court that defendant Story treated him with malicious legal abuse—intentionally targeting, attacking, and exploiting his known and fully disclosed disabilities to gain *significant* leverage in the divorce.

95. Clearly, then, the Chancery Court was biased against Plaintiff. Defendants Binkley and Story participated in misconduct together, which can be easily verified by simply checking the court transcripts for the August 29, 2019, hearing. Incidentally, the Chancery Court refuses to acknowledge this particular transcript as "official" but instead buried it amongst hundreds of pages of Plaintiff's technical records, despite defendant Binkley himself having physically procured the court reporter who produced it.

96. In light of Plaintiff's sworn and signed testimony and the facts and evidence in the divorce in the Chancery Court, the "default" court orders are thus void. Moreover, the Appellate Court was *required* to vacate those orders but didn't. Because Plaintiff was never heard regarding any matters resulting in default orders, justice never took place in the trial court, which is obvious to anyone educated in law.

## (14) MISCELLANEOUS INTRODUCTORY INFORMATION

97. The judge of defendant Chancery Court, defendant Binkley, has a sordid past.[112] He was caught in a prostitution sting in 2010[113], two years before he was elected to the bench.[114] Another state judge, Casey Moreland[115], however, wiped all traces of the incident clean. Moreland—not exactly an upstanding citizen himself—was later found to be trading court favors

---

112 ECF 1-14, PID.597-640

113 ECF 1-15, PageID.620

114 https://www.knoxnews.com/story/news/crime/2021/03/22/tennessee-appeals-court-pulls-judge-michael-binkley-casey-moreland-brian-manookian/4450016001/

115 ECF 1-30, PID.1775-1792

for sex, stealing money from the recovery court he founded, and hosting trips with fellow judges and lawyers at which prostitutes were hired and marijuana was smoked. A courageous attorney, Brian Manookian[116], allegedly blew the whistle on Moreland and Binkley[117]. Manookian was later "sanctioned" $700,000[118] by defendant Binkley in an act of vengeance[119], thus proving that he has been known to predetermine the outcomes of legal matters, as he has done in Plaintiff's underlying divorce.

98. Although defendant Binkley should have never been a judge in the first place, he certainly should have never presided over any action in which defendant Story[120] was counsel. Based on just the above crime and corruption by state court actors in Tennessee and the incestuous relationship between defendants Story and Binkley, Plaintiff should be heard and the instant case should be litigated. However, there is much more that needs to be told.

99. Part of the gravamen of this complaint is the protective order[121] against Plaintiff that was obtained by fraudulent and unconstitutional means. Due process was non-existent. Laws were broken. Fraud was rife. The protective order issued during the divorce was supposed to be temporary. Plaintiff's attorneys early in those proceedings said it would terminate at the completion of the divorce. Plaintiff countered by obtaining a no-contact order against his ex-wife. Prior to the conclusion of the divorce but *after* Plaintiff was essentially forced out of Tennessee by the defendants and blocked from participating in proceedings subsequent to August 29, 2019, the protective order became permanent by default, presumably on October 21, 2019. Apparently, the

---

[116] ECF 1-15, PID.618

[117] ECF 1-15, PID.617

[118] ECF 1-15, PID.616

[119] ECF 1-15, PID.615

[120] ECF 1-15, PID.622

[121] ECF 1-31, PID.1794-1873

order was extended for another five years during the time when Plaintiff was filing evidence and sworn testimony in the Appellate Court regarding the improper relationship between defendants Story and Binkley; however, when Plaintiff asked defendants for the basis of the extension, he was met by nothing but the sound of chirping crickets. On neither occasion, when the protective order was first made permanent or when it was later extended[122], was Plaintiff given the chance to challenge it[123], which would have proved the allegations false and issuance of the orders illegal. Plaintiff nonetheless proved said allegations false in his papers to the Appellate Court, upon which time rule 3.3(g)[124] of the rules of professional conduct required defendant Story to "withdraw or disaffirm such evidence," which she failed to do. For example, she exploited the no trespassing signs[125] at 1986 Sunny Side Drive, Brentwood, TN, (hereinafter the "home" or "marital home") to assassinate Plaintiff's character, but they were actually designed by his ex-wife. Moreover and to a great degree, the order of protection prevents Plaintiff from prosecuting a case against the defendants[126] because records exposing them could be misconstrued as a violation of the order. This is no doubt by design.

100. Another important aspect of the matters precipitating this action is that Plaintiff was portrayed as not having any interest in the home. Defendant Hildebrand had not just a duty, but a moral obligation, to check the deed for the home to verify who the proper owners were. He did not do this, or if he did, he ignored the fact that Plaintiff was co-owner[127] of the property as a

---

[122] ECF 1-31, PID.1798-1803

[123] ECF 1-31, PID.1794-1873

[124] ECF 1-40, PID.2076

[125] ECF 1-32, PID.1837-1849

[126] ECF 1-29, PID.1732 | "…bogus order of protection against me (to attempt to use Ms. Fenton as a 'human shield', to try to hide their crimes behind), with intimidation tactics, coercion, extortion tactics, holding my civil rights hostage, with a noose around my neck, threatening me not to expose their unconscionable acts, 'under color of law', while being an abomination to justice"

[127] ECF 1-27, PID.1416-1430

tenancy by the entirety[128]. Defendant Ausbrooks[129] also shares culpability because she failed to pursue due diligence as well.

101. Regarding the transcripts, defendant McKinney certified the Chancery Court record that only one transcript existed[130]. There are really two transcripts[131]. She wrote a 1-page notice for filing the August 1, 2019, transcript[132] for the court reporter (or that person's associate) who brought it into the Chancery Court. However, she refused to do this for Plaintiff, who instead mailed it. Nonetheless, despite the second transcript being from the reporter that defendant Binkley[133] personally obtained and despite it being unquestionably authentic, it never made it into the record as a standalone document like the first transcript.

102. It seems that nobody is willing to keep the two relevant transcripts made at the Chancery Court in close proximity of each other or to compare them directly. The second transcript, which was made from the August 29, 2019, hearing[134] has been buried among hundreds of pages of technical records[135]. The court has consistently rejected its authenticity despite the fact that defendant Binkley obtained the court reporter himself for that particular hearing. He left the courtroom that day, found the reporter, and had her record the proceedings. There is no legally justifiable reason that the transcript from that hearing should not be accepted as an official record. Plaintiff maintains that the real reason the two transcripts are not juxtaposed in the record is that

[128] ECF 1-13, PID.541-542

[129] ECF 1-34, PID.1895 | FRBP Rule 9011

[130] ECF 1-17, PID.642-643

[131] ECF 1-24, PID.1154-1225

[132] ECF 1-23, PID.1084

[133] ECF 1-24, PID.1157

[134] ECF 1-37, PID.2007-2031

[135] ECF 1-24, PageID.1154-1183

parts of them contradict[136] each other.

103. Defendant Story wrote in her MOTION FOR VIOLATION OF THE EX PARTE ORDER OF PROTECTION AND FOR DATE CERTAIN FOR WALK THROUGH OF HOUSE AND MOTION FOR SCHEDULING ORDER: "Wife would request that this matter be set for trial and that Mediation be waived due to the pending Order of Protection, and Wife is concerned for her safety and for the safety of those participating in the Mediation process." Firstly, nothing in Story's "Exhibit 1" can be even remotely construed as a personal threat by Plaintiff to anyone. Secondly, she unilaterally declared, "This post was in violation of the Ex Parte Order of Protection," which, of course, it was not. Thirdly, mediation was waived not because of any threat by Plaintiff, but so that the path of least resistance could be taken: an outsider may not be so receptive to an outcome that had been predetermined by a criminal cadre. Nobody in the prior actions was more threatened and harassed than Plaintiff. The tactics employed against him were a classic example of projection and were used in order to divert attention away from the real perpetrators.

104. It is crucial to note that defendant Story used the phrase "Scheduling Order" in the motion mentioned in the last paragraph, but no record exists of such an order being issued, nor was any pre-trial or discovery schedule otherwise set. This is further proof that the phrase "final hearing" Story used during the August 29, 2019, "hearing" while referring to the October 21, 2019, "hearing" had special significance. It was clearly known—no later than August 29, 2019—that the divorce's outcome was a foregone conclusion.

105. In October of 2019—and as if Plaintiff was a menace to society—four deputies escorted Plaintiff off his own property without any real legal authority because his house was being

[136] ECF 1-35, PID.1925-2006

stolen under false pretenses and color of law. They not only perpetuated the fraud originating in the Chancery Court, but also intimidated Plaintiff, while their lawless actions have caused his mother now to fear the police.

106. Plaintiff lost his home, thousands of hours in "sweat equity" repairing[137] and maintaining it, thousands of hours of time fighting legal battles associated with it, and his retirement, freedom, Second Amendment rights, Tennessee real estate license[138], employability, and good name all under the color of law. At the end of the day, Plaintiff has filed more than 1,000 pages[139] worth of documents in the Chancery Court and Appellate Court. Nothing in any of it has been used to Plaintiff's benefit. All his documents have gone largely ignored—but for the lone exception of noting his quite vocal complaint in his documents to the Appellate Court that Local Rule 11.01[140] was unconstitutional because it prevented *pro se* parties from objecting to untruthful court orders written by (lying) opposing parties. As massive a conflict of interest it is for any opposing party to write an order, the conflict is even more astounding when the writer is a pathological liar. The proverbial icing on the cake was that she was allowed to break every court order.....which she had herself written. To top it all off and after Plaintiff had raised hell, one or more of the State Defendants changed this rule to now be constitutional so that nobody else can complain about it again—all while *not* remediating the wrongs done to Plaintiff. See exhibit B.

107. Nearly everything in the court "record" is based on lies[141] and fraud[142] at the hands of defendant Story and her accomplices. Courts nationwide have ruled that an action should

---

137 ECF 1-12, PID.508-512; ECF 1-35, PageID.1925

138 ECF 1-12, PID.513-517

139 ECF 1-17, PID.641-1793; ECF 1-35, PageID.1925-2006

140 ECF 1-35, PID.1954, ECF 1-13, PID.547

141 ECF 1-35, PID.1926-1943

142 ECF 1-1, PID.34-47

terminate whenever a party has committed egregious wrongdoing, criminal or otherwise. The case should immediately end.....and *not* in the offender's favor! "'[Equitable estoppel] is wholly independent of the limitations period itself and takes its life, not from the language of the statute, but from the equitable principle that *no [wo]man will be permitted to profit from [her] own wrongdoing* in a court of justice.' (*Battuello*, 64 Cal. App. 4th 842, 847-848, 75 Cal. Rptr. 2d 548 quoting *Bomba v. W.L. Belvidere, Inc.* (7th Cir. 1978) 579 F.2d 1067, 1070.)" *Lantzy v. Centex Homes*, 73 P. 3d 517 (Cal. 2003) (strongest emphasis added).

108. In order to try to begin undoing the damage, Plaintiff wrote the following in his affidavit to the Appellate Court in an attempt to explain how perverse and corrupt the Chancery Court and its associated defendants had operated:

> In matters of unproven certainty, I expect that I would give those whom I love (trusted close friends and family) the "benefit of the doubt" over other parties of unknown credibility, questionable honesty, ethics, mental aptitude, behaviors, history, and motivations. Especially when the disparity between the two parties seems "unrealistically plausible." I do not believe that this makes me unusually biased. I believe that this is a completely natural and rational condition/limitation of humanity.
>
> If my claims in paragraph #1 above are deemed to be rational, a realistic risk or concern, and possibly true, then I believe that it is absolutely imperative that any Judicial oversight committee governing the State of Tennessee insist upon an ethical boundary between those who argue the law and the Judicial decision makers who are entrusted to unbiasedly decide it.
>
> As previously exposed, investigated, warned against, and published in *The Tennessean* by Elaina Sauber on August 30th, 2018, in an article titled "How Close Can Judges Be with Lawyers? Emails Including Williamson Co. Judge Raise Questions."[143]
>
> After which a follow-up article was published in *The Tennessean* by Elaina Sauber on September 24th, 2018, titled, "Williamson County Judge Says There's Nothing

[143] https://www.tennessean.com/story/news/local/williamson/2018/08/30/judge-gifts-impartial-williamson-county/675332002/

> Wrong with Boat Trips He Takes with Lawyers."[144]
>
> The principal parties featured in both articles were Judge Michael W. Binkley and Attorney Virginia Lee Story. The exact same Judge and opposing Counsel whom in roughly an hour of the Court's time forcefully deprived me of nearly everything which I owned, cherished, and loved in life, while refusing me my 14th Amendment Right as a United States Citizen, to equal and due process, by a fair and impartial tribunal!

109. Perhaps the biggest points about underlying matters—which cannot *possibly* be disregarded by any non-corrupt court—are the following:

- Twice during the August 29, 2019, hearing in Chancery Court, defendant Story used the term "final hearing." Moreover, the term "final hearing" was used as early as August 6, 2019, in an order issued by the Chancery Court—an order likely written by Story and then rubber-stamped by defendant Binkley as were most or all orders issued by that court. Stated in that same order, "the hearing date is waived." By proclaiming a "final hearing" date before even reading the complaint's responsive pleading Plaintiff filed on that day—before most pre-trial activity and before *any* discovery whatsoever—clearly prove that the outcome of the divorce had already been predetermined à la WWE.

- A plethora of rules of procedure, constitutionally protected rights, and both state and federal statutory laws—*at least* fifty in total—were either circumvented and/or violated in order to reach the predetermined destination. One major "glitch" was never notifying Plaintiff about the bankruptcy.

- The Chancery Court had no jurisdiction to "sell" the marital home because it was part of the bankruptcy estate over which the federal court already had exclusive jurisdiction.

- The "order of protection" was granted and then later extended without hearing, notice, or due process towards Plaintiff.

[144] https://www.tennessean.com/story/news/local/williamson/2018/09/24/judge-says-nothing-wrong-boat-trips-he-takes-lawyers/1355442002/

- Rather than remediate the egregious wrongdoing done to Plaintiff in Tennessee after he complained that Local Rule 11.01 was unconstitutional because it blocked him from objecting to defendant Story's lie-riddled orders, certain defendants modified it afterward so that it is now constitutional and no future *pro se* party can complain about it ever again.

110. The protective order[145] and final divorce[146] hearing along with seizure of Plaintiff's personal property were addressed simultaneously by default after removing Plaintiff from the picture, thus closing the case without discovery ever getting underway.

111. Defendant Story filed a fraudulent affidavit[147] on October 21, 2019. In it she claimed that Plaintiff "does not want to contest the divorce," that he "relocated to Michigan," and that "[a]t the August 29, 2019 hearing in this matter, the Court set this matter for final hearing on October 21, 2019 in open Court." Such statements are all patently false. Plaintiff made the first statement as a *proposal* to his ex-wife "only if we finish non-contested together without a lawyer." Moreover, Plaintiff would not have wasted over 100 hours of his time to create and file 250 +/- pages[148] of his objection with defendant Chancery Court if he intended to simply walk away from the entire charade. Granted, his document may not have been in the proper form or well articulated, but Plaintiff has several mental disabilities that inhibit him from expressing himself succinctly in anything, much less court filings. Regarding the second statement, Plaintiff did not *voluntarily* "relocate" to Michigan. He had the option of moving to Michigan where he would have a roof over his head or living on the street. He chose the former. Lastly, regarding the third statement, no such October date was mentioned in "open court" at the hearing. That date does

---

145 ECF 1-23, PID.1063-1068

146 ECF 1-36, PID.1994-1997

147 ECF 1-23, PID.1069-1073; ECF 1-36, PID.1986-1991

148 ECF 1-18, PID.766-1038

not appear anywhere in the transcript. For the upcoming hearing, Plaintiff was allowed to participate by phone[149] as agreed at this hearing, but defendants Story and Binkley later blocked him from telephonic participation.

112. Defendant Story lied repeatedly and profusely in the case, which negatively impacted Plaintiff thereby causing him severe damages—including a fraudulent order of protection—and caused a bogus disposition of the case. She lied about the condition of the home, then used this as an excuse to steal Plaintiff's personal belongings. In line with this goal, storage costs for Plaintiff's possessions were supposed to be obtained from the proceeds of the home. However, the suspicion is that some of the defendants had predetermined the off-color selling price of the home ($324,360)[150] and knew in advance that there would be no proceeds from it; therefore, they tried to extort thousands of dollars[151] from Plaintiff's mother for storage[152] and transportation of Plaintiff's personal property.

113. As a result of the heinous miscarriage of justice, Plaintiff has essentially been left unemployable and destitute. He has reached out for help[153] from defendants Admin Office, Appellate Court, and BPR but none have done due diligence at righting the wrong. His quest for justice over the last four years has taken its toll on him. Because of his disabilities and lack of funding to hire experienced attorneys to assist him on his trek, this battle has required the near total consumption of his time—time which could not therefore be used to generate income or obtain the needed vocational rehabilitation.

149 ECF 1-36, PID.1993

150 ECF 1-13, PID.567

151 https://rico.jefffenton.com/evidence/2019-09-16_story-letter-demanding-two-grand-for-storage.pdf
https://rico.jefffenton.com/evidence/2019-09-26_story-letter-demanding-thirty-five-hundred.pdf

152 ECF 1-16, PID.1981

153 ECF 1-27, PID.1370-1664

114. One is left to wonder how such a travesty of justice could occur. There is plenty of blame to go around, which is the reason a good number of entities have been sued. Without their active participation, it would have been difficult to get such a ruse to fly. The action herein seeks to not only reveal the wrongdoing by the defendants, but to also compensate Plaintiff for the damages caused by their nefarious behavior and perhaps uncover a larger scheme of home-stealing by some or all of the defendants that has negatively impacted and continues to impact other misfortunate victims in Tennessee. Plaintiff hopes his litigations will have a positive impact on "disinfecting" the legal system for everyday people in Tennessee.

115. Plaintiff takes medications[154] to help his condition. They help his disability[155], but don't cure it. His cognitive acuity diminishes greatly without them, and there are times he is not taking these medications through no fault of his own, due to his geographic dislocation and loss of insurance. This, of course, makes his temperament extremely scattered and makes it next to impossible[156] for him to complete any mundane task[157], never mind something that would normally marshal all the horsepower of someone's mind.

## IV. CAUSES OF ACTION

This is an action for tortious conduct with the following causes:

- VIOLATION OF T.C.A. § 66-27-123, NOTICE TO TENANT OF INTENT TO CONVERT RENTAL UNITS TO UNITS FOR SALE
- VIOLATION OF T.C.A. § 39-16-507, COERCION OR PERSUASION OF WITNESS

[154] ECF 1-38, PID.2039

[155] ECF 1-38, PID.2032-2045

[156] ECF 1-2, PID.48-63

[157] ECF 1-38, PID.2040-2041

- VIOLATION OF T.C.A. § 39-15-510, OFFENSE OF ABUSE OF ELDERLY OR VULNERABLE ADULT
- VIOLATION OF T.C.A. § 36-4-101, GROUNDS FOR DIVORCE FROM BONDS OF MATRIMONY
- ABUSE OF PROCESS
- INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
- FRAUD/CONCEALMENT
- CIVIL CONSPIRACY
- VIOLATION OF 18 U.S. CODE § 1962(B), RICO
- VIOLATION OF 18 U.S. CODE § 1962(C), RICO
- VIOLATIONS OF 11 U.S. CODE
- VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S. CODE § 1983 AND § 1985
- VIOLATION OF CONSTITUTIONAL RIGHTS
- DISCRIMINATION/VIOLATION OF AMERICANS WITH DISABILITIES ACT, 42 U.S. CODE § 12101 *ET SEQ.*

## COUNT ONE: VIOLATION OF T.C.A. § 66-27-123, NOTICE TO TENANT OF INTENT TO CONVERT RENTAL UNITS TO UNITS FOR SALE

116. Plaintiff incorporates by reference paragraphs one through 115.

117. This count is against defendants Story, Binkley, SA, and the Chancery Court (the "Count 1 Defendants").

118. During a hearing on August 1, 2019, in the Chancery Court, the Count 1 Defendants collaborated to issue an order[158] removing Plaintiff's tenants at the home.

[158] ECF 1-35, PID.1951-1953

119. Irrespective of the legitimacy of anything else related to the home, state law T.C.A. § 66-27-123 requires that tenants living at any property being sold be given a "two (2) months' actual notice" and may "continue renting such unit at the same rental rate until the expiration of the two-month notice period….."

120. The order created and issued by the Count 1 Defendants on August 1, 2019, to remove the tenants after a maximum of just 29 days' notice and well before the time period required by law thus contravened T.C.A. § 66-27-123.

121. As a direct and proximate result of the order created by the Count 1 Defendants contravening prevailing state law, Plaintiff was deprived of a minimum of $1,445.16 in rental income for one month and one day of lost rent.

122. The Count 1 Defendants, except for Binkley and Chancery Court, severally and jointly are thus liable to Plaintiff for compensatory damages of $1,445.16.

## COUNT TWO: VIOLATION OF T.C.A. § 39-16-507, COERCION OR PERSUASION OF WITNESS

123. Plaintiff incorporates by reference paragraphs one through 115.

124. This count is against defendants Story, Yarbrough, SA, Binkley, Beeler, the County, and the Chancery Court (the "Count 2 Defendants").

125. T.C.A. § 39-16-507(a) reads in part: "A person commits an offense who, by means of coercion, influences or attempts to influence a witness or prospective witness in an official proceeding with intent to influence the witness to: (3)…..be absent from an official proceeding to which the witness has been legally summoned."

126. The Count 2 Defendants violated T.C.A. § 39-16-507(a) by wrongfully evicting Plaintiff from the marital home, knowing full well that he had nowhere else in the state he could

reside and that their actions would force him outside the jurisdiction of the Chancery Court and, furthermore, outside the state thus making it infeasible and almost impossible for him to attend court hearings in person.

127. Defendants Story and Binkley had scheduled a "final hearing" for October 21, 2019, at which Plaintiff had a constitutional right to appear and at which they—in an attempt to hide their impropriety of ejecting him from the state—said he could attend "by telephone."[159] Telephonic or video conferencing were the only feasible ways Plaintiff could attend since the Count 2 Defendants forced him to relocate to Michigan.

128. Defendants Story and Binkley later violated this constitutional right by preventing his attendance by phone at the so-called hearing and in direct contravention of § 39-16-507(a).

129. In addition to state law, Tenn. R. Sup. Ct. 3.4, Rule 3.4 - Fairness to Opposing Party and Counsel requires that "A lawyer shall not: (g) request or assist any person to take action that will render the person unavailable to appear as a witness by way of deposition or at trial," which, of course defendants Story, Yarbrough, and SA violated.

130. As a direct and proximate result of the violation of T.C.A. § 39-16-507 by the Count 2 Defendants, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and in his equity in the home, which contained $27,032.08 in premarital assets from his retirement accounts and other sources. See exhibit F.

131. The Count 2 Defendants, except for Binkley, Beeler, the County, and the Chancery Court, severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $624,600, the calculations of which are as follows: $917,400[160] (current

---

[159] ECF 1-36, PID.1993

[160] ECF 1-12, PID.485, PID.494-510, Figure 3 herein

value of the home) minus $300,000[161] (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date). Defendants Binkley, Beeler, the County, and the Chancery Court are also liable to Plaintiff who seeks declaratory and/or injunctive relief directing them to vacate and expunge the fraudulent protective order against Plaintiff.

## COUNT THREE: VIOLATION OF T.C.A. § 39-15-510, OFFENSE OF ABUSE OF ELDERLY OR VULNERABLE ADULT

132. Plaintiff incorporates by reference paragraphs one through 115.

133. This count is against defendants Story, Binkley, Yarbrough, Beeler, Clement, Hivner, Coke, Bennet, McBrayer, SA, BPR, and the State Defendants (the "Count 3 Defendants").

134. Plaintiff is a "vulnerable adult," which from T.C.A. § 39-15-501, "means a person eighteen (18) years of age or older who, because of intellectual disability.....is unable to.....fully protect against neglect, exploitation, or hazardous or abusive situations without assistance from others." Plaintiff has substantiated his disabilities earlier in this complaint.

135. Plaintiff has been exploited and abused[162] particularly by Count 3 Defendants Story, Yarbrough, SA, Binkley, the County, the Chancery Court, and Beeler. Such exploitation occurred, for example, when they required him to handle multiple legal motions and actions, find employment, pack his belongings, tag an exorbitant number of items—on the order of thousands of things—he intended to keep (that he didn't want "auctioned"), prepare his home for "sale," evict his tenants, and move—all within the span of a matter of weeks and which would be next to impossible for an ordinary person, never mind someone with his disabilities.

[161] ECF 1-23, PID.1078-1079

[162] ECF 1-18, PID.795-797, ECF 1-19, PID.808-816; PageID.820-823

136. The Count 3 Defendants took advantage of Plaintiff's disabilities and strategically, by bombarding him with concurrent tasks that they knew he would not be able to accomplish, created their own self-fulfilling prophesy via achieving their end goals in the bankruptcy and divorce proceeding—control and "sale" of the marital home.

137. As a direct and proximate result of the violation of T.C.A. § 39-15-510 by the Count 3 Defendants, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and in his equity in the home, which contained $27,032.08 in premarital assets from his retirement accounts and other sources. See exhibit F. Despite the lie from Defendant Binkley that Plaintiff "share in some of the proceeds" of the sale of the home, Plaintiff has not yet received a penny from it or his personal belongings, which were valued in the thousands of dollars.

138. The Count 3 Defendants, except for Binkley, Beeler, Clement, Hivner, Bennet, McBrayer, and the State Defendants, severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $624,600, the calculations of which are as follows: $917,400 (current value of the home) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date). Defendants Binkley, Beeler, Clement, Hivner, Bennet, McBrayer, and the State Defendants are also liable to Plaintiff who seeks declaratory and/or injunctive relief directing them to vacate and expunge the fraudulent protective order against Plaintiff.

## COUNT FOUR: VIOLATION OF T.C.A. § 36-4-101, GROUNDS FOR DIVORCE FROM BONDS OF MATRIMONY

139. Plaintiff incorporates by reference paragraphs one through 115.

140. This count is against defendants Story, Yarbrough, SA, the Chancery Court, and

Binkley (the "Count 4 Defendants").

141. A divorce proceeding was filed by Count 4 Defendants Story, Yarbrough, and SA against Plaintiff in the Chancery Court on June 4, 2019.

142. T.C.A. § 36-4-101(b) specifically states in part that "A complaint or petition for divorce on any ground for divorce listed in this section must have been on file for sixty (60) days before being heard if the parties have no unmarried child under eighteen (18) years of age."

143. The first hearing for the divorce transpired in the Chancery Court on August 1, 2019, in contravention of this law.

144. Violation of this law is also a violation of Plaintiff's right to due process. Plaintiff would soon be under ridiculous deadlines to satisfy court orders and obligations imposed by the Count 4 Defendants and could have expediently used the additional days to prepare for the first hearing, speak with counsel, and devise a better defense strategy.

145. As a direct and proximate result of the violation of T.C.A. § 36-4-101 by the Count 4 Defendants, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and in his equity in the home, which contained $27,032.08 in premarital assets from his retirement accounts and other sources. See exhibit F.

146. The Count 4 Defendants, except for Binkley and the Chancery Court, severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $624,600, the calculations of which are as follows: $917,400 (current value of the home) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date). Defendants Binkley and the Chancery Court are liable to Plaintiff who seeks declaratory and/or injunctive relief against them with respect to rescinding and expunging the order of protection issued by them.

## COUNT FIVE: ABUSE OF PROCESS

147. Plaintiff incorporates by reference paragraphs one through 115.

148. This count is against defendants Story, Yarbrough, and SA (the "Count 5 Defendants").

149. Assuming that the Count 5 Defendants were representing Plaintiff's now ex-wife in the Chancery Court, which they did, such legal proceeding would then have been done in "proper form." However, the Count 5 Defendants have violated the plaintiff's constitutional rights, rules of procedure, various state and federal laws, and various elements of common law and have used the proceedings for an "ulterior or wrongful purpose"—to attach and/or seize real property owned by Plaintiff[163] as tenancy by the entirety.[164] Moreover, the Count 5 Defendants have acted with malice and disregard of the law and left Plaintiff destitute and homeless.[165]

150. The Count 5 Defendants have also abused the legal process by obtaining—more than once—unconstitutional orders of protection against Plaintiff without him being given any opportunity whatsoever to defend any related allegations. The Count 5 Defendants falsely accused Plaintiff of "domestic abuse" in their motion filed on July 17, 2019, in the Chancery Court. Prior to this date, Plaintiff had never been accused of domestic abuse nor been arrested nor been accused of committing a crime. Plaintiff was even licensed to own firearms. The Count 5 Defendants have falsely damaged Plaintiff's reputation and left a black eye on his record that *severely* impacts his freedom and enjoyment of both his natural and constitutional rights, along with his ability to obtain employment.[166]

---

[163] ECF 1-27, PID.1416-1430, ECF 1-12, PID.485, PID.494-510

[164] See Appendix 3 for a listing of the numerous wrongdoings.

[165] ECF 1-30, PID.1762-1765

[166] ECF 1-36, PID.2000

151. As a direct and proximate result of abuse of process by the Count 5 Defendants, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and in his equity in the home, which contained $27,032.08 in premarital assets from his retirement accounts and other sources. See exhibit F. Despite the lie from Defendant Binkley that Plaintiff "share in some of the proceeds" of the sale of the home, Plaintiff has not yet received a penny from it or his personal belongings, which were valued in the thousands of dollars.

152. The Count 5 Defendants severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $624,600, the calculations of which are as follows: $917,400 (current value of the home) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date). Because of the egregiousness of the offenses and as supported by settled law from the U.S. Supreme Court, Plaintiff seeks punitive damages in the amount of $150,000 against the Count 5 Defendants.[167]

## COUNT SIX: INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

153. Plaintiff incorporates by reference paragraphs one through 115.

154. This count is against all defendants.

155. The conduct of defendants Story and Binkley has been beyond outrageous since the true beginning of this legal nightmare—from violating ethical standards, rules of procedure, and civil laws to committing various crimes against Plaintiff. See Appendix 3.

156. Defendant Story intentionally exploited Plaintiff's inability to multitask by filing multiple frivolous (and mostly false) documents in court requiring him to respond to them. In

[167] *Heck v. Humphrey*, 512 U.S. 477 (1994)

addition to this, her fraudulent actions in the underlying matters required him to evict his current tenants and secure employment, living accommodations, and movers of his belongings.....all while packing and "relocating" nearly 600 miles away—an essentially impossible task for the average person, much less someone who has mental disabilities such as Plaintiff.

157. Plaintiff had advised defendants and others at one time or another that the original offenders in the Chancery Court and in the bankruptcy court had violated rules of professional conduct[168], rules of civil procedure, due process, and civil and criminal law, yet none of them lifted a toxic finger to do anything corrective.

158. Thus far, Plaintiff has had to spend more than 10,000 painstaking hours on matters related to litigation underlying this matter because of the defendants' actions. The defendants have intentionally inflicted—if not at least negligently inflicted—emotional and financial distress upon Plaintiff as a result of their tortious acts during the creation of the fraudulent order to sell the home and the unconstitutional order of protection against him, and he has suffered a great deal.

159. Plaintiff is an individual with various mental disabilities[169] including ADHD and OCPD. See Appendix 1. The date emotional distress was first inflicted began on or about June 16, 2019, but the infliction of emotional distress continues to present day since Plaintiff remains virtually unemployable due to his need to obtain a work-from-home job because of his mother's high risk of contracting infectious disease.[170] She has an IgA antibody deficiency and is homebound.[171] Defendants Story and Binkley have thus forced Plaintiff into a Catch-22. He

168 ECF 1-40, PID.2068-2090

169 ECF 1-30, PID.1749-1752

170 ECF 1-29, PID.1679-1681; PID.1737-1738

171 ECF 18, PID.2417-2488


https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

cannot secure employment in an environment with a large public presence because doing so would endanger the wellbeing of his mother, but must do so in order to secure and afford living accommodations outside his mother's home. However, he cannot do so with the unconstitutional order of protection on his record. Moreover, he is not psychologically free to move forward with false and damaging claims on his record[172], which tarnish his reputation and impinge his constitutional rights.

160. Plaintiff has been under constant oppression by the defendants and various others, and although several agencies and court personnel have been contacted, nothing remedial has been done, which has further increased stress levels. Additionally, Plaintiff has been under tremendous emotional and financial distress due to the loss of the overwhelming majority of his income because of the defendants' actions, which are in violation of law as shown in other counts herein.

161. The defendants acted with malice or reckless indifference and committed extreme and outrageous acts, such as fraud to the highest degree. Specifically, they:

- lied repeatedly on and off the record (See Appendix 2)
- violated rules of procedure, judicial canons, rules of professional conduct[173], civil and criminal law, and/or the Constitution (See Appendix 3 and Count Thirteen)
- knew Plaintiff would be driven well into extreme poverty and be forced to be put on SNAP/food stamps[174] and state medical assistance because of their actions, and/or

---

172 ECF 1-38, PID.2040-2041

173 ECF 1-40, PID.2068-2090

174 ECF 1-30, PID.1762-1765

- failed to intercede, report bad actors for wrongdoing, and/or perform their duties to assist litigants with disabilities

162. Yet defendants proceeded with wrongly seizing and selling the home anyway, or allowed it to happen, or did nothing remedial afterward. Those defendants versed in law who did the most appalling acts—Story and Binkley—must have known they were violating several laws, but even if they were ignorant of existing relevant law, they were made aware of their transgressions via the filings Plaintiff submitted into the record, one of which he submitted on August 29, 2019.

163. Defendant T. Anderson instilled fear into Plaintiff and Plaintiff's mother when he pounded on the door of the home. Plaintiff's mother said she "felt threatened and terrified by the auctioneer when he banged on the door prior to the auction."[175] Additionally, defendants Story and T. Anderson sent harassing and threatening emails to Plaintiff for him to hurry out of his own home. Such misbehavior was unnecessary because the actual "closing" of the marital home was still weeks away.

164. Regarding rescheduling of the matters supposed to be heard on August 29, 2019, to a hearing on October 21, 2019—which is after Plaintiff was forced to move out of state 573 miles away by the defendants—defendants Story and Binkley had originally conceded Plaintiff's attendance at the hearing by phone[176] since this was the only feasible way for him to attend as a *pro se* litigant because he could no longer afford representation. Thereafter, Plaintiff was denied his constitutional right to defend himself and his property at the hearing because defendants Story and Binkley rescinded Plaintiff's means of attending by phone, which is a clear violation of due process. They effectively created the situation that required participation by phone and then blocked it

---

[175] ECF 18, PID.2417-2488

[176] ECF 1-36, PID.1993


https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

afterwards. Such action shows a total disregard of Plaintiff's right to due process and inflicted emotional distress upon him.

165. At the bottom of the summons for Chancery Court, it says, "For ADA assistance, please call ADA coordinator: 615-790-5428." Defendant Beeler was listed as the ADA contact for Chancery Court, which is whom Plaintiff called to request ADA assistance as the form instructed. However, he was quickly informed that "the disability would be if you needed help getting into the building" only. Plaintiff was told in no uncertain terms that the only ADA accommodation offered by the Chancery Court was to have a wheelchair brought out curbside[177] to a disabled person's vehicle to assist the mobility challenged with entering the courthouse. Plaintiff inquired further, "Is there any area of the State of Tennessee that helps people that have.....doctor's certified mental handicaps, to figure out how to do this.....if they don't have money?" He was again told, "There's nothing that I'm aware of, you know, like I said, the ADA number on there is simply if you need assistance getting into the building."[178] The transcript from this call is filed as Appendix 20[179] in this case. The recorded audio is also available.

166. Defendant Beeler did not assist Plaintiff when he asked her to point him to certain court forms. She told Plaintiff that the forms he requested did not exist.[180] Plaintiff later found the forms for which he was looking on the court's website, unfortunately not in time to use them in the Chancery Court.[181] She also failed to provide him reasonable ADA accommodations and refused to answer simple procedural questions, which were clearly within the scope of her position as stated

[177] ECF 1-39, PID.2047

[178] ECF 1-39, PID.2053

[179] ECF 1-39, PID.2046-2067

[180] ECF 1-39, PID.2046-2056

[181] ECF 1-39, PID.2057-2067

on the "Guidelines for Tennessee Court Clerks who Assist Self-Represented Persons"[182] so that he could defend his case. She also refused to record his August 29, 2019, transcript of evidence as an official transcript.

167. Plaintiff requested repeatedly from defendants Chancery Court, Beeler, Appellate Court, Hivner, Clement, Bennett, McBrayer, Admin Office, and Coke to correct how this transcript of evidence was recorded—to unhide it and record it correctly as a transcript of evidence—and pointed out that by simply comparing the two transcripts of evidence that the absurd misconduct between defendants Binkley and Story would become apparent.[183] Every one of them refused to help thereby contributing to Plaintiff's anguish and distress.

168. Defendant Coke—and by extension the State and the Appellate Court with whom Plaintiff spoke via phone—initially sympathized with Plaintiff, but then immediately shut him down when he mentioned the corruption and crimes that had taken place.

169. Defendant Ausbrooks falsified Plaintiff's ex-wife's Chapter 13 schedules[184]. Schedule H failed to list Plaintiff as a codebtor[185] on the mortgages for the home, failed to list real estate taxes for the home, and failed to respond truthfully to the question "Do you expect an increase or decrease within the year after you file this form?" The answer "No" was given[186], but defendant Ausbrooks knew beforehand that the proprietor for the ex-wife's business had planned to retire[187] and close the business within a few months after the date of filing[188] the Chapter 13.

[182] ECF 1-39, PID.2054-2056

[183] ECF 1-35, PID.1925-2006

[184] ECF 1-8, PID.74-478

[185] ECF 1-27, PID.1428-1431

[186] ECF 1-35, PID.1942

[187] ECF 1-35, PID.1941

[188] ECF 1-35, PID.1943


https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

Defendant Ausbrooks's actions have caused Plaintiff significant financial and emotional distress.

170. Defendant Chancery Court was complicit in issuing the fraudulent orders, thus depriving Plaintiff of his right to free speech, due process, equal protection, and Ninth Amendment guarantees. Plaintiff relied on the court to make him whole, not essentially kick him to the curb after beating and robbing him. Because of these actions, defendant Chancery Court has inflicted financial and emotional distress upon Plaintiff.

171. Defendants Binkley, Story, Ausbrooks, and Chancery Court failed to use proper care at many points in time since 2019 and were reckless[189] with regard to giving notice, issuing orders, "selling" the home, following law[190], and whatnot. Discovery may reveal additional evidence that proves more of the defendants' actions were done intentionally to inflict emotional distress upon Plaintiff. As a result of the defendants' conduct, Plaintiff has suffered severe emotional and financial distress.

172. The symptoms caused by Plaintiff's mental and physical health have worsened since the onslaught of litigation at the hands of the defendants' deliberate and wrongful behavior.

173. As a direct and proximate result of the defendants' actions described in this count and throughout this complaint, Plaintiff has been negatively impacted with regard to standard of living, financial reserve, emotional distress, time expenditure, and mental/physical well-being.

174. All defendants, except for government employees and the State Defendants, severally and jointly are thus liable to Plaintiff for compensatory damages in an amount to be determined at trial. Because of the deliberate and outrageous conduct of defendant Story, Plaintiff also seeks punitive damages in the amount of $50,000 against her. Government employees and

---

[189] ECF 1-40, PID.2068-2090

[190] ECF 1-34, PID.1874-1924


https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

the State Defendants are also liable to Plaintiff who seeks declaratory and/or injunctive relief directing them to vacate and expunge the fraudulent protective order against Plaintiff.

**COUNT SEVEN: FRAUD/CONCEALMENT**

175. Plaintiff incorporates by reference paragraphs one through 115.

176. This count is against all defendants except SB&C and RLTN (the "Count 7 Defendants").

177. During the August 1, 2019, hearing in the Chancery Court, defendant Story said, "We hired two different process servers to try to go out to the residence," and, "It's been unbelievably difficult just dealing with Mr. Fenton to even get him served," which were flat out lies. Plaintiff received service of the divorce via U.S.P.S. on June 16, 2019, which he accepted. Almost immediately, he hired attorney Brittany Gates who had a phone conference with defendant Story on June 20, 2019. Despite knowing that Plaintiff obviously had been served, defendant Story had previously fabricated malicious documentation smearing Plaintiff's good name that she apparently didn't want to waste. On June 20, 2019, SA and Story filed a MOTION TO DEEM HUSBAND SERVED despite them knowing Plaintiff had accepted service. At 5pm that day, Plaintiff sent an email to those parties indicating that he had accepted service. Nonetheless, sometime after 6:15pm, WSCO officers came to Plaintiff's residence to serve him an order of protection and the divorce papers. Clearly, this was all done to substantiate defendant Story's wild accusations provided in the beginning of this paragraph and in a vain attempt to fog the cockpit.

178. In order to attempt to make F.R.B.P. 7001 apply with Ms. Fenton as the "debtor in possession," Story stated during the hearing on August 1, 2019, "[Ms. Fenton] is the owner of the property[191]," and neglects to mention that Plaintiff is too (emphasis added). She didn't say *an*

[191] ECF 1-24, PID.1193

owner, but *the* owner. The definite article she used, *the*, means there can be only ***one*** owner. She should have used the indefinite article *an*, which would have been correct because both parties owned the home as tenancy by the entirety.

179. Contrary to the way defendant Story attempted to present Plaintiff and his ex-wife as having separate credit, income, property, and whatnot, tenancy by the entirety is based on the concept that those who are married are not separate persons; rather, they "are but one person." *Tindell v. Tindell*, 37 S.W. 1105, 1106 (Tenn. Ct. App. 1896 quoting *Den v. Hardenbergh*, 10 N.J.L. 42, 45 (1828)); see *Taul v. Campbell*, 15 Tenn. (7 Yer.) 319, 333, 15 Tenn. 318 (1835) (noting that a husband and wife "take but one estate, as a corporation would take, being by the common law deemed but one person"). This portrayal by defendant Story was merely a specter, a falsehood, another fraud upon the court.

180. Defendant Binkley replied: "Is she the only titled owner?" He therefore knew that Story was attempting to fraudulently deny Mr. Fenton's ownership in the home when Story tersely replied "Both of them" in an attempt to mitigate the fact of Mr. Fenton's ownership interest so that the home could be taken relatively easily and against Plaintiff's wishes. Binkley therefore was well aware of what the game plan was.

181. Every time defendant Story would make false statements of law—or false statements in general—defendant Binkley would not correct her. He would instead nod in accordance and makes auditory sounds of concurrence. Such repugnant behavior is not one a so-called judge should exhibit and is a contributing factor of fraud upon the court. Worse yet, the court orders were based on these miscited laws and false statements, thus proving bias—and corruption and fraud—in Chancery Court.

182. F.R.B.P. 7001 states in part "A person with an interest in property in the

possession of the trustee or debtor in possession may seek to recover or reclaim that property under §554(b) or §725 of the Code." And from 11 U.S. Code § 725: "the trustee, after notice and a hearing, shall dispose of any property in which an entity other than the estate has an interest" (emphasis added). Plaintiff was never given official notice[192] about the bankruptcy and thus did not file an adversary proceeding pursuant to F.R.B.P. 7001 in the requisite timeframe to retain the home. See Exhibit D. Parts of 11 U.S. Code § 363 were not invoked or circumvented, such as subsections (e)—since Plaintiff was never notified about the bankruptcy and learned of it at the 11th hour—(b)(1), and (h). Moreover, defendant Story stated to Plaintiff on his first day in Chancery Court, August 1, 2019, that it was "already too far along in the bankruptcy process" to save the home.[193] However, even if such a statement were true according to any rule, law, or common sense, it may not have been "too far along" if Plaintiff had rightfully been given notice of the bankruptcy and had been able to attend any meetings of creditors and equity security holders pursuant to 11 U.S. Code § 341.

183. F.R.B.P. 9011(b)(3) was violated since the initial bankruptcy schedules do not list Plaintiff as having a financial interest in the home and since item 13 on schedule I had the box for "no" checked when it was known that Plaintiff's ex-wife's income would be changing within the specified timeframe. The foregoing is also a violation of 18 U.S. Code §§ 157, 1519, and other criminal statutes.

184. 11 U.S. Code § 543(c) and (d) were violated in order to fraudulently seize the home. If Plaintiff had been given a hearing in the federal court, he could have made known that he had paying tenants in the home who were helping pay the expenses of it and that an additional

[192] ECF 1-13, PID.565-566

[193] ECF 33, PageID.3310-3358

tenant would have provided Plaintiff enough income to pay not only the expenses for the home but also the mortgages and prevent the sale of it. Pursuant to (d)(1), the "interests.....of equity security holders [i.e. Plaintiff] would [have] be[en] better served by permitting a custodian to continue in possession, custody, or control of such property."

185. Also on August 1, 2019, Defendant Story declared, "Well, we didn't sign a lease."[194] Story also said, "I feel sure we have an escape clause because my client didn't sign the lease." But the lease had a severability clause in it. Even if it didn't, however, T.C.A. § 66-28-104 states that "'Landlord' means the owner, lessor, or sublessor of the dwelling unit" and "'Owner' means <u>one</u> (1) or more <u>persons</u>, jointly or severally, <u>in whom is vested</u>: (i) <u>All or part of the legal title to property</u>" (emphasis added). Plaintiff met the definition of "landlord" and negated the need for any other owner(s) of the home to have signed the lease. Moreover, her false statement, "Well, obviously he cannot bind a new owner to comply with this lease, so that is a voidable contract," is contradicted by law, which says that new owners inherit the lease agreement between the tenants and original landlord.

186. Also on August 1, 2019, defendant Story exclaimed, "[H]e hacked the emails so he lost that job." This statement is utterly false and is further fraud upon the court. Plaintiff *resigned* from his job. See exhibit A.

187. During the August 29, 2019, hearing, defendant Story proclaimed, "[T]here was a pretty scary communication from Mr. Fenton." She and defendant Yarbrough also said that he had perpetrated "domestic abuse." If such fantastical statements were true—that Plaintiff caused his ex-wife any physical harm—then why didn't defendant Story or anyone else bring a separate cause of action against Plaintiff? Instead, they continued to drive their false narrative/lies home in

---

[194] ECF 1-24, PID.1192



https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

order to paint Plaintiff as a monster who was endangering his ex-wife, despite having exactly zero real evidence and Plaintiff having no arrest record, no criminal record, and no history of domestic abuse. The presumption that Plaintiff posed a danger was also contrary to Dr. Rochester's analysis that Plaintiff's "condition does not predispose him to any violent behavior." See Appendix 1-2.

188. Also on August 29, 2019, the date of *only the second hearing* in the contested divorce, defendant Story twice used the term "final hearing." There is absolutely no way possible anyone could legitimately know and proclaim that a "final hearing" had already been conceived before even reading the response to the complaint Plaintiff filed that very day—before most pre-trial activity and before *any* discovery whatsoever—without predetermining the outcome of the case, a clearly fraudulent act.

189. Plaintiff's ex-wife had previously tried to get an "order of protection" issued against him from a previous divorce attorney in order to kick him out of marital home. However, the attorney declined because without any domestic issues, arrests, or any instances of violence on record, that attorney said it would not be possible and declined the case. Defendant Story, however, had no problem accomplishing this feat. When Plaintiff recounted everything to a peace officer, the officer said something to the effect of: "Maybe she knows how to work the system a little better."

190. T.C.A. § 39-14-114(b)(1)(A)(i) says that forgery means to "[a]lter, make, complete, execute or authenticate any writing so that it purports to [b]e the act of another who did not authorize that act." The so-called listing agreement for the marital home was altered—presumably by defendant Story—*after* being signed by Plaintiff and without his authorization; therefore, one or more of the Count 7 Defendants committed forgery.

191. T.C.A. § 36-3-605 specifically requires that "the petitioner has proved the

allegation of domestic abuse, stalking or sexual assault by a preponderance of the evidence" in order to extend any order of protection for up to one year. The order was extended by a year without any such evidence and was really extended many months longer than a year if the true origination date of mid-2019 is used. See Appendix 4-12.

192. Plaintiff had revealed to defendants Ausbrooks, Hivner, Clement, Bennett, McBrayer, Coke, Garrett, State Defendants, and others the federal felonies committed by certain defendants. Since Ausbrooks, Hivner, Clement, Bennett, McBrayer, Coke, Garrett and the State Defendants not only then knew of the violations of federal criminal law but also refused to remediate or even investigate the relevant wrongdoing in the divorce and bankruptcy matters, they committed misprision of a felony pursuant to 18 U.S.C. § 4. Case law is crystal clear on the subject. Not only must a person know a felony has been committed, but s/he must take affirmative "steps to conceal the crime."[195] By preventing Plaintiff from obtaining relief in the courts, which would have thus been an admission of the criminal misconduct by judges and other actors, they took those steps by completely ignoring everything Plaintiff said or filed. Evidence of the crimes is unmistakable.

193. As a direct and proximate result of the Count 7 Defendants committing fraud, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019, has lost his portion of the equity in the home, and has an unconstitutional order of protection against him.

194. The Count 7 Defendants, except for government employees and the State Defendants, severally and jointly are thus liable to Plaintiff for compensatory damages of equity in

---

[195] *U.S. v. Caraballo-Rodriguez*, 480 F.3d 62 (1st Cir. 2007); *U.S. v. Cefalu*, 85 F.3d 964 (2d Cir. 1996); *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988); *United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017); *United States v. Baez*, 732 F.2d 780, 782 (10th Cir. 1984)





https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

the home totaling $624,600, the calculations of which are as follows: $917,400 (current value of the home) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date). Government employees and the State Defendants are also liable to Plaintiff who seeks declaratory and/or injunctive relief directing them to vacate and expunge the fraudulent protective order against Plaintiff.

## COUNT EIGHT: CIVIL CONSPIRACY

195. Plaintiff incorporates by reference paragraphs one through 115.

196. This count is against all defendants.

197. Plaintiff had repeatedly told defendants that he was being discriminated against not just because of his intellectual disabilities, but also because Local Rule 11.01 prevented him from objecting to the lie-riddled fraudulent orders written by defendant Story. Rather than address his complaint and remedy the damages it caused him, the Chancery Court, the State, and/or the Appellate Court conspired to modify and did modify the rule so that *pro se* parties can no longer object to it as being unconstitutional. See exhibit B.

198. Plaintiff repeatedly asked multiple sources for a final HUD-1 after the "sale" of the home, but never got one. This is additional proof that there was a conspiracy to conceal the amount of the outstanding mortgages on the home and that—like the WWE—the offering price by the "winning" bidder was predetermined. The fact that the home "sold" for an off-color dollar amount of $324,360 is highly, ***highly*** suspect. It is equally suspect that the closing company, BT&EC, was owned by defendant S. Anderson and the clerk for register of deeds Sherry Anderson. Recall that the auctioneer was defendant T. Anderson, and Plaintiff asserts that there were back door dealings to acquire the home, auction it to a person who had inside information regarding the mortgages due, and then hide the evidence by refusing to provide Plaintiff with the fully executed

HUD-1.

199. Plaintiff was residing at and owned the marital home during the divorce and bankruptcy litigation. The defendants knew this and worked methodically and deliberately to remove Plaintiff from the home and sell it right out from under him. As such, the defendants have not only conspired to deprive Plaintiff of his real property, which had fully vested in it his retirement account and other Plaintiff funds, but they also interfered with the business relationship of Plaintiff and his tenants thereby stopping his rental income from them. The defendants have thus caused serious economic harm to Plaintiff.

200. The defendants, except for government employees and the State, severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $624,600, the calculations of which are as follows: $917,400 (current value of the home) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date). Government employees and the State Defendants are also liable to Plaintiff who seeks declaratory and/or injunctive relief directing them to vacate and expunge the fraudulent protective order against Plaintiff.

**COUNT NINE: VIOLATION OF 18 U.S. CODE § 1962(B), RICO**

201. Plaintiff incorporates by reference paragraphs one through 115.

202. This count is against defendant Story (the "Count 9 Defendant").

203. An association-in-fact enterprise created by the Count 9 Defendant is engaged in and affects interstate commerce.

204. The Count 9 Defendant acquired and maintains interests in and control of the association-in-fact enterprise through a pattern of racketeering activity. Specifically, she orchestrated the components of it by coordinating/conspiring with others in order to obtain the

original fraudulent judgment of divorce in the Chancery Court through political connections, by contacting the bankruptcy court and/or the trustee in order to usurp jurisdiction of the bankruptcy estate and, in particular, thus gain control of and "sell" the home, and in order to obtain and extend the fraudulently obtained order of protection against Plaintiff while using the U.S. mail to accomplish much of her scheme—all of which affect interstate commerce.

205. The following racketeering activities attributed to the Count 9 Defendant:

- 18 U.S. Code § 1341 (when she used the U.S. mail to conduct and perpetuate her fraudulent enterprise, with various letters being sent across state lines, thereby constituting a pattern of racketeering activity by itself; see Appendix 4-5 to 4-14 for evidence of U.S. mail usage for such purposes)
- 18 U.S. Code § 1503 (when she corruptly obstructed, influenced, and/or impeded the bankruptcy and divorce)
- 8 U.S. Code § 1951 (when she performed acts that affected interstate commerce via extortion of the home and fraudulently participated in transferring "ownership" of it and/or conspired to do so through the enterprise; see Appendix 4-1 to 4-4 for evidence of negative effects on interstate commerce)
- 18 U.S. Code § 1957 (when she engaged in or enabled monetary tranSAtions related to the home, which was derived from unlawful activity, including altering the auction listing after Plaintiff signed it and falsifying other records)
- fraud connected with a case under title 11 (when she orchestrated the usurpation of jurisdiction over the marital home in order to gain control of it and "sell" it)

constitute a pattern of racketeering activity pursuant to 18 U.S. Code § 1961(5)—all of which caused Plaintiff to expend significant time and other resources to fight in the Appellate Court, incur

relocation costs, lose his personal belongings, file complaints against the offenders, and arduously and painstakingly address the ramifications of such tasks.

206. The Count 9 Defendant directly and indirectly acquired and maintains interests in and control of the association-in-fact enterprise through the pattern of racketeering activity in violation of 18 U.S. Code § 1962(b).

207. As a direct and proximate result of the Count 9 Defendant's racketeering activities and violations of 18 U.S. Code § 1962(b)—acquisition or maintenance of an interest in or control of the association-in-fact enterprise—and her malicious, willful, and wanton misconduct, Plaintiff has been forced to litigate in the Appellate Court, incur relocation costs, lose his personal belongings, file complaints against the offenders, and arduously and painstakingly address the ramifications of such tasks. This has resulted in expenses, *significant* time expenditure on the order of what is projected to be 12,000 total hours, and tremendous stress upon Plaintiff that has all occurred since establishment of the association-in-fact enterprise. Time spent working on related litigation was time that could not be used to generate income, truly resulting in a net income loss.

208. The Count 9 Defendant is thus liable to Plaintiff for compensatory damages in the amount of $50 per hour trebled to $150, for a total of $1,800,000, plus lost personal property valued at approximately $4,500 trebled to $13,500. Plaintiff also seeks punitive damages in the amount of $50,000 against the Count 9 Defendant to deter such malicious, willful, and wanton misconduct in the future.

## COUNT TEN: VIOLATION OF 18 U.S. CODE § 1962(C), RICO

209. Plaintiff incorporates by reference paragraphs one through 115.

210. This count is against defendants Story, Binkley, Ausbrooks, SA, Beeler,

Yarbrough, T. Anderson, HN&D, Marlin, MSRE, and the Chancery Court (the "Count 10 Defendants").

211. The Chancery Court is an enterprise engaged in and whose activities affect interstate commerce. The Count 10 Defendants are associated with the enterprise.

212. The Count 10 Defendants agreed to and did conduct and participate in the affairs of the enterprise through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically, they are responsible for the following racketeering activities:

- 18 U.S. Code § 1341 (when they used the U.S. mail to conduct and perpetuate their fraudulent activity, with various letters being sent across state lines, thereby constituting a pattern of racketeering activity by itself; see Appendix 4-5 to 4-14 for evidence of U.S. mail usage for such purposes)

- 18 U.S. Code § 1503 (when defendants Story and Binkley corruptly obstructed, influenced, and/or impeded the due administration of justice in the divorce in Chancery Court and by issuing orders of protection against Plaintiff without due process of law, and when they corruptly hijacked jurisdiction of the bankruptcy estate from the bankruptcy court)

- 18 U.S. Code § 1951 (and T.C.A. § 39-14-12) (when they performed acts that affected interstate commerce via extortion of the home—Plaintiff was indirectly threatened with incarceration if he failed to sign the auction listing agreement for the home—and fraudulently transferred "ownership" of it and/or conspired to do so through the enterprise; see Appendix 4-1 to 4-4 for evidence of negative effects on interstate commerce)

- 18 U.S. Code § 1957 (when they engaged in or enabled monetary tranSAtions related to the home, which was derived from unlawful activity, including altering the auction listing after Plaintiff signed it, coercing Plaintiff to sign it,

and falsifying other records)

- fraud connected with a case under title 11 (when Plaintiff was never given official notice of the filing, the Chancery Court assumed jurisdiction of at least a portion of the bankruptcy estate in violation of 28 U.S. Code § 1334, and schedules/documents were filed that contained fraudulent entries in violation of F.R.B.P. 9011(b)(3) and 18 U.S. Code § 1519)

213. See Appendix 4 for some RICO evidence. All mailings contain fraud, violations of due process, and criminal elements. The FINAL DECREE OF DIVORCE is especially rife with fraud. Adding insult to injury is the statement "each party shall be awarded any.....retirement accounts in their respective names," which is moot since Plaintiff invested his full retirement into the home.....and did not receive a penny from it. Another instance is: "Husband.....agrees to remove Wife's name....." How can Plaintiff "agree" to something in which he was excluded from participating? Recall that he was blocked from attending hearings after August 29, 2019. Fraud and several other travesties of justice are evident in the "decree."

214. Pursuant to and in furtherance of their fraudulent scheme, the Count 10 Defendants committed multiple related acts of racketeering as shown in paragraph 212.

215. The acts set forth in this count constitute a pattern of racketeering activity pursuant to 18 U.S. Code § 1961(5).

216. The Count 10 Defendants have directly and indirectly conducted and participated in the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S. Code § 1962(c).

217. As a direct and proximate result of the Count 10 Defendants' racketeering activities and violations of 18 U.S. Code § 1962(c), Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and has lost

his portion of the equity in the home, which contained $27,032.08 in premarital assets from his retirement accounts and other sources. See exhibit F. Despite the lie from defendant Binkley that Plaintiff "share in some of the proceeds" of the sale of the home, Plaintiff has not yet received a penny from it or the sale of many of his personal belongings, which were valued in the thousands of dollars

218. Defendants Story, Ausbrooks, SA, Yarbrough, Marlin, MSRE, HN&D, and T. Anderson severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $624,600, the calculations of which are as follows: $917,400 (current value of the home) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date), trebled to $1,873,800.[196] Plaintiff also seeks punitive damages in the amount of $300,000 against these Count 10 Defendants. Defendants Binkley, Beeler, and the Chancery Court are also liable to Plaintiff who seeks declaratory and/or injunctive relief directing them to vacate and expunge the fraudulent protective order against Plaintiff.

**COUNT ELEVEN: VIOLATIONS OF 11 U.S. CODE**

219. Plaintiff incorporates by reference paragraphs one through 115.

220. This count is against defendants Koval, Walker, Ausbrooks, Marlin, T. Anderson, MSRE, HN&D, Story, Binkley, and Chancery Court (the "Count 11 Defendants").

221. Defendant Ausbrooks never properly listed Plaintiff on any of the papers filed with the bankruptcy court. As a result, the bankruptcy court did not notify Plaintiff about the

[196] Courts have ruled that punitive damages are available under RICO. See *Com-Tech Assoc. v. Computer Assoc. Int'l*, 753 E Supp. 1078, 1079 (E.D.N.Y. 1990), aff'd, 938 F.2d 1574 (2d Cir. 1991) (holding that claim for punitive damages could be asserted in civil action under RICO, even though treble damages are available). See also *Sea Salt, LLC v. Bellerose, No. 2:18-cv-00413-JAW*, 10 (D. Me. Jun. 9, 2021) (where the court reasoned that "compensatory damages in the amount of $1,500,000, treble damages under the RICO Act, and punitive damages in the amount of $3,000,000" are viable).

bankruptcy. Therefore, Plaintiff did not know about the 341 meetings or the home being in jeopardy of being sold.

222. Regarding 11 U.S. Code § 341, the term "equity security holder" means holder of an equity security of the debtor, of which Plaintiff was since he was an owner of the home via tenancy by the entirety.[197]

223. 11 U.S. Code § 362(a)(3) states in part, "[A] petition filed.....operates as a stay, applicable to all entities, of—any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;" (emphasis added). The Count 11 Defendants violated this law by allowing the home to be sold via orders issued by defendant Chancery Court.

224. Parts of 11 U.S. Code § 363 were either not invoked or circumvented, such as subsections (e)—since Plaintiff was never properly notified about the bankruptcy and learned about it at the 11th hour—(b)(1), and (h). Subsection (h) clearly states: "Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners;" (emphasis added). The trustee *did not* sell; defendants T. Anderson, MSRE, HN&D, and Marlin did—under the direction of defendants Story, Binkley, and Chancery Court. Selling the marital home was of *zero* benefit to the estate and *complete* detriment to Plaintiff and his tenants. Defendant Koval was responsible for obtaining the order to sell the home in contravention of 11 U.S. Code § 363.

[197] https://www.law.cornell.edu/definitions/uscode.php?def_id=11-USC-1767684303-71778042

Furthermore, he never notified Plaintiff about any related hearing on any motion or other filings.

225. 11 U.S. Code § 541 was violated when defendants Binkley and Chancery Court asserted jurisdiction over the marital home—by selling it—even though it was rightfully and legally part of the bankruptcy estate with the bankruptcy court having original and exclusive jurisdiction over the bankruptcy estate and thus the home pursuant to 28 U.S. Code § 1334.

226. 11 U.S. Code § 543 (c) was violated because Plaintiff was not protected with regard to the obligations he had to his tenants and their rental agreement nor was he compensated for lost rent for early termination of the lease and eviction of his tenants in contravention of T.C.A. § 66-27-123. Subsection (d) was violated because his "interests.....would [have] be[en] better served by permitting [him] to continue in possession, custody, or control of such property."

227. 11 U.S. Code § 707(b)(4)(C) was violated by defendant Ausbrooks because she failed to perform "a reasonable investigation into the circumstances that gave rise to the petition" and/or "determined that the petition, pleading, or written motion is well grounded in fact and <u>is warranted by existing law</u> or a good faith argument for the extension, modification, or reversal of existing law and does not constitute an <u>abuse under paragraph (1)</u>" (emphasis added). She violated this statute by filing a fraudulent petition in the first place and because she never notified Plaintiff of the bankruptcy thereby precluding him as a "party in interest" from filing an adversarial proceeding or a motion to dismiss the petition.

228. 11 U.S. Code § 1205(b)(4)(C) was violated. It reads in part: "In a case under this chapter, when adequate protection is required.....of an interest of an entity in property, such adequate protection.....will adequately protect.....such entity's ownership interest in property." The Count 11 Defendants did not "adequately protect" Plaintiff, but instead deliberately harmed him by selling the marital home right out from under him, without due process of law.


https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

229. 11 U.S. Code § 1208(c)(10) reads, "On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter for cause, including—failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition." Firstly, Plaintiff was never given proper notice and was not immediately aware of the bankruptcy. He therefore did not request a hearing nor move the court to dismiss the case since it was filed under fraudulent pretenses. Plaintiff was due $125 in weekly support from his ex-wife, as she had agreed to pay, and claims one reason the bankruptcy was filed was to absolve her from continuing said support as already stated above in COUNT SEVEN: FRAUD/CONCEALMENT.

230. As a direct and proximate result of the failure by the Count 11 Defendants to list Plaintiff in the bankruptcy paperwork and for the above provisions enumerated in this count, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and in his equity in the home, which contained $27,032.08 in premarital assets from his retirement accounts and other sources. See exhibit F.

231. Count 11 Defendants Koval, Ausbrooks, Marlin, T. Anderson, MSRE, HN&D, and Story are thus liable to Plaintiff for compensatory damages of equity in the home totaling $624,600, the calculations of which are as follows: $917,400 (current value of the home) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date). Count 11 Defendants Binkley and Chancery Court are also liable to Plaintiff who seeks declaratory and/or injunctive relief directing them to vacate and expunge the fraudulent protective order against Plaintiff.

**COUNT TWELVE: VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S. CODE § 1983 AND § 1985**

232. Plaintiff incorporates by reference paragraphs one through 115.

233. This count is against defendants Beeler, Binkley, Coke, Garrett, Hivner, T. Anderson, S. Anderson, Marlin, MSRE, HN&D, BT&EC, Hildebrand, and the State Defendants except for the State (the "Count 12 Defendants").

234. The Count 12 Defendants violated the civil rights of Plaintiff while acting "under color of any statute, ordinance, regulation, custom" when:

- The home was taken because of the actions of the Count 12 Defendants, despite Plaintiff not being heard in the bankruptcy matter as he should have been, thus violating due process.
- Defendants Hivner, the County, and Appellate Court failed to remediate the wrongdoing of others below them, thus violating due process and equal protection.
- Defendant Hildebrand, if he had checked, would have found Plaintiff listed on the deed for the home and should have provided notice of the bankruptcy to Plaintiff, which he did not do and thus violated due process.
- Defendant Garrett refused to allow Plaintiff to file a complaint against defendant Story, thus violating free speech and due process.
- Defendant Binkley prevented Plaintiff from having a telephonic hearing in the Chancery Court on October 21, 2019, thus violating due process.
- Defendant Binkley stated during the hearing on August 1, 2019, "who's going to control the husband?" because of Plaintiff's long emails, which is protected free speech. Signs on the property, which were designed by Plaintiff's ex-wife, were also protected free speech.

- Defendant Binkley, who apparently wanted to speed along the auction, said during the hearing on August 1, 2019, "I don't have any assurance at this point that his conduct won't continue thereby delaying this process even more," thus violating due process.

- Defendant Binkley said during the hearing on August 29, 2019, "You're to sign this contract today." He followed this statement shortly thereafter with: "You're going to sign this contract now," which are violations of due process and free speech—and of the Tennessee Code of judicial conduct rule 3.10, which states: "A judge shall not practice law." Because he was giving legal "advice" to sign a legal instrument, the contract, he was practicing law.

- Defendant Binkley told Plaintiff via an order filed August 29, 2019, "he is required to comply with the rules just as an attorney is required," yet none of the defendants followed the rules, which thus resulted in a non-level playing field and violations of equal protection and due process. See Exhibit E.

- Defendant Binkley told Plaintiff during the August 1, 2019, hearing, "So the [plaintiff] will be enjoined and restrained from interfering in any form whatsoever directly or indirectly with a smooth transition and preparation of the home for auction." By doing so, he prevented Plaintiff from talking with the mortgage holders in order to try to save the home, thus violating free speech and due process.

- Defendants T. Anderson, MSRE, HN&D, and Marlin, acting as agents of the State/Chancery Court, "sold" the home despite Plaintiff informing them that it was being done fraudulently and without jurisdiction of the Chancery Court, thus violating unreasonable seizure and due process.

- One or more of the Count 12 Defendants (unknown exactly which ones at this time) blocked *pro se* Plaintiff from disputing the lie-riddled orders written by defendant Story and then later changed Local Rule 11. They obviously knew that their actions violated Plaintiff's constitutional rights since they changed

Local Rule 11 immediately after Plaintiff made known that it was unconstitutional, thus violating equal protection and due process. See Exhibit B.

- Plaintiff's mental disabilities were exploited and he was not afforded ADA accommodations, his innate rights to be treated fairly and respectfully were denied, contrary to the Ninth Amendment: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

- When Plaintiff tried to provide any input into the case whatsoever at the hearing on August 29, 2019, and specifically about one of the motions to be heard that day—the motion on the order of protection—he was immediately shut down. Plaintiff said, "Can I still tell a little bit of my side before you rule on all of that?" Defendant Binkley said "briefly," then interrupted Plaintiff by saying, "We're not dealing with that today." Moments afterward he says, "I am trained to separate things in my mind that are important.....and things that are unimportant," implying that the order of protection was not important, but auctioning the house quickly was. Astoundingly, he immediately follows this statement with, "You've got to trust me here," and then right afterward, "I don't really care about all that. That's for another day." However, that day was supposed to be August 29, 2019, the very day of the hearing. The day to which Binkley referred never came for Plaintiff. For proceedings to continue to their conclusion—including loss of the home and income—after no hearings in the bankruptcy court with Plaintiff present, a mere two short "hearings" in Chancery Court, and without any real opportunity for Plaintiff to defend himself violated—or more appropriately, annihilated—his right to due process.

235. 42 U.S. Code § 1985(2) says in part that "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to

injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws" such a person may file an action "for the recovery of damages occasioned by such injury or deprivation." Two or more defendants did "conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice" while violating on multiple occasions the rights of Plaintiff.

236. T.C.A. § 39-12-302 provides: "A crime of force or violence committed while acting in concert with two (2) or more other persons shall be classified one (1) classification higher than if it was committed alone." T.C.A. § 39-16-403 stipulates: "(a) A public servant acting under color of office or employment commits an offense who: (2) Intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity, when the public servant knows the conduct is unlawful." At a minimum, defendants Story, Yarbrough, SA, and Binkley worked in concert to deprive Plaintiff on multiple occasions of a multitude of rights protected by the Constitution. Presumably, they know that violations of rights protected by the Constitution are unlawful.

237. T.C.A. § 39-17-309 provides: "(b) A person commits the offense of intimidating others from exercising civil rights who: (1) Injures or threatens to injure or coerces another person with the intent to unlawfully intimidate another from the free exercise or enjoyment of any right or privilege secured by the constitution or laws of the state of Tennessee." Defendants Binkley, Story, Yarbrough, and SA intimidated and coerced Plaintiff into signing the auction listing agreement for the home and therefore deprived him of his Fourth Amendment right of protection from unreasonable seizure and Fourteenth Amendment right of due process. They similarly coerced Plaintiff out of the home and into another state, thereby intimidating him from the free exercise of his right to due process.

238. 42 U.S. Code § 1985(3) says in part that "if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." The Count 12 Defendants acted in unison to remove Plaintiff from the home, prevent him from presenting his case, block him from attending one hearing, and fraudulently obtain possession and control of the home.

239. Plaintiff made the defendants, except for defendants CB, BOA, RLTN, and SB&C, aware on many occasions that due process rights were being abridged. Plaintiff repeatedly contacted all other defendants notifying them emphatically that his signature on the listing agreement had been coerced by defendants Binkley and Story under the threat of incarceration—and he signed it without even reading it—thus rendering it null and void. Plaintiff further explained that he expressly revoked his forced signature and thereby cancelled said listing agreement and that he knew no real estate listing agreement can be binding upon a property owner in Tennessee until there is a fully executed "purchase and sale agreement," with all parties acknowledging receipt of executed copies, the date of which is commonly referred to as "the binding agreement date."

240. Some Plaintiff notifications to the Count 12 Defendants are as follows:

- On August 30, 2019, he contacted Story and the Chancery Court about false statements in court orders.
- On September 20, 2019, he emailed T. Anderson, HN&D, Marlin, MSRE, Yarbrough, Beeler, and Story.
- On September 23, 2019, he notified Beeler to forward an email to Binkley to

inform him about Story's fraud upon the court.

- On October 10, 2019, he notified BTE&C that the sale was illegal, unauthorized, and fraudulent.

241. Even if Plaintiff had executed the listing agreement freely in good faith, which he did not, he was fully within his rights to terminate said listing agreement by notifying defendants MSRE, HN&D, BT&EC, T. Anderson, and Marlin prior to the sale, which he did. At that point, their legal standing to represent Plaintiff's interests and sell his property instantly and unequivocally ceased to exist.

242. By proceeding with selling the home anyway and otherwise continuing to violate Plaintiff's due process rights, the Count 12 Defendants acted with reckless, willful, and wanton misconduct.

243. State officials in transferring possession of property can implicate due process, which defendant Binkley who was employed in the Chancery Court has certainly done by his acts.[198]

244. For the reasons given heretofore in this complaint, the defendants have deprived Plaintiff of the right of free speech guaranteed under the Freedom of Speech Clause of the First Amendment, the right to protect his property from unreasonable seizure under the Unreasonable Searches and Seizures Clause of the Fourth Amendment, and the right of due process guaranteed under the Due Process Clause and the right of equal protection guaranteed under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, which renders the defendants liable under 42 U.S. Code § 1983 and U.S. Code § 1985.

[198] *Mitchell v. W.T. Grant Co.*, 416 U.S. at 615–18 (1974) and at 623 (Justice Powell concurring). See also *Arnett v. Kennedy*, 416 U.S. 134, 188 (1974) (Justice White concurring in part and dissenting in part). Efforts to litigate challenges to seizures in actions involving two private parties may be thwarted by findings of "no state action," but there often is sufficient participation by state officials in transferring possession of property to constitute state action and implicate due process.

245. As a direct and proximate result of the defendants' actions and liability pursuant to 42 U.S. Code § 1983 and § 1985, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and in his equity in the home, which contained $27,032.08 in premarital assets from his retirement accounts and other sources. See exhibit F.

246. The defendants are thus liable to Plaintiff for violation of the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the U.S. Constitution. Plaintiff seeks compensatory damages in the amount of $1,400 per month beginning September 2019 against defendants Story, Yarbrough, and Ausbrooks, who are severally and jointly liable, for their violations of said clauses that they violated when they conspired with court personnel to achieve their illicit goals. The remaining defendants violated those same clauses when defendant Binkley illegally issued an order of protection—and then extended it—against Plaintiff and prevented a telephonic hearing. Plaintiff also seeks an award of punitive damages in the amount of $150,000 in order to punish defendants Story, Yarbrough, and Ausbrooks $50,000 per person for their reckless, willful, and wanton misconduct with respect to disregarding the plaintiff's right to due process and violating such right and to deter such reckless, willful, and wanton misconduct in the future. The remaining defendants, judicial actors and the State or its individual components, are also liable to Plaintiff who seeks declaratory and/or injunctive relief directing them to vacate and expunge the fraudulent protective order against Plaintiff.

## COUNT THIRTEEN: VIOLATION OF CONSTITUTIONAL RIGHTS

247. Plaintiff incorporates by reference paragraphs one through 115.

248. This count is against defendants Ausbrooks, Beeler, Binkley, Coke, Koval, Garrett, Hivner, T. Anderson, S. Anderson, Marlin, MSRE, HN&D, BT&EC, Hildebrand,

Clement, Bennet, McBrayer, Walker, Story, Yarbrough, and the State Defendants (the "Count 13 Defendants").

249. Defendant Ausbrooks failed to list in any bankruptcy filings Plaintiff having a financial interest in the home, which prevented him from getting notice of the bankruptcy and knowing it was taking place. As a result, Plaintiff could not take over the mortgages, assume full ownership of the home, and prevent its "sale," thus violating due process. See Exhibit C. See also the bankruptcy filing in its entirety at ECF no. 1-8 page 90 *et seq*. Such illegal seizure also could be considered to have violated "the Third Amendment [which] thus constitutionalized the maxim, 'every man's home is his castle'." *Engblom v. Carey*, 677 F.2d 957 (2d Cir. 1982).

250. The home was taken because of the actions of the Count 13 Defendants, despite Plaintiff not being heard in the bankruptcy matter as he should have been, thus violating due process and unreasonable seizure.

251. Defendants Clement, Hivner, and the State Defendants failed to remediate the wrongdoing of others below them, thus violating due process and equal protection.

252. Defendant Koval deprived Plaintiff of personal property without Plaintiff being allowed to defend, thus violating due process.

253. Defendant Hildebrand should have checked the deed for the home, which listed Plaintiff as an owner of it, and provided notice of the bankruptcy to Plaintiff, which he did not do and thus violated due process.

254. Defendant Garrett refused to allow Plaintiff to file a complaint against defendant Story, thus violating free speech and due process.

255. Defendant Binkley said during the hearing in Chancery Court on August 29, 2019, "The husband will be enjoined and restrained from interfering in any form whatsoever

directly or indirectly with a smooth transition and preparation of the home for auction," which meant that Plaintiff was not allowed to contact the bank to pay off the loan and thus prevented him from saving the home from auction and violated due process and resulted in an unreasonable seizure.

256. Defendant Binkley made the preceding statement without consideration of Plaintiff being allowed to provide evidence that he could pay for the mortgages on the home and associated expenses if another renter was brought aboard, thus violating due process and resulted in an unreasonable seizure.

257. Defendants Story and Yarbrough stated in the MOTION TO SELL THE MARITAL RESIDENCE filed in the Chancery Court on July 17, 2019, "Wife currently has an Ex Parte Order of Protection against Husband as the result of the domestic abuse she has incurred by Husband." This statement was made without evidence. In fact it is false. And since it was made in an official record, it violates T.C.A. §§ 39-16-503, 39-16-504, 39-16-702, and 39-14-114, which carry up to a 30-year prison sentence and a fine of up to $25,000. Plaintiff was never afforded the opportunity to dispute this claim, nor provide evidence that the police had never come to the home prior to the divorce. He has no arrest record and has never before or since been accused of abusive or violent behavior. See letters from mental health professional in Appendix 1. To make such an unopposed and false claim without being given any opportunity whatsoever to prove its invalidity goes well beyond the heartland of infringement of constitutional rights. Indeed, it goes beyond any realm of infringement of all human rights, and is an egregious violation of due process.

258. Because of the fraudulent "Order of Protection" at the hands of defendants Story, Yarbrough, Binkley, and the State Defendants, Plaintiff can no longer own his firearms, which he had owned for many years (Tennessee lifetime handgun carry permit no. 083253258).

As a result of these defendants' actions, his Second Amendment right has been violated.

259. Defendants Binkley and Story prevented Plaintiff from having a telephonic hearing in the Chancery Court on October 21, 2019, thus violating due process.

260. Defendant Binkley stated on August 1, 2019, "who's going to control the husband?" because of Plaintiff's long emails, which is protected free speech. Signs on the property, which were designed by Plaintiff's ex-wife, were also protected free speech.

261. The Ninth Amendment states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." By exploiting Plaintiff's mental disabilities and not affording him ADA accommodations, his innate rights to be treated fairly and respectfully were denied.

262. Defendant Binkley, who apparently wanted to speed along the auction, said on August 1, 2019, "I don't have any assurance at this point that [Plaintiff's] conduct won't continue thereby delaying this process even more," thus violating due process.

263. Defendant Binkley said on August 29, 2019, "You're to sign this contract today." He followed this statement shortly thereafter with: "You're going to sign this contract now," which are violations of due process and free speech—and of the Tennessee Code of judicial conduct rule 3.10, which states: "A judge shall not practice law." Because he was giving legal "advice" to sign a legal instrument, the contract, he was practicing law.

264. Defendant Binkley told Plaintiff via an order filed August 29, 2019, "he is required to comply with the rules just as an attorney is required," yet none of the defendants followed the rules, which thus resulted in a non-level playing field and violations of equal protection and due process. See exhibit E.

265. When Plaintiff tried to provide any input into the case whatsoever at the hearing

on August 29, 2019, and specifically about one of the motions to be heard that day—the motion on the order of protection—he was immediately shut down. Plaintiff said, "Can I still tell a little bit of my side before you rule on all of that?" Defendant Binkley said "briefly," then interrupted Plaintiff by saying, "We're not dealing with that today." Moments afterward he said, "I am trained to separate things in my mind that are important.....and things that are unimportant," implying that the order of protection was not important, but auctioning the house quickly was. Astoundingly, he immediately follows this statement with, "You've got to trust me here," and then right afterward, "I don't really care about all that. That's for another day." However, that day was supposed to be August 29, 2019, the very day of the hearing. The day to which Binkley referred never came for Plaintiff. For proceedings to continue to their conclusion—including loss of the home and income—after no hearings in the bankruptcy court with Plaintiff present, a mere two short "hearings" in Chancery Court, and without any real opportunity for Plaintiff to defend himself violated—or more appropriately, annihilated—his right to due process.

266. Defendants have also recklessly changed "ownership" of the home—or are responsible for it—without Plaintiff being heard in the bankruptcy, which is another violation of Plaintiff's right to due process.

267. Plaintiff had repeatedly told the defendants that he was being discriminated against not just because of his intellectual disabilities, but also because Local Rule 11.01 prevented him from objecting to the lie-riddled orders written by Story. Rather than address his complaint and remedy the damages it caused him, the Chancery Court, the State, and/or the Appellate Court modified the rule so that *pro se* parties can no longer object to it as being unconstitutional. See exhibit B. This rule was discriminatory and unconstitutional to *pro se* litigants in 2019 during the time of Plaintiff's litigation, but has been rewritten as a result of his complaints about it. However,

this is too little too late. He has been wrongly burdened with a mark on his otherwise perfect record—which prevents him from obtaining meaningful employment—and has lost hundreds of thousands of dollars in money and property. The preceding violated Plaintiff's equal protection and due process rights.

268. Since Plaintiff was never noticed about the bankruptcy, title for the property is still legally in his name according to the U.S. Supreme Court in *Pennoyer v. Neff*, 95 U.S. 714 (1878): "This court now holds that, by reason of the absence of [notice].....on the [litigant], the [court] had no jurisdiction, its judgment could not authorize the sale of land in said county, and, as a necessary result, a purchaser of land under it obtained no title; that, as to the former owner, it is a case of depriving a person of his property without due process of law" (emphasis added).

269. Notice must be given in a manner that actually notifies the person or that has a reasonable certainty of resulting in such notice.[199] Defendants were never assured that Plaintiff received such notice. In fact, he hadn't. See the partial transcript from the phone conversation Plaintiff had with the U.S. trustee who admitted as such in Exhibit D.

270. As a direct and proximate result of the violation of the plaintiff's constitutional rights by the defendants, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019, has lost his portion of the equity in the home, and has an unconstitutional order of protection against him.

271. The Count 13 Defendants, except for the State, Binkley, Beeler, Hivner, Hildebrand, Clement, Bennet, McBrayer, and Walker, severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $624,600, the calculations of

[199] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950); *Walker v. City of Hutchinson*, 352 U.S. 112 (1956); *Schroeder v. City of New York*, 371 U.S. 208 (1962); *Robinson v. Hanrahan*, 409 U.S. 38 (1972)


https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

which are as follows: $917,400 (current value of the home) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date). Because of the egregiousness of the offenses and as supported by settled law from the U.S. Supreme Court regarding malicious intent or the reckless indifference to the rights of Plaintiff by the defendants, Plaintiff seeks punitive damages in the amount of $450,000 against all Count 13 Defendants except the State, Binkley, Beeler, Hivner, Hildebrand, Clement, Bennet, McBrayer, and Walker.[200] The relevant remaining defendants are liable to Plaintiff who seeks declaratory and/or injunctive relief against them with respect to rescinding and expunging the order of protection issued by the Chancery Court.

## COUNT FOURTEEN: DISCRIMINATION/VIOLATION OF AMERICANS WITH DISABILITIES ACT, 42 U.S. CODE § 12101 *ET SEQ.*

272. Plaintiff incorporates by reference paragraphs one through 115.

273. This count is against defendants Binkley, Beeler, Walker, Clement, Bennett, McBrayer, Coke, and the State Defendants (the "Count 14 Defendants").

274. Plaintiff is a qualified individual with various mental disabilities as defined in the ADA. These disabilities include Plaintiff's diagnoses of ADHD and OCPD. See Appendix 1. He has mental impairments that substantially limit major life activities, including, but not limited to, thinking, sleeping, speaking, reading, working, concentrating, writing, and accomplishing tasks in a timely fashion. Plaintiff meets the essential eligibility requirements for the receipt of services or the participation in programs or assistance that should be provided by State Defendants pursuant to 42 U.S. Code § 12102(2) and 42 U.S. Code § 12131(2).

275. 42 U.S. Code § 12132 holds that Plaintiff shall not be excluded from participation

---

[200] *Smith v. Wade*, 461 U.S. 30 (1983): "The common law, both in 1871 and now, allows recovery of punitive damages in tort cases not only for actual malicious intent, but also for reckless indifference to the rights of others."

in or be denied the benefits of the services, programs, or activities of the State Defendants, or be subjected to discrimination by the Count 14 Defendants. Relevant to matters concerning this action, that benefit is the fundamental right of access to state courts and due process.

276. 28 C.F.R. § 35.150(a) holds that the State Defendants "shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."

277. As set forth above, the Count 14 Defendants have denied the disabled Plaintiff access to its services entirely. Even after the Count 14 Defendants had actual notice of Plaintiff's disability, they still denied Plaintiff access to services in the Tennessee court system.

278. The State Defendant's services are, when viewed in their entirety, unusable by the disabled Plaintiff.

279. Plaintiff has further been subjected to overt discrimination whereby the State Defendant's staff knew of Plaintiff's disability and refused to help him under color of the State Defendant's prejudicial procedures.

280. The State Defendants are public entities as defined under Title II of the ADA, 42 U.S. Code § 12131(1)(B).

281. The Count 14 Defendants knowingly and consistently discriminated against Plaintiff by failing to provide him with reasonable accommodations.

282. By failing to provide Plaintiff with assistance for his specific mental disability needs, the Count 14 Defendants have denied Plaintiff the benefits of needed services, programs, and assistance, thus discriminating against Plaintiff on the basis of his disability in violation of 42 U.S. Code § 12132. Discrimination against *pro se* litigants with mental impairment occurs particularly when such people do not receive services sufficient to bring them on par with *pro se*

litigants who do not suffer these impairments.

283. The Count 14 Defendants' denial of access and discrimination constitutes a violation of Plaintiff's fundamental right to due process of law protected by § 1 of the Fourteenth Amendment of the U.S. Constitution. Plaintiff, therefore, seeks damages pursuant to *United States v. Georgia*, 546 U.S. 151, 126 S. Ct. 877 (2006).

284. The Count 14 Defendants' denial of access and discrimination is also good cause for prophylactic relief according to *Tennessee v. Lane*, 541 U.S. 509, 124 S. Ct. 1978 (2004), which held that in providing prophylactic relief in the context of a "fundamental right of access to the courts Title II constitutes a valid exercise of Congress' authority under §5 of the Fourteenth Amendment to enforce that Amendment's substantive guarantees" and "Title II validly abrogated state sovereign immunity with respect to both equal protection and due process claims." *Lane*, quoting *Boddie v. Connecticut*, 401 U. S. 371 at 379 (1971), also said, "This duty to accommodate is perfectly consistent with the well-established due process principle that, 'within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard' in its courts."

285. 42 U.S. Code § 12202 holds that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State."

286. Plaintiff was discriminated against on various occasions by the Count 14 Defendants because of his mental disabilities. Defendant Binkley openly mocked him in court and

disregarded his disabilities as something with which he should just deal. See Appendix 3-3.

287. Certain Count 14 Defendants prevented Plaintiff from special assistance, filing procedures, and accommodations as required by 42 U.S. Code § 12101 *et seq*. Examples are the request for modification Plaintiff filed with the Appellate Court on July 8, 2020; the phone call Plaintiff had with the office of defendant Beeler on October 15, 2018, for an ADA accommodation; and the phone call Plaintiff had with defendant Coke on February 13, 2020, requesting ADA assistance.

288. The Count 14 Defendants thus discriminated against Plaintiff and deprived him of due process on the basis of his disabilities.

289. As a direct and proximate result of the violation of the plaintiff's ADA rights by the Count 14 Defendants, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019, has lost his portion of the equity in the home, and has an unconstitutional order of protection against him.

290. The Count 14 Defendants Coke and the State severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $624,600, the calculations of which are as follows: $917,400 (current value of the home) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife), plus $67,200 (rental income lost to date). The relevant remaining Count 14 Defendants are also liable to Plaintiff who seeks declaratory and/or injunctive relief against them regarding rescinding and expunging the order of protection issued by the Chancery Court.

## V. DEMAND FOR JUDGMENT

291. WHEREFORE, Plaintiff seeks declaratory and/or injunctive relief against defendants Binkley, the Chancery Court, and/or any other named defendant with authority by directing them to abide by the law and Constitution and to vacate and expunge the illegal and unconstitutional order(s) of protection issued by them against Plaintiff.

292. Plaintiff also seeks compensatory and punitive damages as set forth in the above counts, together with prejudgment and postjudgment interest at the prevailing rate set by law, court costs, fees, and any other relief or compensation deemed appropriate.

## VI. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues raised in this complaint.

## DECLARATION

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 20[201], 2024

JEFFREY RYAN FENTON, PRO SE
17195 SILVER PARKWAY, #150
FENTON, MI, 48430-3426
CONTACT@JEFFFENTON.COM
(P) 615.837.1300

[201] I have a slew of citations I planned to make to the record in this lawsuit, which I am still interested in adding during a later revision of this complaint, if the court allows. I simply don't have enough time currently due to my service deadline.

# VII. EXHIBITS/APPENDICES

month. She is an architect, works for a firm, and Mr. Fenton was the IT person for the firm, and he hacked the emails so he lost that job. He is very intelligent. He has a high school education, but he is a self-taught computer genius.

And he also has -- or he had a real estate license. I don't believe that's current. He had a flip home of rental property in 2016, is my understanding, but he never filed his tax return for 2016, when he sold that home, and so we've got a tax liability from 2-2016, standing out there.

2017, 2018, my client did get the tax returns filed, but they withheld everything she paid in because they still haven't filed the

Transcript of defendant Story speaking on August 1, 2019, in Chancery Court

---

Since you can no longer realize the VALUE which I bring to your organization **on my own**, I'm out!

If you are agreeable, I will refund your $2,500 deposit for your website rebuild, minus any reimbursable expenses (very minor), and a few office tech expenses which I have not yet billed you for. Then you can go hire ANYONE that you want to build your website, **it will be OFF MY PLATE!** I wish that it hadn't taken me so long to reach this conclusion, your website rebuild was the LAST web project that I've accepted (I've been turning people down for two years), because of how much TIME and coordination they require with clients to complete, yet I never seemed to be able to find TIME to rebuild your site, so I failed. I'd rather accept that and move forward, than continue to make empty promises and waste more of my TIME and YOURS.

Likewise, I'd like to end ALL of MY business with your company. I don't want Fawn to be stuck in the middle anymore. So if you need IT help, even if it is the smallest question that Fawn knows that I can answer in two minutes, please don't ask Fawn or anyone else to call me. I'm DONE! I will even refuse to help my loving wife, with any problems which she encounters in YOUR OFFICE.

I've provided detailed NOTES about most of the work that I performed inside the [IT] folder on your Server's desktop, so that someone could easily follow behind me. If they can't find the information they need there, then I'm sorry, they'll need to figure it out the same way that I did. I've tried to be very open and to document my work, but it all takes TIME, which costs more money… and no one is perfect. I'm not interested in being your on-call knowledgebase for any price. That's someone else's problem now!

Please hire a local website / hosting company / registrar / and administrator whom you personally TRUST (they can easily steal your digital assets, domain names, etc… if they are not

Email to Ken Adkisson on April 27, 2017, from Plaintiff ***voluntarily*** leaving his job.

Exhibit A

**Rule 11. Orders and Judgments**

[As of March 1, 2019]

**Section 11.01 Preparation and Submission**

Unless the court directs otherwise, attorneys for prevailing parties will prepare proposed orders for entry by the court and shall file such proposed orders not more than seven (7) days following the day on which the ruling is made by the court. If the proposed order submitted reflects that it has been approved for entry by counsel for all parties, then the court will take action promptly to enter such proposed order, or, at the court's discretion, enter the court's own order with respect to the ruling. If the proposed order does not reflect that it has been approved for entry by counsel for all parties, then the court will take no action to enter such proposed order for seven (7) days after receipt of the proposed order to afford counsel for the opposing party to submit an alternative proposed order. If the opposing party submits an alternative proposed order, the court shall undertake promptly to enter either the original proposed order, the alternative proposed order, or the court's own order with respect to the ruling. All of the time periods in this section may, for good cause, be extended by the court.

A party's approval for entry of a proposed order, which does not by its express terms state that it is an agreed order, shall not be construed as anything other than the party's agreement that the proposed order accurately reflects the court's ruling on the particular matter and shall not be construed to imply that party's agreement with or consent to the ruling set out in the proposed order.

[Adopted Effective September 1, 2004; Amended Effective September 1, 2010; Further Amended December 1, 2014].

---

**Rule 11. Orders and Judgments**

[As of March 1, 2023]

**Section 11.01. Preparation and Submission**

Unless otherwise directed, the prevailing party shall prepare and file with the Clerk a proposed order not more than seven (7) days following the Court's ruling. If the proposed order reflects it has been approved for entry by all parties, the Court may promptly enter the proposed order or enter its own order. Unless expressly referred to as an agreed order, a party's approval for entry of a proposed order shall be construed only as the approving party's agreement that the proposed order accurately reflects the Court's ruling.

If a proposed order does not reflect it has been approved for entry by all parties, the Clerk shall hold the proposed order for seven (7) days to afford the opposing party an opportunity to file an alternative proposed order. If the opposing party files with the Clerk an alternative proposed order, the alternative proposed order shall be conspicuously identified as such by the filing party. The Court will promptly enter the original proposed order, the alternative proposed order, or the Court's own order.

The time periods in this section may be extended by the Court for good cause.

**This rule was unconstitutional because it discriminated against a class, i.e., the class of *pro se* litigants. After Plaintiff repeatedly complained, the relevant defendants didn't undo the enormous damage it caused him, but instead rewrote the rule to prevent other *pro se* parties from complaining ever again. Note the omission of "attorneys" and "counsel" in the newer constitutional rule compared to the unconstitutional prior rule.**

Exhibit B

**Fill in this information to identify your case and this filing:**

Debtor 1 — **Fawn [redacted] Fenton**
First Name — Middle Name — Last Name

Debtor 2
(Spouse, if filing) — First Name — Middle Name — Last Name

United States Bankruptcy Court for the: MIDDLE DISTRICT OF TENNESSEE

Case number

☐ Check if this is an amended filing

Official Form 106A/B

# Schedule A/B: Property

12/15

**In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

**Part 1: Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In**

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.

■ Yes. Where is the property?

1.1

**1986 Sunny Side Drive**
Street address, if available, or other description

**Brentwood** — **TN** — **37027-0000**
City — State — ZIP Code

**Williamson**
County

**What is the property?** Check all that apply

■ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other

**Who has an interest in the property?** Check one

☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
■ At least one of the debtors and another

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| $425,000.00 | $425,000.00 |

**Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.**

**Tenants by the Entireties**

☐ **Check if this is community property** (see instructions)

**Other information you wish to add about this item, such as local property identification number:**

**Separated Spouse is on Deed only**

2. **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here.....=>** **$425,000.00**

**Part 2: Describe Your Vehicles**

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*


Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com Best Case Bankruptcy


Plaintiff is clearly listed as being on the deed of the real property, but he is not mentioned anywhere as having a financial interest in it nor was he given notice of the proceeding.

Exhibit C

**Partial Transcript of Phone Conversation with Chapter 13 Trustee, John C. McLeMore, on July 2, 2020**

**2:12 Plaintiff:** I was equally deeded on that property; however, I was never provided with any notification that she had even filed bankruptcy or that she had even missed a single payment on the house, and it had every penny that I had ever saved or invested in my life invested in that home, and I was wondering how did that work regarding my fourteenth amendment right not to have any property seized or to have an opportunity to save any property that I owned without notice and without an opportunity to save that?

**2:50 McLeMore:** OK, wait just a second…I haven't sold any real estate…I sold a Toyota.

…

**5:57 Plaintiff:** I'm trying to figure out how in the world they could sell my home without…or order the sale of it…or that she could default on it and get it in a position where it had to be sold, without me ever being notified that it was at risk.

**6:15 McLeMore:** Ok, do you know whether it was sold by Henry?…

…

**18:50 Plaintiff:** I'm trying to understand how she could default on something that I had a financial interest in without notifying me or how she could…

**19:00 McLeMore:** OK, well, you're analysis of the lending is correct…

…

**23:22 McLeMore:** what I don't see in the expedited motion from 9-18…is…the….is the notice…where…oh (unintelligible) that irritates me so much! OK, computers.

**27:27 Plaintiff**: You could say I was given notice if you wanna say 5 days before it was forced to be sold or something, but that's not notice as in like you could do something about it. There was nothing I could do about it, period.

**28:38 Plaintiff:** I was never listed on the bankruptcy, I was never listed on notifications, I was never listed on anything.

…

**29:04 McLeMore:** (rudely) First of all, I can't be your lawyer…

**29:16 McLeMore:** If you are correct that you were an owner of this real estate…then, um, I do not understand either how it was sold without your having being given notice by the bankruptcy court. And I'm looking here, and it doesn't look to me like you were. I don't understand that. I can't…

**31:40 McLeMore:** I can't help you. I've given you the one answer that…that…that I know is accurate, and the answer is, I do not know. I do not know how this property was sold without your getting notice…

…

**38:47 McLeMore:** I will say this. When I get ready to sell a piece of property, I go get a title search, and if the title search says the property is owned by the husband and wife, and only one is in bankruptcy, then I've got work to do in order to make that sale happen.

**39:09 Plaintiff:** What does that mean?

**39:12 McLeMore:** It means that you cannot sell a piece of property owned by husband and wife and give title to it. The only thing there is for sale when property is owned by husband and wife, and you are telling me you were not divorced at the time of the sale.

**39:58 McLeMore:** All either of you own is the right to own all of the property in the event of the death of the other.

RECEIVED BY
Judge Chambers
Date 8-29-19

IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

2019 AUG 29 PM 2:34

FILED FOR ENTRY 8-29-19

| | | |
|---|---|---|
| FAWN [redacted] FENTON,<br>Plaintiff/Wife, | ) | |
| vs. | ) | No. 48419B |
| JEFFREY RYAN FENTON,<br>Defendant/Husband. | ) | |

**ORDER FROM AUGUST 29, 2019 HEARING**

**EX PARTE ORDER OF PROTECTION EXTENDED PENDING FINAL HEARING, RESETTING MOTION FOR VIOLATION OF ORDER OF PROTECTION, WAIVING MEDIATION AND SETTING FINAL HEARING, ORDER TO VACATE AND ORDER ALLOWING WIFE TO SIGN ALL NECESSARY CONTRACTS TO COMPLETE THE SALE OF THE MARITAL HOME AND CLOSING**

This matter came on to be heard on the 29th day of August, 2019 before the Honorable Michael W. Binkley, Judge holding Court for the Chancery Court of Williamson County, Tennessee, upon Wife's Motion for Violation of Ex Parte Order of Protection and for Date Certain for Walk Through of House and Motion for Scheduling Order. It appearing to the Court based upon arguments of counsel, statements of Husband representing himself Pro Se, and the record as a whole that the following shall be the Order of this Court.

It is therefore **ORDERED, ADJUDGED and DECREED** that the Husband was again advised of the risks of proceeding Pro Se and that he is required to comply with the rules just as an attorney is required. Husband acknowledged that he understood and wishes to proceed Pro Se. The Motion for Violation of the Order of Protection will be continued pending further Orders of the Court as Husband had filed a very lengthy response on the morning of the hearing being August 29, 2019. The Motion for Violation of the Order of Protection will be reset with the Final Hearing in this cause set for October 21, 2019 at 9:00 a.m. The Motion for Scheduling Order and to Waive Mediation in this cause is appropriate and the same is granted.



381



Plaintiff, only because of the nefarious actions of defendants, was forced to proceed *pro se*. He was instructed that he must follow the rules—that defendants repeatedly violated..... and resulted in him having to proceed *pro se* in the first place.

Exhibit E

*****************************************************************************

[ECF No. 1-12, PageID.518-523]

Plaintiff's Vanguard Retirement Funds

$8023.32 4/25/2010

$9758.76 4/25/2010

$17,782.08 TOTAL RETIREMENT FUNDS (100% liquidated for purchase of the home)

*****************************************************************************

Also, borrowed $9,250 on DUPLEX HELOC, to deposit in marital home funds, part used for initial purchase, remainder used for initial improvements to the marital home.

This should be differentiated from retirement investment, but it is debt for which Plaintiff was solely responsible, borrowed against his premarital duplex.

$9,250.00 1/21/2011 Chk 1061 Borrowed against premarital duplex BancorpSouth HELOC

+

$17,782.08 TOTAL RETIREMENT FUNDS (100% liquidated for purchase of the home)

=

$27,032.08 Plaintiff's total premarital investment in the home.

Plaintiff's Premarital Investment in the Marital Home

Exhibit F

# APPENDIX 1

**Radnor Psychiatric Group, PLC**
5123 VIRGINIA WAY
SUITE C-11
BRENTWOOD, TENNESSEE 37027

Telephone: (615) 373-5205
Fax: (615) 373-5165

November 1, 2018

RE: Jeffrey Fenton, [redacted]

To Whom It May Concern:

Jeffrey Fenton has been a patient under my care since 2012. He is treated for a severe Generalized Anxiety Disorder, Attention Deficit Disorder, and suffers from an Obsessive Compulsive Personality Disorder. He also has specific phobias regarding weather, driving across bridges, and flying, along with obsessive concerns over his health.

His symptoms of severe anxiety, obsessive worry, preoccupation with details and rules, perfectionism, inflexibility, and problems with rigidity have all interfered with his ability to hold a job and have a healthy relationship.

I have prescribed medication including Lexapro 40 mg a day, Vyvanse 70 mg a day, Xanax 1 mg every six hours as needed, and Restoril 30 mg at night for chronic insomnia. He also has continued to see Terry Huff, LCSW, in psychotherapy. Despite his compliance with his medication and therapy, his symptoms continue to be disabling.

Please consider Mr. Fenton's severe psychiatric condition in any judgments being made about his ability to work and his ongoing divorce. If you have any questions regarding his treatment or prognosis, please contact me with his permission.

Sincerely,

Richard E. Rochester, M.D.
RER/sde

A1-1

**Radnor Psychiatric Group, PLC**
5123 VIRGINIA WAY
SUITE C-11
BRENTWOOD, TENNESSEE 37027

Telephone: (615) 373-5205
Fax: (615) 373-5165

July 19, 2019

To Whom It May Concern:

RE: Jeffrey Fenton, [redacted]

Jeff Fenton has been a patient under my care since February 2012. He has been diagnosed with a Generalized Anxiety Disorder, Attention Deficit Disorder, and some Obsessive Compulsive Personality traits. He has been complaint with both his psychiatric medications prescribed and his individual psychotherapy with Terry Huff, LCSW.

The symptoms of his illnesses have interfered with his ability to maintain employment, despite compliance with our treatment recommendations. His condition does not predispose him to any violent behavior and, to my knowledge, he has not been involved in any violent behavior since being a patient under my care.

If you have any further questions regarding his diagnosis, treatment, or prognosis, please contact me with his permission.

Sincerely,

Richard E. Rochester, M.D.

**Radnor Psychiatric Group, PLC**
5123 VIRGINIA WAY
SUITE C-11
BRENTWOOD, TENNESSEE 37027

Telephone: (615) 373-5205
Fax: (615) 373-5165

January 10, 2023

To Whom It May Concern:

RE: Jeffrey Fenton, [redacted]

Jeff Fenton has been a patient under my care since February 2012. He has been diagnosed and treated for a Generalized Anxiety Disorder, Attention Deficit Disorder, and Obsessive Compulsive Personality Disorder. He has been compliant with all my treatment recommendations and medications.

His condition is currently stable on escitalopram 40 mg a day, lamotrigine 100 mg a day, Adderall XR 60 mg a day, alprazolam 0.5 mg to 1 mg q.i.d. and temazepam 15 mg to 30 mg nightly as needed for insomnia. He has no side effects of his current medication regimen, which he has been on now for several years. At no time has he abused his medication. However, due to the severity of his condition, he has been unable to work and hold any full time employment.

If you have any questions regarding my diagnosis or treatment, please contact me with his permission.

Sincerely,

Richard E. Rochester, MD

RER/sde

**Terry M. Huff, LCSW**
**5115 Maryland Way**
**Brentwood, TN 37027**
**ph: 615-627-4191**

July 29, 2019

To Whom It May Concern:

I have been seeing Mr. Jeff Fenton in individual psychotherapy from May 3, 2018 to present. He has also been a participant in my support group for adults with ADHD (attention deficit hyperactivity disorder). During this period I have never had any suspicion, or reason for concern, that Mr. Fenton is at risk for harming himself or others.

Respectfully,

Terry M. Huff, LCSW

Terry M. Huff, LCSW

Terry M. Huff, LCSW
Suite 134
5115 Maryland Way
Brentwood, TN 37027
615-627-4191
terrymhuff.com

August 28, 2019

To Whom it May Concern:

I'm writing at the request of my client, Mr. Jeff Fenton, to explain his mental health challenges and their effects on his general functioning. I am licensed as a clinical social worker in Tennessee, and I have a private psychotherapy practice in Brentwood. I have been providing psychotherapy services for thirty years. My specialty is in helping adults with attention deficit hyperactivity disorder (ADHD).

I began seeing Mr. Fenton May 3, 2018. His primary concerns for which he sought my help were marital problems and effects of his ADHD. He has a history of particular difficulties with occupational functioning due to extraordinary perfectionism and getting lost in details, which contribute to inefficiency and missed deadlines. This particular challenge, along with certain other features, are consistent with symptoms of obsessive compulsive personality disorder. ADHD and OCPD have been the focus of Mr. Fenton's psychotherapy. He also has specific phobias and social anxiety, which have not been the primary focus in therapy.

ADHD is a neurological condition that makes it difficult to manage one's attention and inhibit impulses. It is often misperceived as an inability to focus rather than difficulty managing and shifting the focus of one's attention. Adults with ADHD often have difficulty returning to open awareness when locked into a focused state of awareness. They often have trouble activating and sustaining effort on monotonous tasks, organizing and prioritizing tasks, keeping track of items needed for tasks, estimating and tracking time, managing emotions skillfully, inhibiting speech and action (tending to talk excessively and interrupt others), and inhibiting impulses.

Obsessive Compulsive Personality Disorder is characterized by "preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency," according to the DSM-5 (Diagnostic and Statistical of Mental Disorders - 5th edition). Individuals with this disorder try "to maintain a sense of control through painstaking attention to rules, trivial details, procedures, lists, schedules, or form to the extent that the major point of the activity is lost." They may get so caught up in the details of a project that they don't complete it, or they miss deadlines. If can take them a long time to complete a task due to this excessive preoccupation with details. They are often "inflexible about matters of morality, ethics, or values and may force themselves and others to follow rigid moral principles and very strict standards of performance." They often have trouble delegating tasks to others, as others must conform to their way of doing things. Those tasks must be done "correctly." They tend to "plan ahead in meticulous detail and are unwilling to consider changes." Their ability to compromise may be compromised by the inflexibility. They are uncomfortable with relationships and situations in which they are not in control or where they must rely on others. They are uncomfortable with the unpredictable.

One effect of the OCPD is Mr. Fenton's communication when dealing with conflict. His excesses in speech and writing can appear imposing or hostile. He acknowledges his compulsion to communicate excessively. The compulsion is driven by an undercurrent of unsettled feelings that persist until he is certain there is no possibility of being misunderstood. This pattern is consistent with the disorder (OCPD). His effect on others—i.e., anyone receiving the excess of communication—is often lost on him, as his attention is locked into the effort to be understood. Consequently, those efforts are experienced by others as intense and sometimes hostile.

Mr. Fenton is aware that he has more work to do on this problem. He recently requested that we focus less on the present crisis and more on managing the challenge of coping effectively with the symptoms ADHD and OCPD, and decreasing self-defeating behavior. Due to both conditions, Mr. Fenton's excessive attention to what he wants to communicate obstructs him from being aware, in a given moment, of effects of his efforts (e.g., the impact of the volume of his voice when speaking, or the volume of information when writing).

Mr. Fenton has been forthcoming in psychotherapy sessions and has been open and willing to be challenged with respect to his symptoms and their effects. He acknowledges mistakes when they are pointed out and is working to understand how his best intentions sometimes go awry, and his persistent efforts can be self-defeating.

Mr. Fenton has never expressed any intention of harming himself or others during the sixteen months that I have known him. I have never had reason to suspect any intention to harm himself or others. He has participated frequently in a support group for adults with ADHD. He has participated actively and has offered help to others in the group.

Thank you for consideration of the role that mental health and disability have played out in Mr. Fenton's life and relationships. His participation in psychotherapy and related services will continue.

Respectfully,

Terry M. Huff, LCSW

Terry M. Huff, LCSW

# APPENDIX 2

**The following is a non-exhaustive list of lies told by defendant Story during Plaintiff's matter in the Chancery Court, which are also crimes according to 18 U.S. Code § 157(3) "false or fraudulent representation[s], claim[s], or promise[s]":**[202]

- It is "already too far along in the bankruptcy process" to save the home, which is not only nonsensical, but contradicts the 180 days the bankruptcy court allegedly gave on April 26, 2019, to sell the home, therefore providing 83 days to salvage the home. (stated August 1, 2019)
- Plaintiff "lost" his job, when he actually resigned. (stated August 1, 2019)
- "[Ms. Fenton] is the owner of the property," when Plaintiff also owned it. (stated August 1, 2019)
- "Mr. Fenton would transfer balances from his credit cards to a credit card in her name," when the reverse was actually true. (stated August 1, 2019)
- "Obviously he cannot bind a new owner to comply with this lease, so that is a voidable contract." This is not true according the severability clause in it and according to law, which requires a new owner to honor an existing lease except in the case when the new owner or a close relative will occupy the premises. (stated August 1, 2019)
- "He's known since March of last year that the house was going on the market, and he signed the lease in April of this year." She made this comment with no evidence whatsoever. Plaintiff only learned of the house sale/auction on August 1, 2019. (stated August 1, 2019)
- "The bankruptcy was filed April. He knew this was coming down the pike." No, Plaintiff didn't. (stated August 1, 2019)
- "Mrs. Fenton filed for divorce back in '18." She filed June 4, 2019. (stated August 1, 2019)
- "It's been unbelievably difficult just dealing with Mr. Fenton to even get him served." Plaintiff was served June 15, 2019, *a mere 11 days* after filing. Service often takes weeks or months. She served Plaintiff multiple times *after she knew he had been served* in an attempt to bolster this false claim. (stated August 1, 2019)
- "[Plaintiff] does not want to contest the divorce." (stated in a fraudulent affidavit she filed in the Chancery Court October 21, 2019).

"[Plaintiff] does not wish to communicate with Virginia Story." This, however, is one of the few true statements defendant Story has made. Plaintiff has no affinity for criminal actors within the U.S. legal system.

[202] Defendant Story fits many of the criteria for being a psychopath. See, for example, www.psychologytoday.com/us/blog/so-sue-me/201408/are-lawyers-all-raging-psychopaths

# APPENDIX 3

**The following are violations of statutory code by the defendants:**

<u>Tennessee Code Annotated</u>

§ 36-3-605 *Ex Parte* Protection Order — Hearing — Extension
- No hearing, one-year duration exceeded

§ 36-3-608 Duration of Protection Order — Modification
- Order of protection exceeded one year

§ 36-4-101 Grounds for divorce from bonds of matrimony
- 60-day waiting period before first hearing contravened

§ 39-14-114 Forgery
- Alteration of the listing agreement for the marital home after being signed by Plaintiff

§ 39-15-510 Offense of Abuse of Elderly or Vulnerable Adult
- knowingly abusing an adult with mental disabilities

§ 39-16-504 Destruction of and tampering with governmental records
- false entries in affidavit, other records

§ 39-16-702 Perjury
- false statements under oath while in Chancery Court and in documentation

§ 66-27-123 Notice to Tenant of Intent to Convert Rental Units to Units for Sale
- less than two months of actual notice given to Plaintiff's tenants

<u>United States Code</u>

11 U.S. Code § 341 Meetings of creditors and equity security holders
- Plaintiff, having an interest in the bankruptcy estate, never notified of meetings

11 U.S. Code § 725 Disposition of certain property
- If home to be sold, trustee's duty after notice and hearing to Plaintiff, not Chancery Court's

18 U.S. Code § 4 Misprision of felony
- Reporting of felonies by certain defendants to other defendants who took steps to conceal

18 U.S. Code § 1341 Frauds and swindles
- Using U.S. mail to send fraudulent protective order to MI, obtaining home by fraud

18 U.S. Code § 1503 Influencing or injuring officer or juror generally
- Corruptly influencing the divorce proceedings and usurped jurisdiction from bankruptcy court

18 U.S. Code § 1951 Interference with commerce by threats or violence
- Extortion of Plaintiff to sign listing agreement, interstate commerce affected

18 U.S. Code § 1962 Prohibited activities
- Racketeering violations of predicates §§ 1341, 1503, 1951, 1957, and fraud under title 11

42 U.S. Code § 1983 Civil action for deprivation of rights
- Violation of Fourteenth Amendment (equal protection – disability, due process – multiple)

42 U.S. Code § 1985 Conspiracy to interfere with civil rights
- Defendants collectively interfering with Plaintiff's civil rights, state/federal cases

42 U.S. Code § 12101 *et seq.* Findings and purpose
- Plaintiff denied services and programs, discrimination by State Defendants

**The following are violations of the TN Code of Judicial Conduct by state judge defendants:**[203]

CANON 1—A JUDGE SHALL UPHOLD AND PROMOTE THE INDEPENDENCE, INTEGRITY, AND IMPARTIALITY OF THE JUDICIARY, AND SHALL AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY.

1.1 Compliance with the Law (when defendant Binkley asserted jurisdiction over the bankruptcy estate despite the bankruptcy court having original and exclusive jurisdiction per 11 U.S. Code § 541, when he violated the ADA and other law, when he violated the Constitution)

1.2 Promoting Confidence in the Judiciary ("The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge," when defendant Binkley openly ignored due process, showed annoyance with people who have disabilities, and exhibited bias when deciding Plaintiff's matters in the Chancery Court)

CANON 2—A JUDGE SHALL PERFORM THE DUTIES OF JUDICIAL OFFICE IMPARTIALLY, COMPETENTLY, AND DILIGENTLY.

2.2 Impartiality and Fairness (when defendant Binkley violated law, when he prevented Plaintiff from explaining his disability, when he declined to act on Plaintiff's answer/counterclaim, when he issued orders of protection without due process, when he predetermined the case's outcome.)

2.3 Bias, Prejudice, and Harassment (when defendant Binkley commented during the August 1 and 29, 2019, hearings: "Fair is something you do in the fall" and said Plaintiff's disability "bothers" him and said, "But we all have burdens," making light of Plaintiff's disability.)

2.5 Competence, Diligence, and Cooperation (defendant Binkley clearly lacked competence when he asked during the August 1, 2019, hearing—not even knowing where he was—"Are we Chancery or Circuit?" and "Any possibility she could be an innocent spouse? I don't know how that works anymore.")

2.6 Ensuring the Right to be Heard (when defendant Binkley blocked Plaintiff from explaining his disability, declined to rule on his answer/counterclaim, and essentially blocked any participation by Plaintiff after he was forced to become *pro se*)

2.9 *Ex Parte* Communications (when defendant Binkley spoke with defendant Story regarding Plaintiff's handwritten note he left at the residence of Ms. Fenton and then apparently told defendant Story to compose the fraudulent affidavit of October 21, 2019)

2.12 Supervisory Duties (when judges superior to defendant Binkley failed to act based on Plaintiff's input of Binkley's wrongdoing)

2.15 Responding to Judicial and Lawyer Misconduct (when judges failed to act to correct the misconduct of judges below them)

CANON 3—A JUDGE SHALL CONDUCT THE JUDGE'S PERSONAL AND EXTRAJUDICIAL ACTIVITIES TO MINIMIZE THE RISK OF CONFLICT WITH THE OBLIGATIONS OF JUDICIAL OFFICE.

3.10 Practice of Law (states "A judge shall not practice law." After saying earlier in the August 29, 2019, hearing, "We can't sit here and be your lawyer for you," defendant Binkley said to Plaintiff, "You're going to sign this contract now." In a best-case scenario: the contract should be void/voidable because Plaintiff was forced to sign; worst-case: defendant Binkley was acting as Plaintiff's attorney as he just stated he was not going to do by giving him "advice" to sign, in violation of this rule)

While not an official violation, defendant Binkley said at the "hearing" on August 29, 2019, "Now, you're choosing to represent yourself. There's not a thing that I can do about that." Well, yes, there was. According to a guide produced by the TN Supreme Court Access to Justice Commission, "for a judge to do nothing to address the needs or problems faced by self-represented litigants actually advances injustice and contributes to the loss of respect for the judicial system by a substantial portion of the public."[204]

[203] https://www.tncourts.gov/rules/supreme-court/10

[204] *A Bench Book for General Sessions Judges of the State of Tennessee*, (2013)

**The following are violations of the rules of professional conduct by defendant Story, a publicly censured attorney:**

3.3 CANDOR TOWARD THE TRIBUNAL

- (a) A lawyer shall not knowingly:
  (1) make a false statement of fact or law to a tribunal;

3.5 IMPARTIALITY AND DECORUM OF THE TRIBUNAL

A lawyer shall not:

- (a) seek to influence a judge, juror, prospective juror, or other official by means prohibited by law;

4.1 TRUTHFULNESS IN STATEMENTS TO OTHERS

- (a) In the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person.

5.1 RESPONSIBILITIES OF PARTNERS, MANAGERS, AND SUPERVISORY LAWYERS

- (a) A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct.

8.3 REPORTING PROFESSIONAL MISCONDUCT

- (b) A lawyer who knows that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the Disciplinary Counsel of the Board of Judicial Conduct.

8.4 MISCONDUCT

It is professional misconduct for a lawyer to:

- (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
- (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;
- (d) engage in conduct that is prejudicial to the administration of justice;

# APPENDIX 4

Capital One

Page 1 of 2
**Platinum MasterCard Account Ending in 5861**
Jul. 06, 2019 - Aug. 05, 2019 | 31 days in Billing Cycle

## Payment Information

Payment Due Date
Sep. 02, 2019

For online and phone payments, the deadline is 8pm ET.

| New Balance | Minimum Payment Due |
|---|---|
| $1,031.98 | $34.00 |

**LATE PAYMENT WARNING:** If we do not receive your minimum payment by your due date, you may have to pay a late fee of up to $38.00.

**MINIMUM PAYMENT WARNING:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Minimum Payment | 8 Years | $2,424 |
| $42 | 3 Years | $1,526 |
| Estimated savings if balance is paid off in about 3 years: $898 | | |

If you would like information about credit counseling services, call 1-888-326-8055.

## Account Summary

| | |
|---|---|
| Previous Balance | $735.96 |
| Payments | - $25.00 |
| Other Credits | - $162.13 |
| Transactions | + $462.25 |
| Cash Advances | + $0.00 |
| Fees Charged | + $0.00 |
| Interest Charged | + $20.90 |
| **New Balance** | **= $1,031.98** |
| Credit Limit | $1,500.00 |
| Available Credit (as of Aug. 05, 2019) | $468.02 |
| Cash Advance Credit Limit | $500.00 |
| Available Credit for Cash Advances | $468.02 |

Rewards Balance as of 08/04/2019
$8.30

Track and redeem your rewards with our mobile app or on www.capitalone.com

| Previous Balance | Earned | Redeemed |
|---|---|---|
| $3.78 | $4.52 | $0.00 |

## Account Notifications

Welcome to your account notifications. Check back here each month for important updates about your account.

Pay or manage your account on our mobile app or at www.capitalone.com. Customer Service: 1-800-903-3637 See reverse for Important Information

Capital One

Please send us this portion of your statement and only one check (or one money order) to ensure your payment is processed promptly. Allow at least seven business days for delivery.

Payment Due Date: **Sep. 02, 2019** Account Ending in 5861

| New Balance | Minimum Payment Due | Amount Enclosed |
|---|---|---|
| $1,031.98 | $34.00 | $ ________ |

400038

Get the app designed to save time.
Effortlessly manage your account on the go with the Capital One® mobile app.
Text ONE to 80101 to download the app.
Messaging & Data rates may apply.

JEFFREY R FENTON
1986 SUNNY SIDE DR
BRENTWOOD, TN 37027-5404

Capital One
P.O. Box 71083
Charlotte, NC 28272-1083

Out-of-state bank account

CREDIT ONE BANK CREDIT CARD STATEMENT
Account Number [redacted]
May 04, 2019 to June 03, 2019

**SUMMARY OF ACCOUNT ACTIVITY**

| | | |
|---|---|---|
| Previous Balance | | $217.00 |
| Payments | - | $612.05 |
| Other Credits | - | $3.47 |
| Purchases | + | $761.75 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$0.00** |
| **Interest Charged** | + | **$0.00** |
| New Balance | | $363.23 |
| Credit Limit | | $700.00 |
| Available Credit | | $336.00 |
| Statement Closing Date | | 06/03/19 |
| Days in Billing Cycle | | 31 |

**QUESTIONS?**
Call Customer Service or Report a Lost or Stolen Credit Card 1-877-825-3242
Outside the U.S. Call 1-702-405-2042

Please send billing inquiries and correspondence to:
P.O. Box 98873, Las Vegas, NV 89193-8873

**PAYMENT INFORMATION**

| | |
|---|---|
| New Balance | $363.23 |
| Past Due Amount | $0.00 |
| Amount Due This Period | $25.00 |
| **Minimum Payment Due** | **$25.00** |
| **Payment Due Date** | **06/28/19** |

Late Payment Warning:
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $38.

Minimum Payment Warning:
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.

For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on the statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 18 months | $441.00 |

If you would like a location for credit counseling services, call 1-866-515-5720.

**TRANSACTIONS**

| Reference Number | Trans Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| 2449398422D9RDJGN | 05/10 | 05/10 | AT&T*BILL PAYMENT 800-331-0500 TX | 95.05 |
| 240731446S66FX47H | 05/13 | 05/13 | ALARMCLUB COM INC 561-8339949 FL | 15.00 |
| 2443106472DJJ2LNT | 05/15 | 05/15 | AMAZON.COM*MN1IU5AB2 AMZN AMZN.COM/BILL WA | 188.13 |
| 24610434809FF426V | 05/15 | 05/15 | THE HOME DEPOT #0723 BRENTWOOD TN | 60.30 |
| 2443106492DYTGM1K | 05/16 | 05/16 | AMZN MKTP US*MN7CO11P2 AM AMZN.COM/BILL WA | 20.95 |
| 2469216482XZ4YLX5 | 05/16 | 05/16 | ZAXBY'S #69701 FRANKLIN TN | 8.77 |
| 2469216482X8A9HKZ | 05/16 | 05/16 | AMZN Mktp US*MN81N51D2 Amzn.com/bill WA | 26.37 |
| 7407193483JMBJRD1 | 05/16 | 05/16 | PAYMENT-THANK YOU LAS VEGAS NV | -312.05 |
| 2443106492DYGZY33 | 05/17 | 05/17 | AMZN MKTP US*MN8IA65Q1 AM AMZN.COM/BILL WA | 37.99 |
| 2443106492DYVAQZ2 | 05/17 | 05/17 | AMZN MKTP US*MN7L14511 AM AMZN.COM/BILL WA | 27.10 |
| 24445004D8PTRT5LJ | 05/20 | 05/20 | KROGER #596 BRENTWOOD TN | 202.14 |
| 24692164D2XPNGSW9 | 05/21 | 05/21 | COMCAST 800-266-2278 GA | 50.00 |
| 74071934E3JMBLJZX | 05/22 | 05/22 | PAYMENT-THANK YOU LAS VEGAS NV | -150.00 |
| 24906414F24FBTYNB | 05/23 | 05/23 | EIG*Hostgator.com 713-5745287 MA | 29.95 |
| 74071934F3JMBLWRB | 05/23 | 05/23 | PAYMENT-THANK YOU LAS VEGAS NV | -150.00 |
| F5727004K000FR | 05/27 | 05/27 | CREDIT ONE REWARD CREDIT LAS VEGA CREDIT | -3.47 |
| | | | **Fees** | |
| | | | **TOTAL FEES FOR THIS PERIOD** | **0.00** |
| | | | **Interest Charged** | |
| | 06/03 | 06/03 | Interest Charge on Purchases | 0.00 |
| | 06/03 | 06/03 | Interest Charge on Cash Advances | 0.00 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **0.00** |

| **2019 Totals Year-to-Date** | |
|---|---|
| Total fees charged in 2019 | $0.00 |
| Total interest charged in 2019 | $0.00 |

5385 JBH 001 7 3 190603 0 PAGE 1 of 2 2 0 5727 9620 A188 O1GQ5385

Please return this portion with your payment, and write your account number on your check, made payable to *CREDIT ONE BANK*

CreditOne BANK

For address, telephone and email changes, please complete the reverse side.
Or, update your contact information online at www.CreditOneBank.com.

**PAY YOUR BILL ONLINE at CreditOneBank.com**

| | |
|---|---|
| Account Number: | [redacted] |
| New Balance: | $363.23 |
| Minimum Payment Due: | $25.00 |
| Payment Due Date: | 06/28/19 |

**AMOUNT ENCLOSED:** $ .

CREDIT ONE BANK
PO BOX 60500
CITY OF INDUSTRY CA 91716-0500

JEFFREY FENTON
1986 SUNNY SIDE DR
BRENTWOOD TN 37027-5404

Out-of-state bank account

A4-2

Releasing children from poverty
Compassion
in Jesus' name

**Compassion International**
**Colorado Springs, CO 80997**

## Year-end Tax Receipt

Sponsor/Donor: 00725819
January 17, 2018
01/01/2017 through 12/31/2017

Mr. Jeffrey R. Fenton
1986 Sunny Side Dr
Brentwood, TN 37027-5404

Thank you for your faithfulness to children in need! For tax purposes, your 2017 Compassion tax-deductible donations are listed below.

**GIVING HISTORY**

| Date | Donation | Description | Amount |
|---|---|---|---|
| 01/19/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 02/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 03/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 04/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 05/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 06/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 07/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 08/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 09/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 10/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 11/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| 12/15/2017 | Child Sponsorship Support | Aprilia Rimabunga Barengo | $38.00 |
| Total cash contributions | | | $456.00 |

**GOODS OR SERVICES PROVIDED IN CONSIDERATION FOR CONTRIBUTIONS**

| Date | Item | Amount |
|---|---|---|
| Total fair market value of goods and services provided | | |
| **Total tax-deductible contributions** | | **$456.00** |

*Compassion is a public charity exempt from Federal Income Tax as an organization described in Section 501 (c)(3) of the Internal Revenue Code, EIN 36-2423707. Contributions to Compassion are tax deductible to the fullest extent allowed by law. No goods or services were provided in consideration for the contributions except as reported above. Compassion controls 100 percent of the funds contributed.*

Page 1 of 2

Out-of-state company for child sponsorship

☐ CORRECTED (if checked)

**Form 1098 — 2017 — Mortgage Interest Statement — COPY B FOR PAYER** (OMB No. 1545-0901)

RECIPIENT'S/LENDER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone number
BANCORPSOUTH BANK
P.O. BOX 789
TUPELO, MS 38802
IOZ 3286234 7000
1-888-797-7711

*Caution: The amount shown may not be fully deductible by you. Limits based on the loan amount and the cost and value of the secured property may apply. Also you may only deduct interest to the extent it was incurred by you, actually paid by you, and not reimbursed by another person.

| | |
|---|---|
| RECIPIENT'S federal identification no. | 64-0117230 |
| PAYER'S social security number | XXX-XX-XXXX |
| 1 Mortgage interest received from payer(s)/borrower(s) * | $ 2,451.92 |
| 2 Outstanding mortgage principal as of 1/1/2017 | $ 54,746.56 |
| 3 Mortgage origination date | 04/29/2011 |
| 4 Refund of overpayment interest | $ 0.00 |
| 5 Mortgage insurance premiums | $ |
| 6 Points paid on purchase of principal residence | $ |
| 7 Is address of property securing mortgage same as PAYER'S/BORROWER'S address? If Yes, box is checked. If No, see box 8 or 9, below | ☒ |
| 8 Address of property securing mortgage | |
| 9 If property securing mortgage has no address, below is the description of the property | |
| 10 Other | |
| 11 Number of Mortgaged properties | |
| Account Number (see instructions) | 00161000725759 |

PAYER'S/BORROWER'S name, Street address (including apt. no.), City or town, state or province, country, and ZIP or foreign postal code
7000 1 AV 0.378 0.3780
FAWN [redacted] FENTON
1986 SUNNY SIDE DR
BRENTWOOD, TN 37027-5404

The information in boxes 1 through 9 is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if the IRS determines that an underpayment of tax results because you overstated a deduction for this mortgage interest or for these points, reported in boxes 1 and 6; or because you didn't report the refund of interest (box 4); or because you claimed a non-deductible item.

Form 1098 (Keep for your records) www.irs.gov/form1098 Department of the Treasury – Internal Revenue Service

2 of 3

☐ CORRECTED (if checked)

**Form 1098 — 2018 — Mortgage Interest Statement — Copy B For Payer/Borrower** (OMB No. 1545-0901)

RECIPIENT'S/LENDER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.
BANK OF AMERICA, N.A.
CUSTOMER SERVICE
PO BOX 31785
TAMPA, FL 33631-3785 800-669-6607

*Caution: The amount shown may not be fully deductible by you. Limits based on the loan amount and the cost and value of the secured property may apply. Also, you may only deduct interest to the extent it was incurred by you, actually paid by you, and not reimbursed by another person.

| | |
|---|---|
| RECIPIENT'S/LENDER'S TIN | 94-1687665 |
| PAYER'S/BORROWER'S TIN | XXX-XX-[redacted]5 |
| PAYER'S/BORROWER'S name | FAWN FENTON |
| Street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code | [redacted] BRENTWOOD TN 37027-4628 |
| 1 Mortgage interest received from payer(s)/borrower(s)* | $ 11,961.41 |
| 2 Outstanding mortgage principal as of 1/1/2018 | $ 248,006.48 |
| 3 Mortgage origination date | 04/29/2011 |
| 4 Refund of overpaid interest | $ 0.00 |
| 5 Mortgage insurance premiums | $ 0.00 |
| 6 Points paid on purchase of principal residence | $ 0.00 |
| 7 ☐ If address of property securing mortgage is the same as PAYER'S/BORROWER'S address, the box is checked, or the address or description is entered in box 8. | |
| 8 Address or description of property securing mortgage (see instructions) | 1986 SUNNYSIDE DRIVE BRENTWOOD, TN 37027-5404 |
| 9 Number of properties securing the mortgage | |
| 10 Other | |
| Account number (see instructions) | 231099135 |

The information in boxes 1 through 9 is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if the IRS determines that an underpayment of tax results because you overstated a deduction for this mortgage interest or for these points, reported in boxes 1 and 6; or because you didn't report the refund of interest (box 4); or because you claimed a non-deductible item.

Form 1098 (Keep for your records) irs.gov/Form1098 Department of the Treasury - Internal Revenue Service

Out-of-state banks for first and second mortgages

Story Abernathy & Campbell
PLLP | AN ASSOCIATION OF ATTORNEYS

Virginia Lee Story*
virginia@tnlaw.org

Joanie L. Abernathy
joanie@tnlaw.org

Neil Campbell*
neil@tnlaw.org

Kathryn L. Yarbrough
kyarbrough@tnlaw.org

Of Counsel:
James E. Story,*
Attorney at Law

Marissa L. Walters
Paralegal/Associate Attorney
marissa@tnlaw.org

HISTORIC DOWNTOWN
FRANKLIN, TENNESSEE
136 Fourth Avenue South
Franklin, TN 37064

OFFICE (615) 790-1778
FAX (615) 790-7468

*Licensed in Kentucky

September 16, 2019

***Via Email***
Mr. Jeffrey Fenton
**Email**: Jeff@meticulous.tech

***Via First Class Mail***
Ms. Marsha Fenton
[redacted]

**Re:** ***Fawn [redacted] Fenton vs. Jeffrey Ryan Fenton***
***Williamson County Chancery Court No. 48419B***

Dear Mr. Fenton:

My client was at the house over the weekend and has indicated that you left the house in a mess despite you having known since August 1, 2019 that the property would be auctioned. The costs for cleaning out the house and moving the items that you have tagged per the Court Order to storage will be in excess of $2,000. Please send a check payable to Fawn Fenton noted for moving and clean up to my office address. I will provide you with each invoice so you have an accounting of actual costs.

If I do not receive a check from you in the amount of $2,000 by **Friday, September 20, 2019**, we will have to sell the remaining items in the house and then dispose of the items that cannot be sold. Any proceeds from items sold will be deposited into the Clerk's office for distribution after payment of the costs.

As for the items you have tagged and for which you will send the $2,000 advance by **Friday, September 20, 2019** for the movers and clean up, please make the arrangements for a storage unit. This will need to be done by **Thursday, September 26, 2019**. Send me the name of the storage location and unit number with verification that the amount has been paid in advance so that when the movers arrive there are no snags.

Finally, we did not locate any guns in the house. Please advise where they are located with the contact information or whether you have taken them with you to Michigan. If you have any guns in your possession, please provide an itemized list of all types, manufacturers, and models.

Sincerely,

Virginia Lee Story
Attorney at Law

cc: Ms. Fawn Fenton

Story Abernathy & Campbell
PLLP | AN ASSOCIATION OF ATTORNEYS

Virginia Lee Story
Joanie L. Abernathy
Neil Campbell
Kathryn L. Yarbrough
Of Counsel
James E. Story, Attorney at Law
Marissa L. Walters

HISTORIC DOWNTOWN FRANKLIN, TENNESSEE
130 Fourth Avenue South
Franklin, TN 37064
OFFICE (615) 790-1778
FAX (615) 790-7468

September 26, 2019

***Via First Class Mail and E-Mail***

Mr. Jeffrey Fenton
[redacted]
Jeff@meticulous.tech

**Re:** ***Fawn*** [redacted] ***Fenton vs. Jeffrey Ryan Fenton***
***Williamson County Chancery Court No. 48419B***

Dear Mr. Fenton:

To follow up on correspondence sent to you on September 16, 2019, we never received any information on a storage unit you would like to use to store the extensive list of items you wish to retain from the Sunnyside residence. Therefore, Ms. Fenton took it upon herself to obtain a quote from Fox Moving and Storing to have these items packed, moved and stored. **The quote is attached hereto.** As you can see, the cost for packing only your personal items (i.e. remaining clothing, photos, etc.) is $639.00. The cost for moving the larger items and your personal items is $2,895.00. This would include moving the items to Fox's storage facility in Nashville. The cost to store these items in their storage facility would be approximately $495.00 per month. Finally, to have all of these items packed and moved to Michigan, the cost would be over $6,000.00.

At this point, it is our position that moving the items to Michigan is not financially responsible but that is up to you if you want to use any proceeds you received to have your items shipped. It is our position and that of Mr. Anderson's that the entire value of the remaining contents of the home is only approximately $3,000.00, therefore the cost to move and store these items far outweighs their worth. However, if you would like for the items to be packed and stored in the Fox storage facility in Nashville then you will need to send a check to my office in the amount of $3,534.00 no later than next Wednesday, October 2, 2019, made payable to Fawn Fenton and she will schedule the movers and the storage facility for one month until you decide if you want to have the items moved to Michigan. The only other option is to have the remaining property sold and any proceeds will be placed in the Clerk & Masters office for distribution at a later date. We will go ahead and file a Motion with the Court to sell or otherwise get rid of all remaining items in the home in the event that you do not agree to pay the cost for packing, moving and storing the items that you wish to retain.

Finally, you still have not disclosed where all of your guns are located. Please advise where they are located with the contact information or whether you have taken them with you to Michigan. If you have any guns in your possession, please provide an itemized list of all guns that you removed, manufacturers, and models.

I thank you in advance for your prompt response to these time sensitive matters.

Sincerely,

Virginia Lee Story
Attorney at Law

Enclosure
cc: Ms. Fawn Fenton

# Order of Protection

☐ Amended Order

☐ Petitioner is under 18

Case # (the clerk fills this in): 48419 B

WILLIAMSON COUNTY CLERK & MASTER

2019 JUN 20 AM 8:41

FILED FOR ENTRY 10/3/19

In the Chancery ____________ Court of Williamson ________ County, TN

**Petitioner** *(person needing protection)*

| FAWN | [redacted] | FENTON |
|---|---|---|
| *first* | *middle* | *last* |

**Petitioner's Children under 18 Protected by this Order:** N/A

Name, Age, Relationship to Respondent — Name, Age, Relationship to Respondent

1. ____________ 3. ____________

2. ____________ 4. ____________

**Respondent's Information** *(person you want to be protected from):*

| JEFFREY | RYAN | FENTON | [redacted] |
|---|---|---|---|
| *first* | *middle* | *last* | *date of birth (MM/DD/YYYY)* |

| 1986 SUNNY SIDE DR | BRENTWOOD | TN | 37027 |
|---|---|---|---|
| *street address* | *city* | *state* | *zip* |

[redacted]

Respondent's Employer: UNEMPLOYED ____________

*Employer's name* — *Employer's phone #*

**Describe Respondent:**

| Sex | Race | Hair | Eyes | Height – Weight – SSN – Other | |
|---|---|---|---|---|---|
| ☒ Male<br>☐ Female | ☒ White<br>☐ Asian<br>☐ Black<br>☐ Hispanic<br>☐ Other: ______ | ☒ Black<br>☒ Grey<br>☐ Blond<br>☐ Bald<br>☐ Brown<br>☐ Other: ______ | ☐ Brown<br>☐ Hazel<br>☒ Blue<br>☐ Green<br>☐ Grey<br>☐ Other: ______ | Height: 5'9" | Weight: 240 |
| | | | | Social Sec. # (If known) | (Provided to Clerk's office if known) **Do not list it here.** XXXXX |
| | | | | Scars/Special Features | |
| | | | | Phone Number | [redacted] (Cell)<br>[redacted] (Home) |

**Petitioner's relationship to the Respondent** *(Check all that apply):*

- ☒ We are married or used to be married.
- ☒ We live together or used to live together.
- ☐ We have a child together.
- ☐ We are dating, used to date, or have had sex.
- ☐ We are relatives, related by adoption, or are/were in-laws. *(Specify):* ____________
- ☐ We are the children of a person whose relationship is described above *(Specify):* ____________
- ☒ The Respondent has stalked me.
- ☐ The Respondent has sexually assaulted me.
- ☒ Other: Harassment via text messages, emails, phone voicemail

This is a Court Order.

04/18/18
Form #OP2018-7



A4-8

**Findings About Abuse:**

*Warning!*
☐ Weapon involved
☒ Has or owns a weapon



1. The Court has jurisdiction over the parties and this case. The Respondent was given reasonable notice of the hearing and an opportunity to be heard.

2. Based on the information in the *Petition*, and the hearing held, the court finds that the Respondent:
☑ Did the things listed in the Petition and the court adopts these as facts and incorporates them by reference, AND/OR
☐ Did the following things:

________________________________________

________________________________________

________________________________________

AND there is credible evidence that Respondent is a threat to the safety of the Petitioner and ☐ Petitioner's Minor Children.

3. Respondent has specifically: *(check all that apply):*
☑ Abused/Threatened to Abuse
☐ Sexually Assaulted
☑ Stalked
the ☑ Petitioner AND ☐ Petitioner's Minor Children.

**Findings about the minor children of the parties:** *(check one):*

☐ The Court has jurisdiction over custody for the child(ren) of the parties because his/her/their home state is Tennessee.

☐ The Court has temporary emergency jurisdiction over custody for the children of the parties listed above because they are in Tennessee now, and they (or the Petitioner) were at risk. (If another state has jurisdiction over child custody under UCCJEA, this Court's temporary jurisdiction will end on ______ or when the other state's Court makes an order.)

**Findings About Firearms:**

**The Respondent** *(check all that apply):*

☑ Has no firearms

☑ Has firearms that he/~~she~~ must give to someone else who is allowed to have them (TCA § 36-3-625).

☐ Has firearms that are registered under the National Firearms Act and must be either transferred to a responsible third party, or locked in a safe or other secure container to which the Respondent does not have access. A state or federal agency must give its approval before the firearms are turned in.

☐ Has a federal firearms license (FFL) or is a responsible party under an FFL, and has firearms under that FFL that qualify as business inventory, and *(check one):*

> ☐ There is **no** responsible party listed on the FFL other than the Respondent in this case. The Respondent must turn in or transfer all firearms inventory under his/her control to a separate FFL holder who is legally allowed to have firearms.
> ☐ There **is** another responsible party listed on the FFL other than the Respondent in this case. This Order does not require the Respondent to turn in or transfer the firearms inventory.

**Other Findings:**

☐ Petitioner is a party to a lease or rental agreement and that continuing to reside in the rented or leased premises may jeopardize the life, health and safety of the petitioner or the petitioner's children.

☐ Petitioner has proven by a preponderance of the evidence that petitioner and any minor children in the petitioner's care are the primary users of the wireless telephone number(s): ____________________ and the Court should enter a separate order, pursuant to TCA §36-3-627, directing ____________________, a wireless telephone service provider, to transfer the billing responsibility for and rights to the wireless telephone number or numbers of petitioner since petitioner is not the account holder.

***The Court orders Respondent to:***

☑ Obey all orders on this form.
☑ Not abuse or threaten to abuse Petitioner or Petitioner's minor children.
☑ Not stalk or threaten to stalk Petitioner or Petitioner's minor children.

**Other Orders to the Respondent** *(Check all that apply):*

☑ **No Contact**
You must not come about the Petitioner (including coming by or to a shared residence) for any purpose and must not contact ☑ Petitioner AND ☐ Petitioner's children, either directly or indirectly, by phone, email, messages, text messages, mail or any other type of communication or contact.

☑ **Stay Away**
You must stay away from the ☐ Petitioner's home ☐ Petitioner's workplace ☐ Children's home and workplace.

☑ **Personal Conduct –**
☑ You must not cause intentional damage to the Petitioner's (or Petitioner's children's) property or interfere with the utilities at their home(s).

☑ You must not hurt or threaten to hurt any animals owned or kept by the Petitioner/Petitioner's children.

☐ **Counseling/Substance Abuse Programs**
You must go to the following program(s) and give the court proof that you have gone, participated and have made progress in this program *(contact information)*: ____________________

☐ **Parenting Time**
☐ The Petitioner will have custody of the minor child(ren) in this case.
☐ You will have parenting time with your minor child(ren) at the following times:
____________________
____________________

☐ Your parenting time will be supervised by: ____________ at: ____________.

☐ Exchange of the children will take place at and will happen as follows:
____________________
____________________

☐ The person in charge of getting the minor children to and from visitation will be:

☐ Mom ☐ Dad ☐ Other *(name)*: ____________________ **to** the visits
☐ Mom ☐ Dad ☐ Other *(name)*: ____________________ **from** the visits.

This is a Court Order.

☐ **Child Support** $ ____ each ______________ (month/week, etc., beginning ______________ (date).

- ☐ This is the guideline amount. See the attached DHS *Child Support Worksheet.*
- ☐ This is **not** the guideline amount and is a deviation from the guideline amount. The Court has considered the best interest of each child in this case, and finds that guideline support would be unjust or inappropriate in this case.
- ☐ Other: ____________________________________________________________

**Payment method:**

- ☐ Pay the Petitioner directly by the __________ day of each month. (the court finds that this does not endanger the Petitioner or the Petitioner's minor children and it is not a violation to send payment only with no notes or comments to the Petitioner)
- ☐ Take payment to this Court Clerk's Office. You will also have to pay a clerk fee of _____% on each payment. The additional clerk fee amount is $__________ each month.
- ☐ Support payments will be ☐ withheld from your paycheck (Contact the Central Collection and Disbursement Unit at 800-838-6911 by ______________ or ☐ shall be sent directly to Central Collection Disbursement Unit at Central Child Support Receipting Unit, P. O. Box 305200, Nashville, TN 37229.

☐ **Petitioner Support** $ _____/ each month.

**Payment method:**

- ☐ Pay the Petitioner directly by the __________ day of each month. (The court finds that this does not endanger the Petitioner or the Petitioner's minor children and it is not a violation to send payment only with no notes or comments to the Petitioner)
- ☐ Take payment to this Court Clerk's Office. You will also have to pay a clerk fee of _____% on each payment. The additional clerk fee amount is $__________ each month.
- ☐ Payment will be
  - ☐ withheld from your paycheck (Contact the Central Collection and Disbursement Unit at 800-838-6911 by ________________(date)
  - ☐ shall be sent directly to Central Collection Disbursement Unit at Central Child Support Receipting Unit, P. O. Box 305200, Nashville, TN 37229.

☐ **Control of all Types of Property**

☐ Petitioner only ☐ and/or Petitioner's children are the only ones who can live in the property at:

____________________________________________________________

*(address)*

☐ You must move out immediately from *(address):* ______________________________

☐ You must provide suitable alternate housing for the Petitioner by *(date):* ______________, 20____.

☐ You must pay to the petitioner all costs, expenses and fees pertaining to the petitioner's breach of a lease or rental agreement for residential property in the amount of ________________________.

☐ Only the Petitioner can use, control, and possess the following property, things, and animals:

____________________________________________________________

☐ If the parties shared a residence, Respondent can obtain his/her clothing and personal effects such as medicine as follows: (List items to be obtained and process as approved by local law enforcement personnel):

____________________________________________________________

____________________________________________________________

☑ **Orders to the Respondent about Firearms:**

- You must not have, or attempt to have, receive or attempt to receive or in any other way get any firearm while this or any later protective order is in effect.

This is a Court Order.

- You must transfer all firearms in your possession within 48 hours to any person who is legally allowed to have them.
- You must fill out and file a *Firearms Declaration* within 1 business day of transferring your firearms. You may take more than 1 business day to file this form **only** if the Court gave you a later deadline. (You can get the *Firearms Declaration* form from the Court Clerk's Office or at *www.tncourts.gov.)*
- If a state or federal agency approves it, your weapons that are registered under the National Firearms Act must be either transferred to a responsible third party, or placed in a locked safe or other secure container to which you do not have access.
- If your *Firearms Declaration* shows that you have a federal firearms license (FFL), and that you are the **only** responsible party listed on that FFL, you must transfer all firearms inventory under your control to a separate FFL holder or another responsible party.

☑ **Costs, fees and litigation taxes**
You must pay all court costs (Petitioner's costs and your costs), lawyer fees, and other fees or taxes related to this case.

☐ **Other Orders:**

☐ Petitioner and any minor children in the petitioner's care are the primary users of the wireless telephone number(s): ____________________and a separate order shall be entered per to TCA §36-3-627, directing ____________________, a wireless telephone service provider, to transfer the billing responsibility for and rights to the wireless telephone number or numbers of petitioner since petitioner is not the account holder.

☐ ______________________________________________________________

______________________________________________________________

**THIS ORDER TAKES EFFECT IMMEDIATELY UPON SIGNING.**

**This Order starts today,** *(date)*: 10/21/19. **This Order ends** *(date)*: 10/21/20.
☑ In 1 year. (The Petitioner may ask to extend the Order) ☐ In 5 years (1st violation of current PO)
☐ In 10 years (2nd or more violation of current PO)

**Date:** 10/21/19 **Time:** 10:05 ☐ a.m. ☐ p.m. [signature] Signature of Judge or Chancellor

**Certificate of Service – Respondent** *(check one)*:

☐ Signed by Respondent: ____________________
☐ Signed by Respondent's counsel: ____________________
☐ Hand delivered to Respondent.
☑ Hand delivered to Respondent's counsel.
☐ U.S. mail, prepaid postage to Respondent's last known address
☐ U.S. mail, prepaid postage to Respondent's counsel's last known address
☐ Reasonable attempts to find the Respondent's address were made, but there is no known address at this time.

Signature of Server: [signature]

Server's title *(check one)*: ☐ Clerk ☑ Deputy Clerk
☐ Authorized Officer ☐ Attorney

Service was made on:
Date: 10-21-19
Time: 10:45 ☑ a.m. ☐ p.m.

**Certificate of Service – Petitioner** *(check one)*:

☐ Signed by Petitioner: ____________________
☐ Signed by Petitioner's counsel: ____________________
☐ Hand delivered to Petitioner.
☐ Hand delivered to Petitioner's counsel.
☑ U.S. mail, prepaid postage to Petitioner's last known address.
☐ U.S. mail, prepaid postage to Petitioner's counsel's last known address.
☐ Reasonable attempts to find the Petitioner's address were made, but there is no known address at this time.

Signature of Server: [signature]

Server's title *(check one)*: ☐ Clerk ☑ Deputy Clerk
☐ Authorized Officer ☐ Attorney

Service was made on:
Date: 10-21-19
Time: 10:45 ☑ a.m ☐ p.m.

☑ **The Clerk certifies a copy of this Order was forwarded to 911, local law enforcement, and any court in which the respondent and petitioner are parties to an action.**

This is a Court Order.


https://rico.jefffenton.com/evidence/1-23-cv-01097_fenton-vs-story-first-amended-complaint.pdf Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

## Warnings to Respondent:

**This Order is valid everywhere in the U.S.**

If you travel to another state, territory or tribal land, with the intention of disobeying this Order, you can be charged with a federal crime. The courts of any U.S. state, the District of Columbia, all tribal lands, and U.S. territories, must enforce this Order, even if the Order is not registered. (18 U.S.C. §§ 2262, 2265)

**No Guns, Firearms**

You must not have any firearm while this Order is in effect. You cannot own, possess, have, buy or try to buy, receive or try to receive, or in any other way get any firearm or ammunition.

You must legally transfer, sell, or turn in any firearm that you have within 48 hours. Transfers are only legal if the person you transfer to is allowed to have firearms. You may get your firearms back when the Order of protection ends.

**You will face separate charges if you disobey this Order**

You may face separate, Class A misdemeanor charges if:

- You do not transfer your firearm(s) legally by the deadline
- You have a firearm while the Order is in effect
- The penalty for each violation is up to 11 months and 29 days in jail and a fine of up to $2,500. There may be other charges if domestic violence is involved. If you disobey this Order on purpose, you may face up to 10 days in jail and a $50 fine for each violation. You may also have to pay a civil penalty of up to $50 for each violation.
- If you do not transfer, sell, or turn in any firearm you may face Class A misdemeanor charges and you may also be charged with a federal crime.
- If you hurt or try to hurt anyone while this Order, probation or diversion is in effect, you may face charges for aggravated assault, a Class C felony. (TCA §§ 39-13-102(c), 36-3-610)

**Only the Court can change this Order:**

Neither you nor the Petitioner can agree to change this Order. Even if the Petitioner attempts to contact you or agrees to have contact with you, you must obey this Order. If you do not, you can be jailed for up to 11 months and 29 days and fined up to $2,500.

**To the Petitioner:**

You may ask any government agency or utility provider to keep private any information that could be used to locate you, such as addresses, phone numbers, and/or social security number. To do so, give a copy of this Protective Order to the Records Department of the agency or utility.*(TCA § 10-7-504(a)(15-16))*


Clerk & Master
PO Box 1666
Franklin, TN 37065
NASHVILLE
TN 370
UNITED STATES POSTAGE
PITNEY BOWES
$ 000.65
02 1P
0000915573
OCT 23 2019
MAILED FROM ZIP CODE 37064
Jeffrey Ryan Fenton
17195 Silver Parkway #150
Fenton, MI 48430
48430-342695